**No. 24-12217-FF**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**STATE OF FLORIDA, ET AL.,**

*Plaintiffs-Appellants,*

**V.**

**CENTERS FOR MEDICARE AND MEDICAID SERVICES, ET AL.,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:24-cv-317-WFJ-AAS

---

### OPENING BRIEF

---

Ashley Moody
  *Attorney General*
Henry C. Whitaker
  *Solicitor General*
Natalie Christmas
  *Counselor to the Attorney General*
  *Counsel of Record*

FLORIDA OFFICE OF THE ATTORNEY
  GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
Natalie.Christmas@myfloridalegal.com

*Counsel for State of Florida*

R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
202-955-0620
jkelson@boydengray.com

Andrew T. Sheeran
  *General Counsel*
FLORIDA AGENCY FOR HEALTH
  CARE ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
Andrew.Sheeran@ahca.myflorida.com

*Counsel for Florida Agency for
Health Care Administration*

Docket No. 24-12217-FF

*State of Florida v. Centers for Medicare and Medicaid Services*

## **CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiffs-Appellants provide this Certificate of Interested Persons and Corporate Disclosure Statement. To the best of Plaintiffs-Appellants' knowledge, the following persons and entities may have an interest in the outcome of this case:

1. Bagenstos, Samuel R.

2. Becerra, Xavier

3. Boynton, Brian M.

4. Breckenhauer, Eric B.

5. Brooks-LaSure, Chiquita

6. Centers for Medicare and Medicaid Services

7. Christmas, Natalie

8. Department of Health and Human Services

9. Dos Santos, Joshua

10. Florida, State of

11. Florida Agency for Health Care Administration

12. Goldberg, Lindsay S.

13. Hoffman, Janice L.

Docket No. 24-12217-FF
*State of Florida v. Centers for Medicare and Medicaid Services*

14.   Jung, William F.

15.   Kelson, Jared M.

16.   Lyons, Susan Maxson

17.   McCotter, R. Trent

18.   McMahon, Madeline

19.   Moody, Ashley

20.   Rodriguez, Paul R.

21.   Ruppalt, Laura B.

22.   Salzman, Joshua Marc

23.   Sansone, Amanda Arnold

24.   Sheeran, Andrew T.

25.   Whitaker, Henry Charles

Pursuant to Eleventh Circuit Rule 26.1-3(b), Plaintiffs-Appellants are unaware of any publicly traded company or corporation that has an interest in the outcome of this appeal.

Dated:  September 18, 2024          /s/ Jared M. Kelson

                                    Jared M. Kelson

                                    *Counsel for Florida Agency for
                                    Health Care Administration*

C-2 of 2

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellants respectfully request oral argument. This case involves complex and recurring issues of preclusion and administrative law. Oral  argument would substantially aid the Court in its resolution of the case.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................... i

TABLE OF CONTENTS ................................................................ ii

TABLE OF CITATIONS ............................................................... iii

STATEMENT OF JURISDICTION ................................................. 1

INTRODUCTION ...................................................................... 2

STATEMENT OF THE ISSUES ..................................................... 7

STATEMENT OF THE CASE ....................................................... 7

    I.   Background ...................................................................... 7

        A.   Children's Health Insurance Program ...................... 7

        B.   Continuous Eligibility ............................................ 9

        C.   Florida CHIP ..................................................... 11

        D.   State Health Official Letter and Frequently Asked Questions... 13

    II.   Procedural History ........................................................ 15

SUMMARY OF THE ARGUMENT .............................................. 19

ARGUMENT ......................................................................... 21

    I.   The *Thunder Basin* Framework for Implied Preclusion ................... 23

    II.   Section 1316(a) Does Not Apply to Florida's Claims ................... 25

    III.   The *Thunder Basin* Factors Confirm the District Court's Jurisdiction ............................................................... 30

        A.   Implied Preclusion Could Foreclose All Meaningful Review of Florida's Claims ......................................... 30

        B.   Florida's Claims Are Wholly Collateral to Section 1316(a) ...... 36

        C.   Florida's Claims Are Outside CMS's Expertise ...................... 40

CONCLUSION ....................................................................... 43

CERTIFICATE OF COMPLIANCE ............................................. 45

CERTIFICATE OF SERVICE .................................................... 46

## <u>TABLE OF CITATIONS</u>

**CASES**                                                                        **Page(s)**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967)..................................................................... 41

*Abbott v. Perez*,
    585 U.S. 579 (2018)..................................................................... 31

*Alabama v. CMS*,
    780 F. Supp. 2d 1219 (M.D. Ala. 2011) ................................... 22

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993).................................................. 18

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023)....................................21, 22, 24, 29, 30, 34, 36, 42, 43

*Baptist Mem'l Hosp.-Golden Triangle, Inc. v. Azar*,
    No. 3:17-cv-491, 2018 WL 3118703 (S.D. Miss. June 25, 2018)............... 22

*Club Madonna, Inc. v. City of Miami Beach*,
    924 F.3d 1370 (11th Cir. 2019) ............................................... 19

*Cochran v. SEC*,
    20 F.4th 194 (5th Cir. 2021)..................................21, 24, 26, 27, 29–31, 37

*Doe v. Fed. Aviation Admin.*,
    432 F.3d 1259 (11th Cir. 2005) .........................................................38–40

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ............................................. 5, 22, 24, 29, 30, 36, 37, 42

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023)............................................................24, 29

*Florida v. HHS*,
    No. 8:24-cv-1080, 2024 WL 3537510 (M.D. Fla. July 3, 2024) ...........22, 40

iii

*Florida v. Nelson*,
 576 F. Supp. 3d 1017 (M.D. Fla. 2021) ...............................................31, 34

*\*Free Enter. Fund v. PCAOB*,
 561 U.S. 477 (2010) .................................. 5–7, 21, 22, 24, 30, 33, 36, 40–43

*Heckler v. Ringer*,
 466 U.S. 602 (1984).................................................................................. 38

*Loper Bright Enters. v. Raimondo*,
 144 S. Ct. 2244 (2024) .........................................................................39, 41

*Maine v. Taylor*,
 477 U.S. 131 (1986).................................................................................. 31

*Martin v. Shalala*,
 63 F.3d 497 (7th Cir. 1995)....................................................................... 40

*Mata v. Lynch*,
 576 U.S. 143 (2015).................................................................................. 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
 463 U.S. 29 (1983) .................................................................................... 17

*New York v. HHS*,
 No. 1:07-cv-8621, 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008).............. 42

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
 715 F.3d 1268 (11th Cir. 2013) ................................................................ 32

*Salinas v. U.S. R.R. Ret. Bd.*,
 592 U.S. 188 (2021).................................................................................. 35

*Stangler v. Shalala*,
 No. 2:94-cv-4221, 1994 WL 764104 (W.D. Mo. Dec. 28, 1994)..........22, 26

*State Dep't of Pub. Welfare of State of Tex. v. Califano*,
 556 F.2d 326 (5th Cir. 1977)..................................................................... 28

*State of Ill., Dep't of Pub. Aid v. Schweiker*,
 707 F.2d 273 (7th Cir. 1983)..................................................................... 28

*Tennessee v. Dep't of Educ.,
    104 F.4th 577 (6th Cir. 2024) ................................. 24, 26, 27, 29, 31, 34, 35

Texas v. Becerra,
    577 F. Supp. 3d 527 (N.D. Tex. 2021) .................................................... 31

Texas v. Brooks-LaSure,
    680 F. Supp. 3d 791 (2023) ................................................... 22, 31, 40, 42

Texas v. United States,
    787 F.3d 733 (5th Cir. 2015) ............................................................ 32, 34

*Thunder Basin Coal Co. v. Reich,
    510 U.S. 200 (1994) ................................................... 2, 6, 7, 20, 23, 24, 34

United States v. Nixon,
    418 U.S. 683 (1974) ........................................................................... 15

West Virginia v. Thompson,
    475 F.3d 204 (4th Cir. 2007) ................................................................ 32

West Virginia v. U.S. Dep't of the Treasury,
    59 F.4th 1124 (11th Cir. 2023) ............................................................. 31

## STATUTES

5 U.S.C. § 701 ....................................................................................... 40

5 U.S.C. § 702 ....................................................................................... 40

5 U.S.C. § 703 ................................................................................... 37, 40

5 U.S.C. § 704 ....................................................................................... 40

5 U.S.C. § 705 ....................................................................................... 40

5 U.S.C. § 706 ................................................................... 5, 15, 37, 41

28 U.S.C. § 1331 ........................................................................... 21, 37, 40

28 U.S.C. § 2201 ............................................................................... 37

42 U.S.C. § 1316 ............................................. 2, 5, 6, 19, 20, 25–28, 33, 37

42 U.S.C. § 1396a (2022) ................................................................. 9

42 U.S.C. § 1396a ................................................................. 10, 16

42 U.S.C. § 1397aa *et seq.* ........................................................ 2, 3, 8

42 U.S.C. § 1397bb ........................................................ 3, 8, 15, 16

42 U.S.C. § 1397cc ..................................................... 3, 8, 11, 15, 18

42 U.S.C. § 1397ff ........................................................ 3, 9, 26, 27

42 U.S.C. § 1397gg ........................................................... 10, 25

42 U.S.C. § 1397hh ................................................................ 16

42 U.S.C. § 1397mm .............................................................. 16

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................... 4, 10, 11

Federal Mine Safety and Health Amendments Act of 1977,
  Pub. L. No. 95-164, 91 Stat. 1290 ........................................... 23

Fla. Stat. § 409.812 ............................................................... 12

Fla. Stat. § 409.813 ............................................................... 12

Fla. Stat. § 409.8132 ........................................................... 13, 30

Fla. Stat. § 624.91 ............................................................. 13, 30

Omnibus Budget Reconciliation Act of 1989,
  Pub. L. No. 101-239, 103 Stat. 2106....................................... 11

**OTHER AUTHORITIES**

42 C.F.R. § 435.926 ............................................................. 9, 14

42 C.F.R. § 457.10 ................................................................ 16

vi

42 C.F.R § 457.60 ................................................................. 16

42 C.F.R. § 457.200 ............................................................. 34

42 C.F.R. § 457.204 ................................................. 9, 28, 34, 37

42 C.F.R. § 457.206 ........................................................ 28, 37

42 C.F.R. § 457.208 ........................................................ 28, 37

42 C.F.R. § 457.300 ............................................................. 16

42 C.F.R. § 457.320 ............................................................... 8

42 C.F.R. § 457.342 ................................. 3, 4, 8, 10, 14, 15

42 C.F.R. pt. 457, subpt. E ................................................. 8

42 C.F.R. § 457.510 ......................................................... 8, 17

42 C.F.R. § 457.525(b) ....................................................... 16

42 C.F.R. § 457.570 ......................................................... 8, 17

CMS, *Mandatory Continuous Eligibility for Children in Medicaid and
CHIP: Frequently Asked Questions* (Oct. 27, 2023) ......................................... 2

CMS, SHO #23-004, *Section 5112 Requirement for all States to Provide
Continuous Eligibility to Children in Medicaid and CHIP Under the
Consolidated Appropriations Act, 2023* (Sept. 29, 2023) ................................ 13

Fla. Const. art. III, § 19(a) ............................................................. 12

Fla. Const. art. VII, § 1(d) ............................................................ 13

Stabilize Medicaid and CHIP Coverage Act of 2021,
S. 646, 117th Cong. (2021) ...................................................... 17

Stabilize Medicaid and CHIP Coverage Act,
H.R. 1738, 117th Cong. (2021) ................................................. 17

vii

Staff of Florida H.R. Health Care Servs. Comm.,
  *Review of the Implementation of the Florida KidCare Act* (Sept. 1999) ........12, 13

State of Florida, *Florida KidCare Program* (Mar. 11, 2021) ............................ 12

## <u>STATEMENT OF JURISDICTION</u>

The district court dismissed this case for lack of jurisdiction on May 31, 2024. Florida timely appealed on July 8, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## **INTRODUCTION**

On October 27, 2023, the Centers for Medicaid and Medicare Services ("CMS") issued a document mislabeled "Frequently Asked Questions" that fundamentally transformed the Children's Health Insurance Program ("CHIP") into an entitlement, imposed new obligations on States, and purported to "end" a conflicting agency regulation without notice-and-comment. Doc.1-4, at 1 (FAQs).[1] The FAQs are clearly unlawful. But when the State of Florida and its Agency for Health Care Administration (collectively, "Florida") sued under the Administrative Procedure Act ("APA"), the district court invoked the framework in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), concluded its jurisdiction was impliedly precluded by 42 U.S.C. § 1316(a), and dismissed the case.

CHIP is a cooperative federal-state program under Title XXI of the Social Security Act that provides subsidized health insurance for children in low-income families who do not qualify for free coverage under Medicaid. 42 U.S.C. § 1397aa *et seq.* States develop and administer their own CHIP plans, and the

---

[1] *Mandatory Continuous Eligibility for Children in Medicaid and CHIP: Frequently Asked Questions* ("FAQs"), https://www.medicaid.gov/federal-policy-guidance/downloads/faq102723.pdf.

federal government provides funds to help defray the costs of programs that meet minimum requirements. *Id.* States must submit their CHIP plans and any subsequent amendments for CMS to determine if they "substantially comply" with those requirements as a condition of receiving federal funds. *Id.* § 1397ff.

Congress has been clear that nothing in Title XXI "shall be construed as providing an individual with an entitlement." *Id.* § 1397bb(b)(5). Title XXI thus allows States to require "premiums, deductibles, coinsurance, and other cost sharing." *Id.* § 1397cc(e)(1)(A). Florida has always collected monthly premiums as a condition of enrollment, currently ranging from $15 to $20 per family regardless of the number of children enrolled. Those premiums offset program costs, ensure Florida maintains a balanced budget as mandated by its state constitution, and preserve Florida CHIP as a bridge between Medicaid and private insurance.

Title XXI allows States to disenroll CHIP participants for nonpayment of premiums. *See id.* § 1397cc(e)(3)(C). CMS has promulgated regulations allowing disenrollment for the same reason, including during periods of "continuous eligibility." 42 C.F.R. § 457.342(b). *Eligibility* is the determination that someone qualifies to participate in CHIP—e.g., meets the State's income, residency, and age requirements—and States generally don't reconsider that determination

3

during "continuous eligibility" periods. *Enrollment* means the participant is not only eligible but has agreed to participate in CHIP and will pay any required enrollment costs and monthly premiums. Congress and CMS have consistently distinguished these terms for decades.

In the Consolidated Appropriations Act, 2023 ("2023 CAA"), Congress amended Title XXI to require that States provide CHIP participants with 12 months of "continuous eligibility." Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022). The 2023 CAA says nothing about enrollment or premiums. Nevertheless, the FAQs prohibit States from disenrolling CHIP participants for nonpayment of premiums during these continuous eligibility periods and purport to "end" the provision in 42 C.F.R. § 457.342(b) that expressly allows such disenrollment. Doc.1-4, at 1 (FAQs). The FAQs thus attempt to transform CHIP into an entitlement program where participants cannot be disenrolled during a 12-month period regardless of whether they pay required premiums.

On February 1, 2024, Florida sued CMS[2] in the United States District Court for the Middle District of Florida. The complaint claimed the FAQs are

---

[2] Plaintiffs-Appellants sued CMS, the CMS Administrator, HHS, and the HHS Secretary (collectively, "CMS").

contrary to law, in excess of authority, arbitrary and capricious, and failed to comply with the procedural requirements of the APA. *See* 5 U.S.C. § 706. Florida simultaneously moved for a preliminary injunction relief, arguing that it would suffer irreparable sovereign and monetary harms from the FAQs.

The district court never reached any of these issues. Instead, it agreed with CMS that section 1316(a) impliedly precludes district-court jurisdiction under *Thunder Basin*. The district court reasoned that section 1316(a) "provides for administrative review of state CHIP plans," and that Florida's claims are "of the type congress intended to be reviewed" under that scheme. Doc.32, at 9–10 (Dist.Ct.Order).

The district court erred because a special statutory review scheme can impliedly preclude jurisdiction only when it "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within the statutory structure.'" *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489 (2010) (cleaned up) (quoting *Thunder Basin*, 510 U.S. at 207, 212). Courts first consider the relevant statute's "text, structure, and purpose." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). They also "presume that Congress does not intend to limit jurisdiction" where (1) "'preclusion could foreclose all meaningful judicial review,'" (2) "the suit is 'wholly collateral to a statute's

review provisions," and (3) "the claims are 'outside the agency's expertise'"—commonly referred to as the *Thunder Basin* factors. *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212–13).

The text of section 1316(a) makes clear that it applies only to "determination[s]" about whether an individual state CHIP plan or plan amendment "submitted … for approval" conforms to applicable federal requirements. 42 U.S.C. § 1316(a)(1). Florida is not challenging the disapproval of any state CHIP plan or plan amendment. The structure and purpose of section 1316(a) also demonstrate that Congress provided for administrative review of only a narrow subset of possible claims that do not include the APA issues in this case, including the scope of CMS's authority and procedural requirements for rulemaking. That is enough for the district court to exercise jurisdiction.

The *Thunder Basin* factors confirm that the claims in this case are not "the type Congress intended to be reviewed" under section 1316(a). *Thunder Basin*, 510 U.S. at 212. Implied preclusion of district-court jurisdiction "could foreclose all meaningful judicial review," *id.* at 212–13, because Florida might never receive a "determination" reviewable under section 1316(a), and future judicial review would not be able to remedy the harms Florida suffers in the meantime. Florida's claims are also "wholly collateral," *id.*, because they don't request the

6

review of any determination on a state CHIP plan or plan amendment, don't involve the type of claim regularly adjudicated by CMS in that context, and don't seek the kind of remedy that those proceedings routinely afford. And Florida's claims are "outside the agency's expertise," *id.*, because they involve straightforward "statutory questions" and "standard questions of administrative law, which the courts are at no disadvantage in answering," not "technical considerations of agency policy" or "fact-bound inquiries," *Free Enter. Fund*, 561 U.S. at 491 (cleaned up).

This Court should reverse.

## STATEMENT OF THE ISSUES

Whether 42 U.S.C. § 1316(a) impliedly precludes district court jurisdiction to review an agency rule—mislabeled "Frequently Asked Questions"—issued by the Centers for Medicare and Medicaid Services that imposes new obligations on States and purports to amend its regulations.

## STATEMENT OF THE CASE

### I.  BACKGROUND

### A.  CHILDREN'S HEALTH INSURANCE PROGRAM

CHIP is a cooperative federal-state program under Title XXI of the Social Security Act that provides subsidized health insurance for children in low-

income families who do not qualify for Medicaid. 42 U.S.C. § 1397aa *et seq.* States develop and administer their own CHIP plans, and the federal government provides funds to help defray the costs of programs that meet minimum requirements. *Id.* States have considerable flexibility to select the standards used "to determine the eligibility of targeted low-income children," which often include age, family income, and residency requirements. *Id.* § 1397bb(b)(1); 42 C.F.R. § 457.320. Once a child is determined to be *eligible*, the child may then *enroll* and obtain insurance coverage.

Congress has been clear that CHIP is not an entitlement program. 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan."). States may require "premiums, deductibles, coinsurance, and other cost sharing" as a condition of enrollment. *Id.* § 1397cc(e)(1)(A); 42 C.F.R. § 457.510. They can also disenroll CHIP participants for nonpayment of premiums after sufficient notice and a grace period for late payment. *See* 42 U.S.C. § 1397cc(e)(3)(C); 42 C.F.R. §§ 457.342(b), 457.570; *see also id.* pt. 457, subpt. E.

CMS administers CHIP on behalf of the federal government. To receive federal funds, States must submit their CHIP plans and any amendments for

8

CMS to determine if they "substantially comply" with federal requirements. 42 U.S.C. § 1397ff. If CMS subsequently concludes that a State is in "substantial noncompliance" with federal requirements, CMS must withhold federal funds after providing notice and a reasonable opportunity for correction. *Id.* § 1397ff(d)(2); *see* 42 C.F.R. § 457.204.

## B.    CONTINUOUS ELIGIBILITY

Prior to 2024, the Social Security Act gave States the *option* to provide children up to twelve months of "continuous eligibility" for Medicaid. 42 U.S.C. § 1396a(e)(12) (2022). A child "determined to be eligible for benefits" remained "eligible for those benefits" during the continuous eligibility period, even if the child's circumstances changed in a way that would otherwise make the child ineligible—e.g., the child's family income increased above the eligibility threshold. *Id.*

CMS regulations specified five exceptions to Medicaid continuous eligibility: (1) "[t]he child attains the maximum age specified" by the State, (2) "[t]he child or child's representative requests a voluntary termination of eligibility," (3) "[t]he child ceases to be a resident of the State," (4) "eligibility was erroneously granted … because of agency error or fraud, abuse, or perjury," or (5) "[t]he child dies." 42 C.F.R. § 435.926(d).

9

States also had the *option* under CMS regulations to provide continuous eligibility to CHIP participants. *Id.* § 457.342(a). CMS incorporated the same five exceptions from Medicaid for CHIP continuous eligibility, and further provided that CHIP participants may "be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees." *Id.* § 457.342(b).

In the 2023 CAA, Congress amended the Social Security Act to *require* that "an individual who is under the age of 19 and who is determined to be eligible for benefits under a State [Medicaid] plan … shall remain eligible for such benefits" for twelve months following the eligibility determination, unless the individual "attains the age of 19" or "ceases to be a resident of such State." Pub. L. No. 117-328, § 5112(a), 136 Stat. at 5940 (amending 42 U.S.C. § 1396a(e)(12)). Congress made the same requirement applicable to CHIP by reference in 42 U.S.C. § 1397gg(e)(1), which lists Medicaid provisions that shall apply "in the same manner" to CHIP. *See* Pub. L. No. 117-328, § 5112(b), 136 Stat. at 5940 (amending 42 U.S.C. § 1397gg(e)(1)(K)). Both became effective

January 1, 2024. *Id.* § 5112(c), 136 Stat. at 5940. [3]

### C. FLORIDA CHIP

In 1990, pre-dating CHIP, Florida established one of the first state-sponsored programs to offer subsidized health insurance to children in low-income families who did not qualify for Medicaid. The program began as a demonstration project under the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6407, 103 Stat. 2106, 2266, which required States to charge premiums to participating families, *id.* § 6407(c)(2), 103 Stat. at 2266.

When Congress established CHIP in 1997, it grandfathered programs in three states—Florida, New York, and Pennsylvania—into the federal initiative because they already provided "comprehensive … coverage" to children. 42 U.S.C. § 1397cc(a)(3), (d). The grandfathering provisions allowed those States to both maintain and modify their existing programs within broad limits. *Id.* Florida subsequently transferred administration of its program to "Florida KidCare," an umbrella program created to oversee Florida Medicaid and CHIP.

---

[3] Congress also provided that "if the [CHIP participant] becomes eligible for full benefits under" Medicaid, the participant can be transferred to Medicaid for the "remaining duration of the 12-month continuous eligibility period." 42 U.S.C. § 1397gg(e)(1)(K).

Doc.1-2 (Florida KidCare Program).[4] Florida CHIP continued to require premium payments and provided a 6-month period of continuous eligibility for CHIP participants (later extended to 12 months). *Id.* at 83. Eligible participants could still be disenrolled for nonpayment of premiums. *Id.* at 97–98, 177–78.

Florida CHIP is a personal responsibility program intended to bridge the gap between families with low incomes who receive free health insurance through Medicaid and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. §§ 409.812–.813; Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), https://perma.cc/8NH4-MHBD. Cost-sharing is also vital to its ongoing operation and sustainability. Participating families must pay monthly premiums that currently range from $15 to $20 total, regardless of the number of children enrolled. Doc.1-2, at 22–23, 176–77 (Florida KidCare Program). The more than $30 million collected annually helps offset program costs and ensure that Florida meets the balanced budget requirement in its Constitution. *See* Fla. Const. art.

---

[4] State of Florida, *Florida KidCare Program* (Mar. 11, 2021), https://perma.cc/SJA7-GZQD.

12

III, § 19(a); *id.* art. VII, § 1(d); Staff of Florida H.R. Health Care Servs. Comm., *supra*, at 7–8; Doc.1-1, at ¶¶ 4, 6–7 (Noll Decl.).

Florida law requires the disenrollment of CHIP participants for failure to pay required premiums. Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9). Participants disenrolled during a period of continuous eligibility, however, may re-enroll for the next month upon payment of the necessary premium without a new eligibility determination.

### D. STATE HEALTH OFFICIAL LETTER AND FREQUENTLY ASKED QUESTIONS

On September 29, 2023, CMS issued a State Health Official ("SHO") Letter notifying States that they must provide 12 months of continuous eligibility for Medicaid and CHIP participants, during which they cannot terminate that eligibility except in certain circumstances. Doc.1-3, at 4–5 (SHO Letter).[5] The SHO Letter relied on the 2023 CAA amendments for the change. And although the 2023 CAA amendments explicitly provide for only two exceptions to continuous eligibility—reaching the age of 19 or ceasing to be a resident of the

---

[5] CMS, SHO #23-004, *Section 5112 Requirement for all States to Provide Continuous Eligibility to Children in Medicaid and CHIP Under the Consolidated Appropriations Act, 2023* (Sept. 29, 2023), https://www.medicaid.gov/federal-policy-guidance/downloads/sho23004.pdf.

State—the SHO Letter instructed States that they were "expected to" continue terminating Medicaid and CHIP eligibility during the continuous eligibility period for all five reasons specified in existing Medicaid regulations. *Id.*; 42 C.F.R. §§ 435.926(d), 457.342(b). The SHO Letter added that CMS was "still assessing how non-payment of premiums intersects with [continuous eligibility] under the CAA." Doc.1-3, at 4 n.14 (SHO Letter).

The next month, on October 27, 2023, CMS issued the FAQs. In response to the question "can states terminate CHIP coverage during a continuous eligibility (CE) period due to non-payment of premiums?" the FAQs answered, "No." Doc.1-4, at 1 (FAQs). The FAQs continued that "[t]here is not an exception to [continuous eligibility] for non-payment of premiums" under the 2023 CAA amendments, and so the "existing regulatory option at 42 CFR § 457.342(b) for states … to consider non-payment of premiums as an exception to [continuous eligibility] will end on December 31, 2023." *Id.*

The FAQs provided, however, that "States will continue to have the option to institute an enrollment fee in CHIP" and require its payment prior to enrollment, and that States may also "require payment of the first month's premium prior to enrolling a child." *Id.* But they added that CMS regulations "exclude" unpaid premiums from federal cost-sharing, *id.* at 2, so States must

14

absorb those costs. The FAQs were clear that nonconforming States "will need to" submit amendments to their CHIP plans. *Id.* at 1.

## II.  PROCEDURAL HISTORY

On February 1, 2024, Florida sued CMS because the FAQs violate the APA. 5 U.S.C. § 706(2)(A), (C), (D). Florida explained that the FAQs transform CHIP into an entitlement program where participants cannot be disenrolled regardless of whether they pay required premiums—it becomes pay for one month, get eleven months for free.

Florida argued that the FAQs are contrary to law because nothing in Title XXI "shall be construed as providing an individual with an entitlement." 42 U.S.C. § 1397bb(b)(5). Nor can the FAQs be reconciled with the provisions of Title XXI that allow "termination of coverage" for "failure to make a premium payment" if the State provides sufficient notice and a grace period for late payment. *Id.* § 1397cc(e)(3)(C). And the FAQs violate CMS regulations, which expressly permit States to terminate coverage "during the continuous eligibility period for failure to pay required premiums." 42 C.F.R. § 457.342(b); *see, e.g.*, *United States v. Nixon*, 418 U.S. 683, 695–96 (1974) ("So long as this regulation is extant it has the force of law.").

15

Florida continued that CMS exceeded its authority because the 2023 CAA amendments provide only that children "determined to be *eligible* for benefits under a State plan … shall remain *eligible* for such benefits" for twelve months, unless the individual reaches age 19 or moves out of the State. 42 U.S.C. §§ 1396a(e)(12) (emphases added), 1397gg(e)(1)(K). They do not authorize or require continuous *enrollment*. Nor do they change the clear statement in Title XXI—which includes the new continuous eligibility requirement—that none of its provisions "shall be construed as providing an individual with an entitlement." *Id.* § 1397bb(b)(5). Congress has long distinguished CHIP eligibility and CHIP enrollment,[6] as has CMS,[7] including that enrollment may

---

[6] *See, e.g.*, 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals); *id.* § 1397hh(c)(3) ("enrollees, disenrollees, and individuals eligible for but not enrolled" in a CHIP plan); *id.* § 1397mm(a)(1) ("efforts … to increase the enrollment … of eligible children"); *id.* § 1397mm(h)(1) ("campaigns to link the eligibility and enrollment systems"); *id.* § 1397mm(h)(6) ("enrollment … strategies for eligible children").

[7] *See, e.g.*, 42 C.F.R § 457.60(b)(1) (distinguishing "[e]ligibility standards, enrollment caps, and disenrollment policies"); *id.* § 457.10 (discussing information in an "eligibility notice," including the potential impact of a "determination of eligibility for, or enrollment in, another insurance affordability program"); *id.* § 457.300(c) ("[r]egulations relat[ed] to eligibility, screening, applications and enrollment"); *id.* § 457.525(b) (cost-sharing information must be made available to "[e]nrollees, at the time of enrollment

*(footnote continued on next page)*

16

require additional steps like paying an enrollment fee or monthly premiums. *See* 42 C.F.R. § 457.510. In fact, Congress considered, but did not enact, the continuous enrollment requirement that the FAQs impose.[8]

Florida also argued that the FAQs are arbitrary and capricious because they are internally inconsistent, unreasonably explained, and fail to address important considerations. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The FAQs disclaim the ability to consider "an exception to [continuous eligibility] for non-payment of premiums" that is not in the 2023 CAA amendments, but simultaneously assert flexibility to retain other preferred exceptions that also do not appear in the 2023 CAA amendments. Doc.1-4, at 1 (FAQs). CMS further had not explained why States could "institute an enrollment fee in CHIP" and "require payment of the first month's premium," but not subsequent premiums, nor why the justification

───────────────

and reenrollment after a redetermination of eligibility"); *id.* § 457.570(b) (adjustment to a "child's cost-sharing category" if "the enrollee may have become eligible … for a lower level of cost sharing.").

[8] *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. § 3(b)(1) (2021) (requiring that "an individual who is determined to be eligible for benefits … shall remain eligible *and enrolled* for such benefits" for a specified period (emphasis added)); Stabilize Medicaid and CHIP Coverage Act, H.R. 1738, 117th Cong. § 2(b)(1) (2021) (same).

for CMS's preferred exceptions—they "do not undermine the [continuous eligibility] mandate … and are important to protecting program integrity"—does not apply equally to allowing disenrollment for nonpayment of premiums. *Id.* And CMS entirely failed to consider the authority granted to States, like Florida, whose plans were grandfathered into CHIP, *see* 42 U.S.C. § 1397cc(a)(3), (d), and the interests of States that relied on their ability to terminate coverage for nonpayment of premiums when implementing and expanding their CHIP plans.

Finally, Florida argued that the FAQs failed to comply with the APA's procedural requirements. Because the FAQs purport to amend a substantive regulation issued through notice-and-comment rulemaking, they are a legislative rule that can only be issued through notice-and-comment rulemaking. *See, e.g.*, *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Florida thus asked the court to vacate the FAQs and issue preliminary relief.

CMS responded that the Social Security Act impliedly precludes district-court jurisdiction. CMS also argued that the claims were not ripe for

18

adjudication,[9] and that a preliminary injunction would be inappropriate because the FAQs are lawful, Florida does not face irreparable harm, and the equities do not favor Florida.

On May 31, 2024, the district court dismissed the case after concluding that 42 U.S.C. § 1316(a) impliedly precludes jurisdiction, citing *Thunder Basin*. Doc.32 (Dist.Ct.Order). The court pointedly observed that "the 2023 CAA amendments did not discuss CHIP *enrollment* for CHIP *eligible* children." *Id.* at 4 (emphasis in original). But the court determined that section 1316(a) "provides for administrat[ive] review of state CHIP plans," and Florida's claims are "of the type congress intended to be reviewed" under that scheme. *Id.* at 9.

Florida timely appealed.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing this case for lack of jurisdiction. Section 1316(a) does not display a "fairly discernible" intent to impliedly preclude jurisdiction over the APA claims here. Its text, structure, and purpose

---

[9] *But see Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019) ("A facial challenge presenting a purely legal argument … 'is presumptively ripe for judicial review' because that type of argument does not rely on a developed factual record." (quoting *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009))).

make clear that the review scheme is narrow, applying only to "determination[s]" about whether an individual state CHIP plan or plan amendment "submitted … for approval" conforms to applicable federal requirements. 42 U.S.C. § 1316(a)(1). Florida is not challenging any "determination" on a state CHIP plan or plan amendment, but rather a final rule issued by CMS.

The *Thunder Basin* factors confirm that the APA claims in this case are not "the type Congress intended to be reviewed" under section 1316(a). *Thunder Basin*, 510 U.S. at 212. Implied preclusion of district-court jurisdiction "could foreclose all meaningful judicial review," *id.* at 212–13, because Florida might never receive a "determination" reviewable under section 1316(a), and future judicial review would not be able to remedy Florida's here-and-now injuries. The claims are also "wholly collateral to a statute's review provisions," *id.* (cleaned up), because they don't request the review of any state CHIP plan disapproval under section 1316(a), don't involve the type of claim regularly adjudicated by CMS, and don't seek the kind of remedy that CMS routinely affords. And Florida's claims are "outside the agency's expertise," *id.*, because they involve straightforward "statutory questions" and "standard questions of administrative law, which the courts are at no disadvantage in answering," not

20

"technical considerations of agency policy" or "fact-bound inquiries," *Free Enter. Fund*, 561 U.S. at 491 (cleaned up).

CMS issued clearly unlawful FAQs to transform CHIP, impose new obligations on States, and amend its regulations. *Thunder Basin* does not insulate the agency from district-court review of that action.

## ARGUMENT

Federal district courts "have original jurisdiction" over "*all* civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (emphasis added). "Not some or most—but all." *Cochran v. SEC*, 20 F.4th 194, 199 (5th Cir. 2021) (en banc), *aff'd sub nom. Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023). That includes claims under the APA. And "when a federal court has jurisdiction, it also has a 'virtually unflagging obligation … to exercise' that authority." *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

In narrow circumstances, "[a] special statutory review scheme … may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon*, 598 U.S. at 185. That exception applies only where the scheme "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within the statutory

structure.'" *Free Enter. Fund*, 561 U.S. at 489 (cleaned up) (quoting *Thunder Basin*, 510 U.S. at 207, 212). Courts first look to the relevant statute's "text, structure, and purpose." *Elgin*, 567 U.S. at 10. The Supreme Court has also "identified three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186.

Numerous district courts have concluded that section 1316(a) does not impliedly preclude their jurisdiction over agency rulemaking like the FAQs. *See, e.g.*, *Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 806–07 (2023) (CMS bulletin); *Florida v. HHS*, No. 8:24-cv-1080, 2024 WL 3537510, at *7–8 (M.D. Fla. July 3, 2024) (Jung, J.) (HHS regulation); *Stangler v. Shalala*, No. 2:94-cv-4221, 1994 WL 764104, at *2–3 (W.D. Mo. Dec. 28, 1994) (HHS letter). Even more have exercised jurisdiction over APA claims that challenge CMS actions affecting state obligations under Social Security Act programs. *See, e.g.*, *Baptist Mem'l Hosp.-Golden Triangle, Inc. v. Azar*, No. 3:17-cv-491, 2018 WL 3118703, at *1 (S.D. Miss. June 25, 2018) (CMS FAQs) (collecting cases), *rev'd on other grounds*, 956 F.3d 689 (5th Cir. 2020); *Alabama v. CMS*, 780 F. Supp. 2d 1219 (M.D. Ala. 2011) (SHO Letter).

This case is no different.

I.    THE *THUNDER BASIN* FRAMEWORK FOR IMPLIED PRECLUSION

In *Thunder Basin*, the Supreme Court considered whether the administrative review provisions of the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act"), Pub. L. No. 95-164, 91 Stat. 1290, precluded district-court jurisdiction over a coal company's challenge to an anticipated citation for violating a Mine Act regulation. 510 U.S. at 202–06. The company argued, in relevant part, that the application of the regulation was unlawful. *Id.* at 205.

After reviewing the statute's "language," "structure," "purpose," and "legislative history," the Court concluded that the Mine Act stripped the district court of jurisdiction over the company's claims. *Id.* at 207. The Court observed that the Mine Act "establishes a detailed structure" for administrative review of "violations of 'any mandatory health or safety standard, rule, order, or regulation promulgated' under the Act." *Id.* (citing Mine Act, 30 U.S.C. § 814(a)). Although the Mine Act was "facially silent with respect to pre-enforcement claims," the Court concluded that its "structure … demonstrates that Congress intended to preclude" such challenges. *Id.* at 208. The Court then explained that the company's specific claims were "of the type Congress intended to be reviewed within this statutory structure" because preclusion

23

would not "foreclose all meaningful judicial review," the claims were not "wholly collateral" to the statute's review provision, and the claims were not "outside the agency's expertise." *Id.* at 207, 212–15 (cleaned up).

Accordingly, "[t]o determine whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims," courts look to the relevant statute's "text, structure, and purpose." *Elgin*, 567 U.S. at 10. Courts also examine the *Thunder Basin* factors and "presume that Congress does not intend to limit jurisdiction" when (1) "preclusion could foreclose all meaningful judicial review," (2) "the suit is wholly collateral to a statute's review provisions," and (3) "the claims are outside the agency's expertise." *Free Enter. Fund*, 561 U.S. at 489 (cleaned up); *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 605 (6th Cir. 2024); *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 370 (5th Cir.) (en banc), *judgment vacated as moot*, 144 S. Ct. 480 (2023); *Cochran*, 20 F.4th at 199. The Court has been clear that "the same conclusion might follow if the factors point in different directions." *Axon*, 598 U.S. at 186. "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

## II.    SECTION 1316(A) DOES NOT APPLY TO FLORIDA'S CLAIMS

The text, structure, and purpose of section 1316(a) demonstrates that Congress did not intend to preclude district-court review of the standard-fare APA claims in this case. Section 1316(a), applicable to CHIP through 42 U.S.C. § 1397gg(e)(2), provides that "[w]henever a State plan is submitted to [CMS] by a State for approval," the agency has 90 days to "make a determination as to whether it conforms" to the applicable federal requirements. 42 U.S.C. § 1316(a)(1). A State "dissatisfied" with that determination "may … file a petition with the Secretary for reconsideration," limited to "the issue of whether such plan conforms to the requirements for approval." *Id.* § 1316(a)(2). A State that remains dissatisfied with the Secretary's "determination … on such a reconsideration" may then "file … a petition for review of such determination" with the court of appeals. *Id.* § 1316(a)(3).[10]

Section 1316(a) thus provides for administrative review of a narrow set of CMS actions—"determinations" that a state CHIP plan or plan amendment submitted for approval does not conform to federal requirements. *Id.* § 1316(a)–

---

[10] Section 1316(a) also allows States to petition for review of certain other "final determination[s] of the Secretary" under Social Security Act provisions inapplicable here. 42 U.S.C. § 1316(a)(3).

(b). Moreover, it limits review to "the issue of whether such plan conforms to the requirements for approval." *Id.* § 1316(a)(2).

The plain language of section 1316(a) does not apply to the APA claims in this case. Florida does not challenge any CMS determination related to a state CHIP plan or plan amendment submitted for approval. And even if it did, the issues Florida raised—whether the FAQs are contrary to law, in excess of authority, arbitrary and capricious, and followed necessary procedures—are beyond the scope of review that section 1316(a) allows. *See, e.g.*, *Stangler*, 1994 WL 764104, at *2–3 ("Section 1316(a) merely provides that, when the Secretary rejects a state plan, the state is entitled to an administrative hearing and, if dissatisfied with the Secretary's final determination, may seek review in the Court of Appeals.… There is no indication in the statute that judicial review is precluded when the Secretary has not rejected … a state plan.").

Section 1316(a) is also phrased in "permissive terms." *Tennessee*, 104 F.4th at 604; *Cochran*, 20 F.4th at 200. It provides that a State "may" seek reconsideration of an adverse CMS determination from the Secretary and a federal court of appeals. 42 U.S.C. § 1316(a)(2)–(3); *see also id.* § 1397ff(b)(1) (explaining a State "may" seek to amend its CHIP plan). The statute "does not say that anyone 'shall' or 'shall not' do anything," and "[i]t would be troublingly

counterintuitive to interpret … permissive language as eliminating alternative routes to federal court review." *Cochran*, 20 F.4th at 201; *see Tennessee*, 104 F.4th at 604 (similar).

The structure of section 1316(a)'s review scheme confirms that Congress did not intend it to encompass ordinary APA claims that are independent of state CHIP plan determinations. Section 1316(a) provides a reticulated timeline for review of such determinations. Once a State submits a CHIP plan or plan amendment, CMS must make a determination "within 90 days after" receipt. 42 U.S.C. § 1316(a)(1); *see also id.* § 1397ff(c)(2) (authorizing CMS to instead indicate that "specified additional information is needed"). Otherwise, the plan "is considered approved." *Id.* § 1397ff(c)(2). A State dissatisfied with CMS's determination has 60 days to petition the HHS Secretary for reconsideration. *Id.* § 1316(a)(2). The Secretary then has 30 days to notify the State of the time and date of the hearing, which must be within 20 to 60 days of the notice, and 60 days after the conclusion of the hearing to issue a final determination, which can be challenged in a federal court of appeals. *Id.* § 1316(a)(2)–(3). That means a State is assured that within approximately 300 days of submitting its plan (or less, if the State seeks reconsideration expeditiously), it can submit its claims to a federal court for adjudication.

27

This statutorily imposed timeline confirms that Congress created a narrow scheme for expeditious review of state CHIP plan determinations. No such timeline or assurance exists for Florida's claims because they do not challenge a "determination" on a state CHIP plan "submitted … for approval." *Id.* § 1316(a)(1). In fact, the district court's decision means Florida is *never* assured of review at all. Florida must wait for CMS to deem the State to be in "substantial noncompliance." 42 C.F.R. § 457.204(a)–(c). That could happen next week, next month, or next year. Florida would then be subject to an open-ended agency review process which places no deadlines on CMS. *Id.* § 457.204(d). Judicial review of CMS decisions related to already-approved state CHIP plans or "noncompliance in practice," *id.* § 457.204(b)–(c), is also outside the plain language of section 1316(a). To the extent CMS regulations suggest such review is available, *see id.* §§ 457.206(a), 457.208(a), that cannot preclude Article III jurisdiction otherwise conferred by Congress. *See also infra* Part III.A.

The purpose of section 1316(a) reinforces that it does not cover Florida's APA claims. "Congress wanted to make sure that states could get prompt judicial review of [plan-nonconformity] determinations in the courts of appeals." *State of Ill., Dep't of Pub. Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir. 1983). The review provision is thus concerned with "plan-conformity

28

dispute[s]," not general matters of administrative law. *State Dep't of Pub. Welfare of State of Tex. v. Califano*, 556 F.2d 326, 330 (5th Cir. 1977). There is no "dispute" about plan conformity here, and requiring Florida to wait indefinitely would do nothing to further the prompt judicial resolution of Florida's claims.

The district court was wrong to conclude that it lacked jurisdiction because "there is a valid statutory review scheme that provides for some level of exclusive agency review" of *some* claims. Doc.32, at 8 (Dist.Ct.Order). A statutory review scheme only "divests district courts of their ordinary jurisdiction over the *covered* cases." *Axon*, 598 U.S. at 185 (emphasis added); *see also Cochran*, 20 F.4th at 200 (rejecting the argument that "[b]y giving *some* jurisdiction to the courts of appeals … Congress implicitly stripped *all* jurisdiction from every other court"). But the district court held that section 1316(a) forecloses its jurisdiction over even the promulgation of regulations and compliance with notice-and-comment requirements. There is no indication that Congress had such an expansive, unspoken intent. *Axon*, 598 U.S. at 186.

The text, structure, and purpose of section 1316(a) do not display a "fairly discernible" intent to preclude district-court jurisdiction over Florida's claims. *Elgin*, 567 U.S. at 10. That decides the matter. *Id.*; *Tennessee*, 104 F.4th at 605; *Feds for Med. Freedom*, 63 F.4th at 378; *Cochran*, 20 F.4th at 199–201.

29

III.  THE *THUNDER BASIN* FACTORS CONFIRM THE DISTRICT COURT'S JURISDICTION

The *Thunder Basin* factors confirm that standard-fare APA claims like Florida's are not "the type that Congress intended to be reviewed" under section 1316(a). *Elgin*, 567 U.S. at 15. All three factors point toward district court jurisdiction, although any one would be sufficient in this case. *See Axon*, 598 U.S. at 186 ("[T]he same conclusion might follow if the factors point in different directions.").

A.  IMPLIED PRECLUSION COULD FORECLOSE ALL MEANINGFUL REVIEW OF FLORIDA'S CLAIMS

Courts "presume that Congress does not intend to limit jurisdiction" if preclusion "could foreclose all meaningful judicial review." *Free Enter. Fund*, 561 U.S. at 489 (cleaned up). Even the possibility that judicial review could be unavailable is enough to defeat implied preclusion. *Cochran*, 20 F.4th at 209–10. Implied preclusion would have that effect here.

Florida has not submitted—and does not intend to submit—an amendment to its CHIP plan to conform to the FAQs because doing so would violate state law. Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9). Florida thus has no way to receive a "determination" reviewable under section 1316(a). Similarly, if Florida complies with the FAQs and stops disenrolling CHIP participants for

nonpayment of premiums, there will never be an adverse CMS "determination" and Florida will again "be left unable to seek redress." *Cochran*, 20 F.4th at 209; *see also Texas v. Brooks-LaSure*, 680 F. Supp. 3d at 807 ("If Texas abides by the potentially unlawful [CMS] Bulletin, it will not receive a 'final adverse order,' and 'may thus be left unable to seek redress.'").

Florida suffers irreparable harm in the meantime. Florida law requires disenrolling CHIP participants for nonpayment of premiums, whereas the FAQs prohibit that disenrollment and purport to preempt Florida law. A "state clearly has a legitimate interest in the continued enforceability of its own statutes," *Maine v. Taylor*, 477 U.S. 131, 137 (1986), and "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State," *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Accordingly, "when a federal regulation purports to preempt state law," the State is injured and has "a sovereign interest to sue the United States." *Tennessee*, 104 F.4th at 591 (quoting *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022)); *see West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023) (unlawful spending "condition is a present and continuous infringement on state sovereignty"); *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021) ("state suffers sovereign injury when unlawful agency action preempts state law"); *Texas v. Becerra*, 577 F. Supp. 3d 527, 557

31

(N.D. Tex. 2021) ("[I]rreparable harm exists when a federal regulation prevents a state from enforcing its duly enacted laws."). A State even has an "interest in not being pressured to change its law." *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015). And Florida would never be able to recover funds spent to comply with the FAQs—providing free coverage (in violation of Florida law) to CHIP participants who should be disenrolled for failing to pay monthly premiums—because CMS enjoys sovereign immunity. *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

The district court reasoned "[t]here is no indication that the Eleventh Circuit is incapable of meaningfully reviewing Florida's APA claims." Doc.32, at 10 (Dist.Ct.Order). That misses the point. This Court may never have the opportunity to review Florida's claims. *See also supra* Part II. And if it does, that would be too little, too late. As further discussed below, these "here-and-now" injuries are irreparable.[11]

---

[11] The district court's citation to *West Virginia v. Thompson*, 475 F.3d 204 (4th Cir. 2007), is inapposite. *See* Doc.32, at 10 (Dist.Ct.Order). That case involved a challenge to CMS's disapproval of an amendment to West Virginia's Medicaid plan, the precise determination to which section 1316(a) applies. *West Virginia*, 475 F.3d at 209. Unlike here, there was no question whether CMS's disapproval was subject to district court review.

Florida's only remaining option is to "bet the farm"—by waiting for a CMS enforcement action and the associated risk of losing federal funding, all the while suffering irreparable sovereign harm—"before testing the validity" of the FAQs. *Free Enter. Fund*, 561 U.S. at 490–91 (cleaned up). Under Supreme Court precedent, that is not "a 'meaningful' avenue of relief" that precludes district court jurisdiction. *Id.*

The district court dismissed this argument, claiming that its decision "would merely require Florida to do what all states must do in order to receive or retain federal CHIP funding—submit their CHIP plan to CMS and allow CMS to review it before seeking judicial review." Doc.32, at 13 (Dist.Ct.Order). That fundamentally misunderstands section 1316(a), which only provides for review of state CHIP plans or plan amendments "submitted … for approval." 42 U.S.C. § 1316(a)(1). Florida already has an approved CHIP plan and does *not* seek to amend it. There is no mechanism for review under section 1316(a).

The district court also reasoned that Florida's injuries do "not belong in the category of injuries that justify immediate district court intervention." Doc.32, at 12 (Dist.Ct.Order). That is wrong. Like claims that "challenge structural legitimacy and imply a right not to be subjected to actions and proceedings at all," *id.* at 12–13 (discussing *Free Enterprise Fund*), sovereign harm

33

is an irreparable "'here-and-now injury'" that "is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Axon*, 598 U.S. at 191.

States suffer additional "'here-and-now injury'" when the challenged action "has immediate effects on the States' ordering of their own affairs." *Tennessee*, 104 F.4th at 606; *see also Florida v. Nelson*, 576 F. Supp. 3d at 1039–40. By the time administrative proceedings—with no guaranteed start or end date— conclude and an appellate court could potentially adjudicate the legality of the FAQs, Florida will have repeatedly faced the "constitutionally intolerable choice" of violating either the laws enacted by its legislature or the FAQs. *Thunder Basin*, 510 U.S. at 218; *see Texas v. United States*, 787 F.3d at 752 n.39. No later judicial proceeding can remedy this current—and recurring— irreparable harm to Florida's sovereign interests. In other words, "[j]udicial review … would come too late to be meaningful." *Axon*, 598 U.S. at 191.

Moreover, CMS's review process is not designed to result in a judicially reviewable determination. CMS has assumed broad authority by regulation to investigate state CHIP plans, seeking state records and conducting on-site reviews to determine compliance. 42 C.F.R. § 457.200. Once CMS has made a finding of non-compliance, the State is entitled to a hearing. *Id.* § 457.204(d)(4).

But as CMS explained below, the agency "generally does not hold a hearing until it has made a reasonable effort to resolve the issue through conferences and discussions." Doc.22, at 10 (CMS.Opp'n.Br.) (citing 42 C.F.R. § 457.204(a)(2)). Open-ended "discussions" with a regulating body under threat of an enforcement action, however, too often transmute into strong-arming. And, in any event, "[b]oth parties are incentivized (one by statute and regulation, the other by practical realities, costs, and the threat of enforcement action) to resolve the matter informally." *Tennessee*, 104 F.4th at 606.

"The point is that investigations, informal coercion, and compliance agreements are where Title [XXI] is 'litigated,'" and CMS "doesn't contend that matters resolved 'informally' are subject to any sort of judicial review." *Id.* At most, "a process that requires administrative review first and judicial review second would prove costly and dilatory for all parties involved." *Id.* at 605 n.27. Judicial review of agency proceedings is too little, too late to be meaningful, if it's available at all.

The first *Thunder Basin* factor therefore weighs against implied preclusion. Because there is a "strong presumption favoring judicial review of administrative action," *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 197 (2021) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)), the possibility it

35

may be unavailable if the district court does not exercise jurisdiction should be dispositive.

### B.   FLORIDA'S CLAIMS ARE WHOLLY COLLATERAL TO SECTION 1316(A)

Courts "presume that Congress does not intend to limit jurisdiction" over claims that are "wholly collateral to a statute's review provisions." *Free Enter. Fund*, 561 U.S. at 489 (cleaned up). The APA claims in this case are wholly collateral to any plan-specific "determination" under section 1316(a).

Florida is not challenging a CMS "determination" or asking a court to decide whether its CHIP plan complies with Title XXI. Instead, Florida claims the FAQs are contrary to law, in excess of authority, arbitrary and capricious, and failed to comply with notice-and-comment rulemaking. These claims do not "address the sorts of procedural or evidentiary matters" that CMS ordinarily resolves when approving state CHIP plans. *Axon*, 598 U.S. at 193. They do not require assessing the details of Florida CHIP (or any other state CHIP plan) or determining how the FAQs apply to a particular set of facts. The issues raised by Florida are independent of—and so wholly collateral to—review of any state plan approval under section 1316(a).

Similarly, APA claims are not "the type of … action regularly adjudicated" by CMS under section 1316(a). *Elgin*, 567 U.S. at 22. Reviewing

agency rulemaking is collateral to making an approval determination on any state CHIP plan. This is particularly true of the procedural claims that Florida raises. Neither section 1316(a) nor CMS regulations provide for consideration of agency compliance with APA procedures. *See* 42 U.S.C. § 1316(a); 42 C.F.R. §§ 457.204, 457.206, 457.208.

The relief that Florida ultimately seeks—that the FAQs be declared unlawful and set aside—is also not the kind of remedy that CMS "routinely affords" when approving state CHIP plans. *Elgin*, 567 U.S. at 22; *Cochran*, 20 F.4th at 207 ("whether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff"). Section 1316(a) only provides for approving state CHIP plans and plan amendments. CMS has never suggested that it "routinely" uses such review to ensure compliance with the APA and declare its own regulations unlawful and set them aside. That, instead, is the job of the district court. *See, e.g.*, 5 U.S.C. §§ 703, 706; 28 U.S.C. §§ 1331, 2201.

Contrary to the district court's passing suggestion, procedural claims are not "inextricably intertwined" with any state plan determination subject to section 1316. *See* Doc.32, at 15 n.1 (Dist.Ct.Order) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). Deciding whether CMS followed notice-and-

37

comment rulemaking requirements in issuing the FAQs requires no knowledge of Florida CHIP (or any other state CHIP plan), nor will the claim be affected by any plan-specific determination. And, unlike the plaintiffs in *Heckler*, Florida seeks only traditional remedies for improperly promulgated regulations—declaring unlawful and vacating the FAQs. *Cf. Heckler*, 466 U.S. at 614 ("[T]he relief that respondents seek to redress their supposed 'procedural' objections is the invalidation of the Secretary's current policy and a 'substantive' declaration from her that the expenses of [bilateral carotid body resection] surgery are reimbursable under the Medicare Act."). *Heckler* was also concerned with administrative exhaustion under a different statutory review scheme. *Id.* at 617–18. The lawfulness of the FAQs and whether Florida CHIP complies with them are two separate issues.

The district court also relied on *Doe v. Federal Aviation Administration* ("*FAA*"), 432 F.3d 1259 (11th Cir. 2005), but that case is readily distinguishable. *See* Doc.32, at 14–15 (Dist.Ct.Order). In *Doe*, the FAA determined that certain pilots must be reexamined to verify competency. 432 F.3d at 1260. After being notified, the affected pilots claimed a violation of due process and sued for "a preliminary injunction instructing the FAA how to proceed in its process of reexamination." *Id.* This Court held that the claims fell in the heartland of the

statute at issue, which permitted the FAA to "reexamine an airman already holding a certificate," and provided a detailed administrative scheme for pilots to challenge an order "that an airman's certificate be amended, modified, suspended or revoked." *Id.* at 1262. Even the pilots did not dispute that the administrative review board was "uniquely suited and designated by statute as the sole entity to consider an ... initial challenge to FAA certificate action." *Id.* And this Court concluded the due-process claims were "'inescapably intertwined'" with "review of the procedures and actions taken by the FAA with regard to the mechanics' certificates." *Id.* at 1263.

By contrast, Florida does not seek a court order telling CMS what procedures it must follow when reviewing state CHIP plans. Florida's claims are also not related to any state plan determination or other issue that CMS is "uniquely suited and designated by statute as the sole entity to consider." *Id.* at 1262. Florida claims that the FAQs are contrary to law, in excess of authority, arbitrary and capricious, and failed to follow required procedures, none of which invoke CMS's "uniqu[e]" expertise in administering CHIP. *Id.*; *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."); *infra* Part III.C. Nor does the Social

Security Act designate CMS as "the sole entity to consider" these or similar issues of administrative law, *Doe*, 432 F.3d at 1262, especially whether CMS failed to engage in notice-and-comment rulemaking. Rather, that authority is given to the district court. 5 U.S.C. §§ 701–706; 28 U.S.C. § 1331.

The second *Thunder Basin* factor thus weighs against implied preclusion. Because it's not logical that Congress would require a party to seek (or wait for) agency review of a claim wholly collateral to the agency action, that should be dispositive. *Cf. Martin v. Shalala*, 63 F.3d 497, 504 (7th Cir. 1995) (administrative exhaustion is "unnecessary if the claim is collateral to the claim for benefits and if requiring exhaustion would cause irreparable harm" (cleaned up)).

## C.    FLORIDA'S CLAIMS ARE OUTSIDE CMS'S EXPERTISE

Courts "presume that Congress does not intend to limit jurisdiction" over claims that are "outside the agency's expertise." *Free Enter. Fund*, 561 U.S. at 489 (cleaned up). CMS has no special competence or expertise here.

This case involves straightforward "statutory questions" and "standard questions of administrative law, which the courts are at no disadvantage in answering." *Id.* at 491; *see Florida v. HHS,* 2024 WL 3537510, at *7–8 (Jung, J.) (claims that "ultimately present legal APA and constitutional issues … are outside of HHS and CMS's expertise"); *Texas v. Brooks-LaSure*, 680 F. Supp. 3d

at 807 (conventional APA claims are outside of CMS's expertise). The claims here are purely legal, and it is the competence—and duty—of federal courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of … terms" without deference to an agency. 5 U.S.C. § 706; *see Loper Bright*, 144 S. Ct. at 2273. And, in any event, the agency can readily explain its statutory interpretation in briefing, as it did to the district court. Doc.22, at 19–27 (CMS.Opp'n.Br.).

The claims here involve no "'technical considerations of [agency] policy'" or "fact-bound inquiries." *Free Enter. Fund,* 561 U.S. at 491 (quoting *Johnson v. Robison*, 415 U.S. 361, 373 (1974)). Indeed, CMS argued that the FAQs are not a matter of policy, but "follow[ed] from the … plain text" of the 2023 CAA amendments. Doc.22, at 19–22 (CMS.Opp'n.Br.). By defending the FAQs based "purely" on "congressional intent," and making "no effort to justify the [FAQs] in factual terms," CMS undermined any justification for agency expertise. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). There is no CMS expertise that "could be brought to bear" on Florida's claims during

41

administrative proceedings. *Elgin*, 567 U.S. at 23 (quoting *Thunder Basin*, 510 U.S. at 215).[12]

The lack of applicable agency expertise is even more obvious with respect to Florida's procedural claims. CMS "knows … nothing special" about notice-and-comment requirements, nor has it claimed to. *Axon*, 598 U.S. at 194. Recognizing this, courts regularly exercise jurisdiction over procedural APA claims, even where adjacent statutory review schemes exist. *See, e.g.*, *Texas v. Brooks-LaSure*, 680 F. Supp. 3d at 807.

The third *Thunder Basin* factor thus weighs against implied preclusion. Because it's not logical that Congress would require a party to seek (or wait for) agency review of a claim outside that agency's expertise, that should be

---

[12] That makes this case unlike the unpublished decision in *New York v. HHS*, No. 1:07-cv-8621, 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008), cited by the district court. *See* Doc.32, at 10–11 (Dist.Ct.Order). *New York* involved a challenge by several States to a SHO Letter about procedures to ensure state CHIP plans did not "crowd out" private insurance. New York, 2008 WL 5211000, at *5. The district court held that the challenge was not ripe, *id.* at *10–15, and that section 1316 impliedly stripped it of jurisdiction to hear the claims, *id.* at *15–16. Relevant to both holdings, the *New York* court concluded that the claims "need[ed] further factual development" by CMS, in part because there were "substantial unresolved questions about enforcement and application of the SHO Letter guidelines." *Id.* at *12–13. Here, neither CMS nor the district court has pointed to any such "fact-bound inquiries" that require application of agency expertise. *Free Enter. Fund*, 561 U.S. at 491.

dispositive. *Cf. Free Enter. Fund*, 561 U.S. at 489 ("[W]hen Congress creates procedures designed to *permit agency expertise to be brought to bear* on particular problems, those procedures are to be exclusive." (emphasis added) (cleaned up)).

*    *    *

All three *Thunder Basin* factors weigh against precluding district-court jurisdiction over Florida's claims. And even "if the factors point in different directions," *Axon*, 598 U.S. at 186, any one of them is sufficient to foreclose implied preclusion here. The district court therefore erred in dismissing the case.

## CONCLUSION

Because the Social Security Act does not display a "fairly discernible" intent to preclude the APA claims in this case, and moreover the *Thunder Basin* factors weigh against impliedly precluding district-court jurisdiction, this Court should reverse.

Dated:  September 18, 2024

Ashley Moody
   *Attorney General*
Henry C. Whitaker
   *Solicitor General*

/s/ Natalie Christmas
Natalie Christmas
   *Counselor to the Attorney General*
   *Counsel of Record*

FLORIDA OFFICE OF THE ATTORNEY
   GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
Natalie.Christmas@myfloridalegal.com

*Counsel for State of Florida*

Respectfully submitted,

/s/ Jared M. Kelson
R. Trent McCotter
Jared M. Kelson
   *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
202-955-0620
jkelson@boydengray.com

Andrew T. Sheeran
   *General Counsel*
FLORIDA AGENCY FOR HEALTH
   CARE ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
Andrew.Sheeran@ahca.myflorida.com

*Counsel for Florida Agency for*
*Health Care Administration*

44

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 8,819 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT and 14-point font.

Dated:  September 18, 2024        /s/ Jared M. Kelson
                                         Jared M. Kelson

                                         *Counsel for Florida Agency for Health Care Administration*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2024, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated:  September 18, 2024             <u>/s/ Jared M. Kelson</u>
                                       Jared M. Kelson

                                       *Counsel for Florida Agency for Health Care Administration*