No. 24-12217-FF

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

**STATE OF FLORIDA, ET AL.,**

*Plaintiffs-Appellants,*

**v.**

**CENTERS FOR MEDICARE AND MEDICAID
SERVICES, ET AL.,**

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:24-cv-317-WFJ-AAS

———————————————

**APPENDIX**

———————————————

Ashley Moody
  *Attorney General*
Henry C. Whitaker
  *Solicitor General*
Natalie Christmas
  *Counselor to the Attorney General*
  *Counsel of Record*

FLORIDA OFFICE OF THE ATTORNEY
  GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
Natalie.Christmas@myfloridalegal.com

*Counsel for State of Florida*

R. Trent McCotter
Jared M. Kelson
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
202-955-0620
jkelson@boydengray.com

Andrew T. Sheeran
  *General Counsel*
FLORIDA AGENCY FOR HEALTH
  CARE ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
Andrew.Sheeran@ahca.myflorida.com

*Counsel for Florida Agency for
Health Care Administration*

**No. 24-12217-FF**

# INDEX

DOCUMENT                                                    Docket / Tab No.

District Court Docket Sheet ........................................................Docket Sheet

Complaint (Feb. 1, 2024) ................................................................... 1

    Exhibit 1, Declaration of Austin Noll (Jan. 31, 2024)........................ 1-1

    Exhibit 2, State of Florida, *Florida KidCare Program* (Mar. 11, 2021)
    (pp. 1–23, 83–84, 96–98, 176–80) ..................................................... 1-2

    Exhibit 3, CMS, SHO #23-004, *Re: Section 5112 Requirement for all
    States to Provide Continuous Eligibility to Children in Medicaid and
    CHIP Under the Consolidated Appropriations Act, 2023* (Sept. 29, 2023) ... 1-3

    Exhibit 4, CMS, *Mandatory Continuous Eligibility for Children in
    Medicaid and CHIP Frequently Asked Questions* (Oct. 27, 2023) .............. 1-4

Motion for Preliminary Injunction by Plaintiffs (Feb. 1, 2024)........................ 2

Response in Opposition to Motion for Preliminary Injunction by
    Defendants (Feb. 20, 2024) ................................................................. 22

Reply in Support of Motion for Preliminary Injunction by Plaintiffs
    (Mar. 5, 2024) ..................................................................................... 23

Answer to Complaint by Defendants (May 14, 2024)................................... 31

District Court Order (May 31, 2024) .......................................................... 32

Certificate of Service ................................................................................COS

# Docket Sheet

APPEAL,CLOSED

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:24-cv-00317-WFJ-AAS

| | |
|---|---|
| State of Florida et al v. Centers for Medicare and Medicaid Services et al | Date Filed: 02/01/2024 |
| Assigned to: Judge William F. Jung | Date Terminated: 05/31/2024 |
| Referred to: Magistrate Judge Amanda Arnold Sansone | Jury Demand: None |
| Case in other court: Eleventh Circuit, 24-12217-F | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| Cause: 05:0702 Administrative Procedure Act | Jurisdiction: Federal Question |

**Plaintiff**

**State of Florida**        represented by    **Natalie Christmas**
Florida Attorney General's Office
PL-01 The Capitol
Tallahassee, FL 32399
850-414-3300
Email:
natalie.christmas@myfloridalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew T. Sheeran**
Florida Agency for Health Care
Administration
Bldg 3 - MS 3
2727 Mahan Dr
Tallahassee, FL 32308-5407
850/412-3630
Fax: 850/921-0158
Email:
Sheeran.Andrew@ahca.myflorida.com
*ATTORNEY TO BE NOTICED*

**Henry Charles Whitaker**
Florida Attorney General's Office
PL-01 The Capitol
Tallahassee, FL 32399-1050
850-414-3688
Email: henry.whitaker@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Jared M. Kelson**
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900

Washington, DC 20006
202-955-0624
Email: jkelson@boydengray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura B. Ruppalt**
Boyden Gray PLLC
Suite 350
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
217-840-8413
Email: lruppalt@boydengray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**R. Trent McCotter**
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202-706-5488
Email: tmccotter@boydengray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Florida Agency for Health Care Administration**    represented by    **R. Trent McCotter**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew T. Sheeran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry Charles Whitaker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared M. Kelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Laura B. Ruppalt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natalie Christmas**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Centers for Medicare and Medicaid Services**      represented by **Madeline McMahon**
DOJ-Civ
1100 K Street NW
Washington, DC 20005
202-451-7722
Email: madeline.m.mcmahon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Health and Human Services**      represented by **Madeline McMahon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chiquita Brooks-LaSure**
*in her official capacity as Administrator for the Centers for Medicare and Medicaid Services*      represented by **Madeline McMahon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Xavier Becerra**
*in his official capacity as Secretary of Health and Human Services*      represented by **Madeline McMahon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2024 | 1 | COMPLAINT against All Defendants (Filing fee $405 receipt number AFLMDC-21724119) filed by All Plaintiffs. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Civil Cover Sheet, # 8 Proposed Summons) (McCotter, R.) (Entered: 02/01/2024) |
| 02/01/2024 | 2 | MOTION for Preliminary Injunction by All Plaintiffs. (Attachments: # 1 Exhibit Noll Declaration, # 2 Exhibit FL CHIP State Plan, # 3 Exhibit CMS SHO Letter, # 4 Exhibit CMS FAQs, # 5 Exhibit 1995 Evaluation Report, # 6 Exhibit Becerra Letter)(McCotter, R.) (Entered: 02/01/2024) |
| 02/01/2024 | 3 | CERTIFICATE of interested persons and corporate disclosure statement by Florida Agency for Health Care Administration, State of Florida. (McCotter, R.) (Entered: 02/01/2024) |
| 02/01/2024 | 4 | NOTICE of Lead Counsel Designation by R. Trent McCotter on behalf of Florida Agency for Health Care Administration. Lead Counsel: R. Trent McCotter. (McCotter, R.) (Entered: 02/01/2024) |
| 02/01/2024 | 5 | NEW CASE ASSIGNED to Judge William F. Jung and Magistrate Judge Amanda Arnold Sansone. New case number: 8:24-cv-00317-WFJ-AAS. Motion(s) REFERRED: 2 MOTION for Preliminary Injunction . Motion(s) referred to Magistrate Judge Amanda Arnold Sansone. (JG) (Entered: 02/01/2024) |

| 02/01/2024 | 6 | NOTICE TO COUNSEL R. Trent McCotter, Jared M. Kelson, Laura B. Ruppalt of Local Rule 2.01(a), which requires membership or special admission in the Middle District bar to practice in the Middle District, except for the limited exceptions identified in the Rule. To apply for membership in the Middle District, visit www.flmd.uscourts.gov/for-lawyers. (Signed by Deputy Clerk). (JG) (Entered: 02/01/2024) |
|---|---|---|
| 02/02/2024 | 7 | NOTICE of Local Rule 1.07(c), Local Rule 3.02(a)(2), and Local Rule 3.03.<br><br>-**Local Rule 1.07(c)** requires lead counsel to *promptly* file a **Notice of a Related Action** that identifies and describes any related action pending in the Middle District or elsewhere.<br><br>-**Local Rule 3.02(a)(2)** requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge.<br><br>-**Local Rule 3.03** requires each party to file a disclosure statement. Counsel must make their disclosures using the standard court form. The Disclosure Statement form can be found at www.flmd.uscourts.gov. (Signed by Deputy Clerk). (JCG) (Entered: 02/02/2024) |
| 02/02/2024 | 8 | NOTICE informing the parties that they may consent to the jurisdiction of a United States magistrate judge by filing Form AO 85 Notice, Consent, and Reference of a Civil Action to a Magistrate Judge using the event **Consent to Jurisdiction of US Magistrate Judge**. (Signed by Deputy Clerk). (JCG) (Entered: 02/02/2024) |
| 02/02/2024 | 9 | SUMMONS issued as to All Defendants, U.S. Attorney and U.S. Attorney General. (JOS) (Entered: 02/02/2024) |
| 02/02/2024 | 10 | PROOF of service by Florida Agency for Health Care Administration, State of Florida (McCotter, R.) (Entered: 02/02/2024) |
| 02/05/2024 | 11 | NOTICE of Lead Counsel Designation by Natalie Christmas on behalf of State of Florida. Lead Counsel: Natalie Christmas. (Christmas, Natalie) (Entered: 02/05/2024) |
| 02/05/2024 | 12 | CORPORATE Disclosure Statement by State of Florida. (Christmas, Natalie) (Entered: 02/05/2024) |
| 02/06/2024 | 13 | Unopposed MOTION for Jared M. Kelson to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-21738616 for $150 by Florida Agency for Health Care Administration. (McCotter, R.) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 02/06/2024) |
| 02/06/2024 | 14 | Unopposed MOTION for R. Trent McCotter to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-21738639 for $150 by Florida Agency for Health Care Administration. (McCotter, R.) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 02/06/2024) |
| 02/06/2024 | 15 | Unopposed MOTION for Laura B. Ruppalt to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC-21738648 for $150 by Florida Agency for Health Care Administration. (McCotter, R.) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 02/06/2024) |
| 02/06/2024 | 16 | **ENDORSED ORDER granting 13 Motion to Appear Pro Hac Vice; granting 14 Motion to Appear Pro Hac Vice; granting 15 Motion to Appear Pro Hac Vice.** |

| | | Attorneys Jared M. Kelson, R. Trent McCotter, and Laura B. Ruppalt may appear pro hac vice, subject to the requirement that counsel submit their Pro Hac Vice E-File Registration (see https://www.flmd.uscourts.gov/for-lawyers) within seven days of this order. Signed by Magistrate Judge Amanda Arnold Sansone on 2/6/2024. (BEE) (Entered: 02/06/2024) |
|---|---|---|
| 02/08/2024 | 17 | NOTICE of Appearance by Madeline McMahon on behalf of Xavier Becerra, Chiquita Brooks-LaSure, Centers for Medicare and Medicaid Services, Department of Health and Human Services (McMahon, Madeline) (Entered: 02/08/2024) |
| 02/08/2024 | 18 | Joint MOTION for Miscellaneous Relief, specifically to Establish Briefing Schedule by All Defendants. (McMahon, Madeline) (Entered: 02/08/2024) |
| 02/08/2024 | 19 | **ENDORSED ORDER granting 18 Joint Motion to Establish Briefing Schedule. Defendants' opposition to Plaintiffs' motion for preliminary injunction is due February 20, 2024. Plaintiffs' reply is due March 5, 2024. Signed by Judge William F. Jung on 2/8/2024. (CCB)** (Entered: 02/08/2024) |
| 02/19/2024 | 20 | Consent MOTION to File Excess Pages by All Defendants. (McMahon, Madeline) (Entered: 02/19/2024) |
| 02/20/2024 | 21 | **ENDORSED ORDER granting 20 Joint Motion to File Excess Pages. Defendants may file a response of no more than 30 pages. Plaintiffs may file a reply of up to and including 15 pages. Signed by Judge William F. Jung on 2/20/2024. (CCB)** (Entered: 02/20/2024) |
| 02/20/2024 | 22 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction filed by Xavier Becerra, Chiquita Brooks-LaSure, Centers for Medicare and Medicaid Services, Department of Health and Human Services. (McMahon, Madeline) (Entered: 02/20/2024) |
| 03/05/2024 | 23 | REPLY to Response to Motion re 2 MOTION for Preliminary Injunction filed by Florida Agency for Health Care Administration, State of Florida. (McCotter, R.) (Entered: 03/05/2024) |
| 03/05/2024 | 24 | NOTICE by Florida Agency for Health Care Administration, State of Florida re 2 MOTION for Preliminary Injunction *REQUEST FOR HEARING* (McCotter, R.) (Entered: 03/05/2024) |
| 03/25/2024 | 25 | NOTICE of Hearing (in person) on 2 MOTION for Preliminary Injunction. Motion Hearing set for 4/18/2024 at 09:30 AM in Tampa Courtroom 15 B before Judge William F. Jung. (Two hours reserved.)(CCB) (Entered: 03/25/2024) |
| 04/01/2024 | 26 | Consent MOTION for Extension of Time to File Answer *or Otherwise Respond to Complaint* by All Defendants. (McMahon, Madeline) (Entered: 04/01/2024) |
| 04/01/2024 | 27 | **ENDORSED ORDER granting in part unopposed 26 Motion for Extension of Time to Answer. Defendants' response to the complaint due May 17, 2024. Signed by Judge William F. Jung on 4/1/2024. (CCB)** (Entered: 04/01/2024) |
| 04/18/2024 | 28 | Minute Entry. In Person Proceedings held before Judge William F. Jung: on 4/18/2024. Court Reporter: Tracey Aurelio (JCG) (Entered: 04/18/2024) |
| 04/23/2024 | 29 | **ENDORSED ORDER: When the parties submit their draft, competing orders do not file them on this docket. Rather, copy each other and copy chambers email with pdf and MSWord versions of same. Signed by Judge William F. Jung on 4/23/2024. (Jung, William)** (Entered: 04/23/2024) |
| 04/30/2024 | 30 | TRANSCRIPT of MOTION HEARING held on 4/18/24 before Judge WILLIAM F. JUNG. Court Reporter/Transcriber: TRACEY AURELIO. Email address: |

tracey_aurelio@flmd.uscourts.gov. Telephone number: 8133615448.

| | | |
|---|---|---|
| | | NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 5/21/2024. Redacted Transcript Deadline set for 5/31/2024. Release of Transcript Restriction set for 7/29/2024. (TVA) (Entered: 04/30/2024) |
| 05/14/2024 | 31 | ANSWER to 1 Complaint by Xavier Becerra, Chiquita Brooks-LaSure, Centers for Medicare and Medicaid Services, Department of Health and Human Services.(McMahon, Madeline) (Entered: 05/14/2024) |
| 05/31/2024 | 32 | **ORDER denying 2 Motion for Preliminary Injunction for lack of subject-matter jurisdiction. This case is dismissed without prejudice. The Clerk is directed to terminate all pending deadlines and close this case. Signed by Judge William F. Jung on 5/31/2024. (LG)** (Entered: 05/31/2024) |
| 05/31/2024 | 33 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (AJS) (Entered: 05/31/2024) |
| 07/08/2024 | 34 | NOTICE OF APPEAL as to 32 Order on Motion for Preliminary Injunction by Florida Agency for Health Care Administration, State of Florida. Filing fee $ 605, receipt number AFLMDC-22271850. (Kelson, Jared) (Entered: 07/08/2024) |
| 07/09/2024 | 35 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 34 Notice of Appeal. (MCB) (Entered: 07/09/2024) |
| 07/23/2024 | 36 | TRANSCRIPT information form filed by Florida Agency for Health Care Administration, State of Florida re 34 Notice of Appeal. USCA number: 24-12217. No transcript(s) requested. (Kelson, Jared) (Entered: 07/23/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/20/2024 10:58:17 | | |
| **PACER Login:** | jbarisas | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 8:24-cv-00317-WFJ-AAS |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# Doc. 1

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### Case No. 8:24-cv-317

STATE OF FLORIDA; and FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION,

*Plaintiffs*,

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official capacity as
Administrator for the Centers for Medicare and
Medicaid Services*; DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
XAVIER BECERRA, *in his official capacity as
Secretary of Health and Human Services*,

*Defendants*.

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.     On June 22, 2023, Governor DeSantis signed into law Florida H.B. 121
to substantially expand the provision of subsidized health insurance to children in the
State of Florida. *See* An Act Relating to Florida KidCare Program Eligibility, H.B.
121, 2023 Leg. (Fla. 2023). That program, and especially its expansion, depends on
the collection of monthly premiums. The Biden Administration unlawfully seeks to
undermine that requirement and turn the program into a free-for-all, threatening both
its solvency and long-term stability. Those actions threaten Florida's expansion of the

program to more children in need.

2.    The State of Florida has provided subsidized health insurance for more than three decades to children in low- and moderate-income families who do not qualify for Medicaid. Since 1998, Florida has administered this insurance as part of the Children's Health Insurance Program ("CHIP"), a federal-state partnership under Title XXI of the Social Security Act, Pub. L. No. 105-33, 111 Stat. 251 (1997).

3.    As of October 2023, Florida CHIP provides insurance coverage for more than 119,000 children. Ex.1, Noll Declaration ¶ 3.

4.    An essential feature of Florida CHIP is its tiered cost-sharing. Families who elect to enroll at least one child in the program are required to pay a monthly premium to obtain insurance coverage, currently between $15 and $20 dollars per month. Failure to pay the monthly premium, after a 30-day grace period, results in disenrollment. Ex.2, Florida KidCare Program, Amendment FL-22-0034-CHIP, *Amendment to Florida's Title XXI Child Health Insurance Plan Submitted to the Centers for Medicare and Medicaid Services* (Mar. 11, 2021) ("Fla. CHIP Plan"), at 22–23, 97–98, 176–78.

5.    These premiums offset program costs, ensure Florida maintains a balanced budget as required by its state constitution, and preserve Florida CHIP as a bridge between Medicaid and private insurance rather than an entitlement program.

6.    Congress has expressly allowed cost-sharing with CHIP participants, including through the payment of monthly premiums. 42 U.S.C. § 1397cc(e). Congress has also allowed for the disenrollment of CHIP participants whose premiums are not

2

paid. *Id.* § 1397cc(e)(3)(C). The Centers for Medicare and Medicaid ("CMS"), which administers CHIP for the federal government, has similarly recognized cost-sharing and disenrollment for nonpayment. 42 C.F.R. §§ 457.342(b), 457.500–.560.

7.     Florida also offers CHIP participants 12 months of "continuous eligibility" and has done so voluntarily for almost two decades. Ex.2, Fla. CHIP Plan at 83, 91–92. With limited exceptions, that means Florida will not revisit the eligibility determination of CHIP participants during that period, even if their household incomes increase. CMS regulations have also allowed States to voluntarily offer continuous eligibility. 42 C.F.R. § 457.342(a). Both have existed alongside premium requirements as a condition of enrollment and maintaining CHIP coverage. *See id.* § 457.342(b).

8.     In late 2023, CMS issued a State Health Official letter ("SHO Letter"), Ex.3, and Frequently Asked Questions ("FAQs"), Ex.4, notifying States that they could no longer disenroll participants during periods of continuous eligibility, except in certain circumstances. The FAQs expressly prohibited disenrollment for nonpayment of premiums during the continuous eligibility period and announced that "the existing regulatory option at 42 CFR § 457.342(b)" to do so would "end on December 31, 2023." Ex.4, FAQs at 1.

9.     CMS justified the SHO Letter and FAQs by citing the Consolidated Appropriations Act, 2023 ("2023 CAA"), in which Congress amended the Social Security Act to require 12 months of continuous *eligibility* for any participants found

eligible for benefits under Medicaid or CHIP. Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022).

10.   The SHO Letter and FAQs badly misconstrue the 2023 CAA by incorrectly equating *eligibility* for CHIP benefits with *enrollment* in a CHIP plan and subsequent insurance coverage. Eligibility is the determination that someone qualifies to participate in CHIP—e.g., meets the State's income, residency, and age requirements. Enrollment means the participant is not only eligible but has agreed to participate in a CHIP plan and will pay the enrollment cost and monthly premiums as required. A participant can be eligible for CHIP benefits but not enrolled.

11.   The FAQs are contrary to law. They violate Congress's express allowance for "termination of coverage" for a CHIP participant's "failure to make a premium payment," 42 U.S.C. § 1397cc(e)(3)(C)(ii)(I), which was unaffected by the 2023 CAA. They also violate CMS's own long-existing, and still operative, regulation expressly permitting disenrollment during a continuous eligibility period, 42 C.F.R. § 457.342(b), and fail to provide for programs, like Florida's, that are statutorily grandfathered into the federal CHIP. *See* 42 U.S.C. § 1397cc(a)(3), (d).

12.   The FAQs also exceed CMS's authority. The 2023 CAA unambiguously requires that a child "remain *eligible* for [CHIP] benefits," not that the child remain *enrolled* in CHIP. 2023 CAA § 5112(a) (emphasis added). Where "the intent of Congress is clear, . . . the agency must give effect to that clear intent." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255‒56 (11th Cir. 2020) (cleaned up).

13.     CMS's new position is also arbitrary and capricious because it lacks a reasoned explanation, fails to explain adequately CMS's sudden reversal, and fails to address States' considerable reliance interests and grandfathered programs.

14.     Moreover, though misleadingly labeled "Frequently Asked Questions," the FAQs attempt to amend the Code of Federal Regulations, effective December 31, 2023. *See* Ex.4, FAQs at 1. That final, substantive change to an existing regulation can only be made through notice-and-comment rulemaking under the Administrative Procedure Act ("APA").

15.     CMS's fundamental error conflating eligibility and enrollment threatens the integrity of Florida CHIP, including the more than $30 million collected in premium payments each year. Ex.1, Noll Declaration ¶ 4. CMS is effectually imposing an expansion of entitlement benefits for children, requiring the provision of insurance potentially at no cost for up to 11 months of the year. Florida has declined to expand many entitlement programs because doing so is not in the interest of the State and its residents, as it would put a tremendous strain on the provision of services, making it worse for everyone. *Cf.* Blase & Gonshorowski, Paragon Health Inst., *Resisting the Wave of Medicaid Expansion: Why Florida Is Right* (Dec. 2023), https:// paragoninstitute.org/wp-content/uploads/2023/12/Resisting-the-Wave-Florida-Medicaid.pdf. CMS cannot use the 2023 CAA to expand entitlements through the backdoor. Indeed, CMS undermines the ability of Florida and other States to expand CHIP to even more children in need.

16.     The FAQs should be declared unlawful, set aside, and enjoined.

5

## PARTIES

17.     Plaintiff Florida is a sovereign state with the authority and responsibility to protect its sovereign interests, its public fisc, and the health, safety, and welfare of its citizens.

18.     Plaintiff Agency for Health Care Administration ("AHCA") is an agency and arm of Florida. AHCA administers Florida CHIP under Title XXI of the Social Security Act.[1]

19.     Defendant CMS is the federal agency that oversees federal approval, oversight, and funding for state CHIPs.

20.     Defendant Chiquita Brooks-LaSure is the Administrator of CMS. She is sued in her official capacity.

21.     Defendant Department of Health and Human Services ("HHS") is the parent federal agency of CMS.

22.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

## LEGAL STANDARD

23.     The Administrative Procedure Act ("APA") "embodies [a] basic presumption of judicial review," *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 140 (1967), and requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C.

---

[1] Plaintiff Florida and Plaintiff AHCA are referred to collectively as "Florida" throughout this Complaint.

§ 706(2)(A), "in excess of statutory . . . authority," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

24.    "Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Thus, "as mere creatures of statute," agencies "must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019).

25.    Agency action also must be "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). Agencies may not ignore "important aspect[s] of the problem," *id.* at 43, or "change their existing policies" without "provid[ing] a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

26.    With limited exceptions, "under the APA generally . . . an agency must afford interested persons notice of proposed rulemaking and an opportunity to comment." *Florida v. HHS*, 19 F.4th 1271, 1286 (11th Cir. 2021); *see* 5 U.S.C. § 553(c). The APA's notice-and-comment requirements apply to, among others, actions that "effectively amen[d] a prior legislative rule." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see also See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (notice-and-comment "rulemaking [is] required" when an agency "adopt[s] a new position inconsistent with any . . . existing regulations").

## JURISDICTION AND VENUE

27.    This Court has jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, and 2201.

28.     Under the APA, any "final agency action" is subject to judicial review, and the United States has waived sovereign immunity so long as the plaintiff seeks only non-monetary relief. 5 U.S.C. §§ 702, 704; *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985).

29.     Agency action is "final" when it "mark[s] the consummation of the agency's decisionmaking process," and determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

30.     The FAQs are final agency action reviewable under the APA. They are unequivocal in their language and represent the culmination of CMS's "assess[ment]" of "how non-payment of premiums intersects with [continuous eligibility] under the [2023] CAA." Ex.3, SHO Letter at 4 n.14. They also impose new "obligations" under CHIP, *Bennett*, 520 U.S. at 178, because they prohibit Florida from disenrolling participants who fail to pay their premiums during the continuous eligibility period and require it to "absorb the costs of unpaid premiums." Ex.4, FAQs at 2. Moreover, "'legal consequences will flow'" from the FAQs, *Bennett*, 520 U.S. at 178, because under CMS's continuous *enrollment* requirement, States like Florida must alter their CHIPs, changing the policy balance selected by elected representatives and assuming the cost of premiums for participants who fail to make payments, or lose federal funding for operating an allegedly non-compliant program. The FAQs also purport to amend 42 C.F.R. § 457.342(b), itself a legislative rule that authorizes the very conduct CMS has prohibited.

31. Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, and Florida is a resident of every judicial district and division in its sovereign territory, including this judicial district and division. *See Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022) ("It is well established that a state 'resides at every point within its boundaries.'" (alteration omitted) (quoting *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892))); *see also California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018) ("[A] state with multiple judicial districts 'resides' in every district within its borders."); *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023) ("Texas resides everywhere in Texas."); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[C]ommon sense dictates that a state resides throughout its sovereign borders.").

## FACTUAL BACKGROUND

### Federal CHIP

32. In 1997, Congress established CHIP under Title XXI of the Social Security Act to offer health insurance to "targeted low-income children" and certain other uninsured individuals who do not qualify for health insurance under Medicaid. 42 U.S.C. §§ 1397aa, 1397bb. CHIP is designed as a cooperative effort between States and the federal government. Each State develops and administers its own CHIP, and the federal government provides supplemental funding to help defray the program's costs. *See* 42 U.S.C. §§ 1397aa–1397mm.

33.     To obtain federal reimbursement for CHIP expenditures, a State's CHIP must generally comply with federal standards. *Id.* § 1397ff(a), (d)(2). States must therefore submit their CHIP plans to CMS for approval, and States must operate their programs in accordance with an approved plan. *Id.* § 1397ff(a)(1), (d)(1).

34.     States have considerable flexibility to implement CHIPs that best serve their residents. For example, Title XXI permits States to select the standards they use "to determine the eligibility of targeted low-income children," including standards "relating to the geographic areas to be served by the plan, age, income and resources . . . , residency, disability status (so long as any standard relating to such status does not restrict eligibility), access to or coverage under other health coverage, and duration of eligibility." *Id.* § 1397bb(b)(1)(A); 42 C.F.R. § 457.320(a). States may not, however, impose eligibility standards that favor children with higher family incomes, "deny eligibility based on . . . a preexisting medical condition," or "apply a waiting period" for certain coverage. 42 U.S.C. § 1397bb(b)(1)(B); 42 C.F.R. § 457.320(b).

35.     A child determined to be *eligible* for benefits may then *enroll* in the state CHIP and obtain health insurance coverage. *See, e.g.*, 42 U.S.C. § 1397cc(e)(3)(C)(i) (discussing "individuals *enrolled* under the plan" (emphasis added)). To qualify for federal funding, state CHIPs must provide participants with certain baseline insurance coverage, including coverage for basic health services, mental health services, and dental services. 42 U.S.C. § 1397cc(a), (c).

36.     Title XXI allows States to design their CHIPs to require cost-sharing by participants, including by charging "premiums, deductibles, [and] coinsurance" for

certain covered health services. *Id.* § 1397cc(e)(1)(A). Federal regulations detail state obligations related to "Enrollee Financial Responsibilities," including disclosure requirements and limitations on charges. 42 C.F.R. part 457, subpart E.

37.    Once enrolled in a state CHIP, participants are entitled to certain "[d]isenrollment protections," including receiving "reasonable notice of and an opportunity to pay past due" amounts and "an opportunity for an impartial review to address disenrollment," and prohibiting States from requiring payment of "past due premiums . . . as a condition of . . . reenrollment." *Id.* § 457.570; *see* 42 U.S.C. § 1397cc(e)(C)(ii). When a State elects to require cost-sharing, Congress has allowed the State to "terminat[e]" an enrollee's "coverage" for nonpayment after a 30-day grace period. 42 U.S.C. § 1397cc(e)(3)(C)(i).

38.    Through a 2016 rule finalized after notice-and-comment, CMS gave States the option of providing CHIP participants with a period of "continuous eligibility." 42 C.F.R. § 457.342; *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016); 78 Fed. Reg. 4,594 (Jan. 22, 2013). Congress had provided States a similar continuous eligibility "option" for Medicaid by statute. *See* 42 U.S.C. § 1396a(e)(12).

39.    If a State provides continuous eligibility in CHIP or Medicaid, "[a] child's eligibility may not be terminated during a continuous eligibility period, regardless of any changes in circumstances, unless:

(1)  The child attains the maximum age . . . ;

(2)  The child or child's representative requests a voluntary termination of eligibility;

(3)   The child ceases to be a resident of the State;

(4)   The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or

(5)   The child dies."

42 C.F.R. § 435.926(d); *see id.* § 457.342(b) (citing *id.* § 435.926(d)).

40.    CMS provided that for CHIP, *coverage* (i.e., *enrollment*) may also "be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees required under the State plan, subject to the disenrollment protections afforded under section 2103(e)(3)(C) of the [Social Security] Act (related to premium grace periods) and [42 C.F.R.] § 457.570 (related to disenrollment protections)." *Id.* § 457.342(b). This provision gives effect to the statutory allowance for termination of coverage for nonpayment of premiums. 42 U.S.C. § 1397cc(e)(3)(C).

41.    States can amend their plans at any time and may be required to do so when necessary to conform to new federal requirements. *See id.* § 1397ff(b)(1); 42 C.F.R. § 457.204(c). Plan amendments must be submitted to CMS for approval, and CMS is required to "promptly review . . . plan amendments . . . to determine if they substantially comply with" federal standards. 42 U.S.C. § 1397ff(c)(1); *see* 42 C.F.R. § 457.150. If CMS concludes the plan amendments do not "substantially comply," CMS "withholds payments to the State, in whole or in part," after "giving the State

notice" and "a reasonable opportunity for correction." 42 C.F.R. § 457.204(a); *see* 42 U.S.C. § 1397ff(d)(2).

42.    Congress also expressly grandfathered preexisting plans in three states—New York, Florida, and Pennsylvania—into CHIP. *Id.* § 1397cc(a)(3), (d)(1). These States are permitted to continue operating their plans, which Congress determined already provided "comprehensive . . . coverage" to children, under the CHIP program. *Id.* § 1397cc(a)(3); 42 C.F.R. § 457.440(a).

43.    States operating grandfathered programs may "modify" those programs "from time to time so long as [the program] continues to [include coverage of a range of benefits] and does not reduce the actuarial value of the coverage under the program below the lower of– (A) the actuarial value of the coverage under the program as of August 5, 1997, or (B) the actuarial value [of 'one of the benchmark benefit packages']." *Id.* § 1397cc(d)(2), (a)(2)(B); 42 C.F.R. § 457.440(b).

44.    States must submit annual reports to CMS on the operation of their CHIPs. 42 C.F.R. § 457.750. "CMS reviews State and local administration of the CHIP plan through analysis of the State's policies and procedures, on-site reviews of selected aspects of agency operation, and examination of samples of individual case records." *Id.* § 457.200. A State found to be operating its program in a way that does not comply with its approved plan or with federal standards is subject to withholding of federal funds. *Id.* § 457.204(a)(2).

*Florida CHIP*

45.     In 1990, before Congress established CHIP, the Florida Legislature created the Florida Healthy Kids Corporation as a public-private partnership to "improve access to health insurance for the state's uninsured children." *History,* Healthy Kids, https://www.healthykids.org/healthykids/history/ (last visited Jan. 31, 2024).

46.     The program began in Volusia County as a demonstration project under the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6407, 103 Stat. 2106, 2266 (1989), which required States to charge premiums to participating families with incomes between 100% and 185% of the FPL, *id.* § 6407(c)(2), 103 Stat. at 2266. By 1995, the federal funding had ended, but Florida continued its efforts and the program expanded to additional counties, funded by state, local, and private sources. Ex.5, Demonstration Report at 1–2, 62.

47.     When Congress established CHIP in 1997, it expressly grandfathered the programs in Florida, New York, and Pennsylvania into CHIP. 42 U.S.C. § 1397cc(a)(3), (d)(1). Congress permitted these States to continue operating their programs, which already provided "comprehensive . . . coverage" to children, under the auspices of CHIP. *Id.* § 1397cc(a)(3); 42 C.F.R. § 457.440(a). Congress also gave these States discretion to modify their programs within broad limits. *See* 42 U.S.C. § 1397cc(d)(2), (a)(2)(B); 42 C.F.R. § 457.440(b).

48.     Florida subsequently transferred administration of its program to "Florida KidCare," an umbrella program that oversees both Florida Medicaid and CHIP.

49.     Generally, Florida Medicaid offers no-cost health insurance to children under age 1 whose household incomes are up to 206% of the FPL, children ages 1 through 5 whose household incomes are up to 140% of the FPL, and children ages 6 through 18 whose household incomes are up to 133% of the FPL.[2] Florida CHIP offers subsidized health insurance coverage to children ages 1 through 18 who are not eligible for Medicaid and whose household incomes are up to 210% of the FPL. Ex.2, Fla. CHIP Plan, at 5, 23. As of October 2023, Florida CHIP provides subsidized health insurance coverage to more than 119,000 Florida children. Ex.1, Noll Declaration ¶ 3.[3]

50.     Children must also meet other criteria to be eligible for Florida CHIP. For example, the child must be a U.S. citizen or qualified alien, a Florida resident, and uninsured at the time of application. Ex.2, Fla. CHIP Plan at 80–84, 86.

51.     If a child is determined to meet the eligibility criteria for participation in Florida CHIP, the child's family is notified and invited to enroll the child in the program.

---

[2] Income thresholds are specified in terms of modified adjusted gross income (MAGI). 42 U.S.C. § 1396a(e)(14).
[3] Families that do not qualify for subsidies under CHIP or Medicaid are also eligible to purchase health insurance for children through Florida KidCare, but are required to pay the full premium cost. Ex.2, Fla. CHIP Plan at 5, 23, 177.

52.     Since its inception, Florida CHIP has required cost-sharing. Families who elect to enroll at least one child in the plan are required to pay a modest monthly premium to obtain insurance coverage, at a rate that scales with family income. Families with incomes up to 158% of the FPL pay a monthly premium of $15 per family, and families with incomes between 158% and 210% of the FPL pay a monthly premium of $20 per family. The monthly premiums are the same regardless of the number of children in the family enrolled. Ex.2, Fla. CHIP Plan at 22–23, 176–77.

53.     Premium payments help offset the costs of Florida CHIP. In fiscal year 2019–2020, Florida collected over $30 million in premium payments from families with children enrolled in Florida CHIP. Ex.1, Noll Declaration ¶ 4.

54.     The Florida Constitution requires balanced annual budgets. Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d). Premium payments play an important role in achieving the requirement and maintaining the long-term stability of Florida CHIP.

55.     Requiring participants to make modest contributions to the cost of health insurance also reflects a conscious policy choice by the Florida Legislature, which concluded that Florida residents are best-served when those receiving state-subsidized healthcare retain a measure accountability for, and investment in, the benefits they receive. Florida CHIP is thus a personal responsibility program, intended to bridge the gap between families with the lowest incomes, who receive no-cost health insurance through Medicaid, and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. § 409.812 (Florida KidCare provides "health benefits coverage options from which families may select coverage and through which families may

contribute financially to the health care of their children"); *id.* § 409.813 ("[C]overage under the Florida Kidcare program is not an entitlement."); Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), http://www.leg.state.fl.us/data/Publications/2000/House/reports/ interim_reports/pdf/kidcare.pdf.

56.     Since January 2005, Florida CHIP has provided 12 months of continuous eligibility for participants.[4] During the continuous eligibility period, an enrolled child remains eligible for subsidized health insurance regardless of changes in the child's circumstances (unless the child reaches age 19 or moves out of state). This means that even if the child's household income increases above 210% of the FPL during the relevant period, the child retains access to health insurance through Florida CHIP with no change in monthly premiums for 12 months, measured from the first month of coverage or the month following the date the participant completed renewal. Ex.2, Fla. CHIP Plan at 83, 91–92.

57.     Payment of monthly premiums is required to maintain enrollment in (and thus coverage under) Florida CHIP, but not to maintain underlying eligibility. A child whose family does not pay the monthly premium will be disenrolled from insurance coverage after a 30-day grace period regardless of the child's eligibility. The child can, however, reenroll after a short lock-out period without going through a new eligibility application and determination. *Id.* at 97–98. Florida has required

---

[4] From 1998 to 2005, Florida CHIP provided six months of continuous eligibility. Ex.2, Fla. CHIP Plan at 83, 91–92.

disenrollment for nonpayment of premiums since it started offering subsidized health insurance to children in 1991. Ex.5, Demonstration Report at 25; *cf.* Omnibus Budget Reconciliation Act of 1989, § 6407, 103 Stat. at 2266. And disenrollment for nonpayment of premiums is required by state law. *See* Fla. Stat. 624.91(5)(b)(9).

58.    CHIP premiums are due on the first day of the month prior to the month of coverage. Ex.2, Fla. CHIP Plan at 178. Disenrollments from Florida CHIP occur monthly and become effective on the first day of the month after the unpaid premium was due. For example, disenrollments are February 1, 2024, for participants who have not paid premiums that were due January 1, 2024. Ex.1, Noll Declaration ¶ 11.

59.    In June 2023, Governor Ron DeSantis signed into law Florida H.B. 121, which makes Florida children with household incomes up to 300% of the FPL eligible for subsidized insurance through Florida CHIP. *See* An Act Relating to Florida KidCare Program Eligibility, H.B. 121, 2023 Leg. § 1 (Fla. 2023). The increased income limit is estimated to make subsidized health insurance available to an additional 26,000 Florida children in its first full year of operation alone. *See* Ex.1, Noll Declaration ¶ 5. The expansion will be funded partially through state funds, with the remaining costs covered through the collection of premium payments and matching federal funds. Ex.1, Noll Declaration ¶ 6; *Florida H.R. Staff Final Bill Analysis: H.B. 121*, at 6–7 (June 23, 2023), https://www.flsenate.gov/Session/Bill/2023/121/ Analyses/h0121z1.HRS.PDF.

60.    Under the current proposal for Florida's expanded program, premiums for those already eligible for the program would rise modestly. Families with incomes

between 133% and 175% of the federal poverty level would pay $17 per month, and families with incomes between 175% and 200% of the federal poverty level would pay $30 per month. Newly-eligible families with higher incomes would pay a higher premium, ranging from $60 to $195 per month, depending on income. *See* Fla. AHCA, *New 5-Year Section 1115 Demonstration Request* 3 (Jan. 23, 2024), https://ahca.myflorida.com/content/download/23901/file/Children%27s%20 Health%20Insurance%20Program%20Eligibility%20Extension%20Full%20Public% 20Notice%20Document.pdf.

61.     Florida anticipates collecting approximately $53 million in premium payments (from both existing and new participants) in the first full year of the expanded CHIP plan. Approximately $23.1 million of these are a result of the expanded program and help offset the cost of the expansion. Ex.1, Noll Declaration ¶¶ 6–7.

**2023 CAA**

62.     In the 2023 CAA, Congress amended the Social Security Act to make continuous eligibility mandatory for both Medicaid and CHIP. Pub. L. No. 117-328, § 5112, 136 Stat. at 5940.

63.     Specifically, Congress amended section 1902(e)(12) of the Social Security Act, 42 U.S.C. § 1396a(e)(12), applicable to Medicaid benefits, to read:

> The State plan (or waiver of such State plan) shall provide that an individual who is under the age of 19 and who is determined to be eligible for benefits under a State plan (or waiver of such plan) approved under this title under subsection (a)(10)(A) shall remain eligible for such benefits until the earlier of—

(A) the end of the 12-month period beginning on the date of such determination;

(B) the time that such individual attains the age of 19; or

(C) the date that such individual ceases to be a resident of such State.

2023 CAA § 5112(a), 136 Stat. at 5940.

64.　　Congress then amended section 2107(e)(1) of the Social Security Act, 42 U.S.C. § 1397gg(e)(1), to specify that the Medicaid mandatory continuous eligibility provision also applies to state CHIPs. 2023 CAA § 5112(b), 136 Stat. at 5940 (adding 42 U.S.C. § 1397gg(e)(1)(K)).[5]

65.　　The 2023 CAA addresses only whether a child is "eligible" for CHIP benefits. It says nothing about a child's *enrollment* in, or *coverage* under, a state CHIP.

66.　　Nor does the 2023 CAA address or modify any of the statutory or regulatory provisions allowing States to require participant cost-sharing under CHIP. *See, e.g.*, 42 U.S.C. § 1397cc(e); 42 C.F.R. part 457, subpart E. Nor does it modify Congress's express allowance that States may "terminat[e]" an "individual's coverage" for "failure to make a premium payment" after a 30-day grace period. 42 U.S.C. § 1397cc(e)(3)(C). Nor does it modify 42 C.F.R. § 457.342(b), which expressly permits the termination of CHIP enrollment "during the continuous eligibility period for failure to pay required premiums or enrollment fees."

---

[5] The 2023 CAA also provides that "a targeted low-income child enrolled under the State child health plan or waiver may be transferred to the Medicaid program . . . for the remaining duration of the 12-month continuous eligibility period, if the child becomes eligible for full [Medicaid] benefits . . . during such period." 2023 CAA § 5112(b), 136 Stat. at 5940.

67.     Congress has previously considered bills that would have provided for continuous enrollment in a state CHIP. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021); Stabilize Medicaid and CHIP Coverage Act, H.R. 1738, 117th Cong. (2021). Those bills contained express language requiring that "an individual who is determined to be eligible for benefits . . . shall remain eligible *and enrolled* for such benefits" for the duration of the specified period. S. 646 § 3(b)(1) (emphasis added); H.R. 1738 § 2(b)(1) (same). Those bills have not passed, and the 2023 CAA includes no language referencing "enrollment."

### September 29, 2023, SHO Letter

68.     On September 29, 2023, CMS issued a State Health Official letter "to provide states with guidance on implementing" the new continuous eligibility requirement in the 2023 CAA. Ex.3, SHO Letter at 1. But CMS's "guidance" is, itself, misguided.

69.     In the SHO Letter, CMS conflates "eligibility" and "enrollment," incorrectly stating that continuous eligibility "provides *coverage* to children in . . . CHIP for a full 12-month period regardless of changes in circumstances." *Id.* at 2 (emphasis added). The SHO Letter thus prohibits *disenrollment* during continuous eligibility period. *See, e.g., id.* at 8 ("States may *not* terminate coverage . . . during a [continuous eligibility] period . . . [r]ather, the child must remain eligible for coverage through the end of the 12-month period" (emphasis original)).

70.     CMS also observed that the 2023 CAA "explicitly provide[s]" only two "exception[s]" to continuous eligibility: for children who "[r]each age 19" or "[c]ease

to be state residents." *Id.* at 4. But CMS explained that States "will be expected to" continue terminating eligibility for three other reasons currently expressed in CHIP and Medicaid regulations: when eligibility is voluntarily terminated, when the agency determines eligibility was erroneously granted, or when the child dies. *Id.* at 4–5 (citing 42 C.F.R. §§ 435.926(d), 457.342(b)).

71.     According to CMS, these five circumstances are the only situations in which a State can terminate CHIP eligibility during the continuous eligibility period. *Id.* at 7, 8. States with nonconforming CHIPs "must" submit plan amendments "no later than the end of the state fiscal year in which January 1, 2024 falls." *Id.* at 14.

72.     The SHO Letter did not discuss termination of *coverage* for nonpayment of premiums, noting instead that CMS was "still assessing how non-payment of premiums intersects with [continuing eligibility] under the CAA" and indicating CMS's "inten[t] to issue separate guidance on [the] topic." *Id.* at 4 n.14.

### October 27, 2023, FAQs

73.     On October 27, 2023, CMS issued a document labeled "Frequently Asked Questions" about continuous eligibility under the 2023 CAA. Ex.4, FAQs. Despite its title, the FAQs impose new substantive obligations on States operating CHIPs and effectively amend CMS's existing regulations.

74.     In the FAQs, CMS instructs that beginning January 1, 2024, States cannot "terminate CHIP *coverage* during a continuous eligibility . . . period due to nonpayment of premiums" (emphasis added). *Id.* at 1. As in the SHO Letter, CMS

mistakenly equates *eligibility* for CHIP benefits with *coverage* under—and thus *enrollment* in—a state CHIP.

75.    CMS further reasons that because "[t]here is not an exception to [continuous eligibility] for nonpayment of premiums" under the 2023 CAA, "the existing regulatory option at 42 CFR § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception to [continuous eligibility] will end on December 31, 2023." Ex.4, FAQs at 1. "States that have already adopted [continuous eligibility] for children and treat nonpayment of premiums as an exception to [continuous eligibility] in CHIP will need to submit a CHIP [state plan amendment] as outlined in … [the] SHO Letter." *Id.*

76.    Moreover, CMS continues that States must "absorb the costs of unpaid premiums," as those costs are not eligible for federal reimbursement. *Id.* at 2.

77.    CMS, however, insists that five regulatory reasons for terminating eligibility remain operable. *See* 42 C.F.R. §§ 435.926(d), 457.342(b). Two of those— aging out or moving out-of-state—are expressly included in the 2023 CAA. Ex.4, FAQs at 1. CMS justifies retaining the other three—when the child dies, "requests disenrollment,"[6] or eligibility was erroneously granted—because they "do not

---

[6] While 42 C.F.R. § 435.926(d)(2) permits termination of "eligibility" during the continuous eligibility period whenever "[t]he child or child's representative requests a voluntary *termination of eligibility*" (emphasis added), the FAQs permit States to "terminate *coverage*" whenever "the child or their representative requests *disenrollment*," Ex.4, FAQs at 1 (emphases added), again conflating "eligibility" with "enrollment."

undermine the [continuous eligibility] mandate . . . and are important to protecting program integrity." *Id.*

78.    But CMS does not explain how allowing termination of coverage (i.e., disenrollment)—not termination of *eligibility*—based on premium nonpayment undermines the 2023 CAA's continuous eligibility requirement. Nor does CMS explain why allowing disenrollment for nonpayment of premiums is not important for program integrity.

***Florida's CHIP Expansion Threatened***

79.    In October 2023, CMS informed Florida that it could not obtain approval for Florida's expanded CHIP—including the new premium tiers—through a conventional plan amendment, but would need to apply for a waiver under section 1115 of the Social Security Act, 42 U.S.C. § 1315(a). At the same time, CMS informed Florida that it would need to submit an amendment modifying Florida CHIP to conform with the SHO Letter and FAQs.

80.    CMS indicated that it would not approve Florida's proposed expansion without accompanying modifications to Florida CHIP's continuous eligibility provisions, namely, the provisions that allow the State to disenroll an eligible child for nonpayment of premiums during the continuous eligibility period.

81.    On January 23, 2024, Florida posted for public review and input their application for a section 1115 waiver for the expanded Florida CHIP plan. *See New 5-Year Section 1115 Demonstration Request*, *supra*.

**Secretary Becerra's December 18, 2023, Letter to Governor DeSantis**

82.    On December 18, 2023, Secretary Becerra sent a letter to Governor DeSantis, discussing trends in Medicaid and CHIP enrollment and "urg[ing]" Governor DeSantis "to ensure that no child in [Florida] who still meets eligibility criteria for Medicaid or CHIP loses their health coverage due to 'red tape' or other avoidable reasons." Ex.6, Letter from Secretary Becerra to Governor DeSantis (Dec. 18, 2023) ("Becerra Letter") at 1.

83.    Secretary Becerra's letter listed several recommended "proactive actions to prevent eligible children from losing Medicaid and CHIP," and closed with a suggestion to "[e]xpand Medicaid." *Id.* at 1–2.

84.    The letter also included the ominous warning that "HHS takes its oversight and monitoring role . . . extremely seriously and will not hesitate to take action to ensure states' compliance with federal Medicaid requirements." *Id.* at 1.

**The FAQs Undermine the Integrity and Sustainability of Florida CHIP**

85.    The FAQs impose a continuous enrollment requirement that requires Florida to administer its CHIP without the cost-sharing that Florida deems critical to its program and that has been expressly allowed by Congress.

86.    The FAQs allow eligible children to obtain health insurance for a full 12 months—the duration of the continuous eligibility period—by enrolling and paying the first month's premium only. 42 C.F.R. §§ 435.916(a), 457.343. The same scenario can then repeat following the next eligibility determination, and the next, and so on.

87.    Under the FAQs, there is no consequence for failing to pay premiums, severely diminishing the incentive of participants to make any premium payment after the first month. As a result, widespread nonpayment is a reasonable expectation. Florida's revenue from premium collection could therefore drop by eleven-twelfths (91.67%), which would mean a loss of more than $27.5 million annually under Florida's current program, and an anticipated loss of more than $48.5 million in the first year under an expanded program. *See* Ex.1, Noll Declaration ¶¶ 4, 7. According to CMS, these sums are not federally reimbursable, forcing Florida to assume the losses. Ex.4, FAQs at 2.

88.    Florida anticipates that compliance with the FAQs will cost approximately $1 million each month to provide benefits to CHIP participants who should have been disenrolled. Ex.1, Noll Declaration ¶ 10.

89.    Forcing Florida to comply with the FAQs will also impact the planned expansion of the program, preventing thousands of Florida children from accessing health insurance coverage.

90.    The FAQs amount to a backdoor expansion of no-cost health insurance coverage. Although entitlement programs may be the Biden Administration's preferred policy, *see* Ex.6, Becerra Letter at 2 (suggesting Florida "dramatically reduce barriers for families to enroll their children in coverage, including eliminating CHIP premiums" or "[e]xpand Medicaid"), Congress disagreed. *See* 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan.").

91.    Florida disagrees, too. Fla. Stat. § 409.813 ("coverage under the Florida KidCare program is not an entitlement"); *see also id.* § 409.812. And under the federal CHIP framework, it is Florida's preferred policy that matters. *See, e.g.,* 42 U.S.C. § 1397gg(a) (permitting State to "identify specific strategic objectives" and "performance goals" for CHIP plan); *id.* § 1397ff(d) (providing for "withholding of funds" only "in the case of substantial noncompliance" with "the requirements of" Title XXI).

92.    Florida's approach has been expressly authorized by Congress. Under Title XXI, Congress has recognized that States may "impos[e]" "charges" on CHIP participants for health insurance coverage, including "premiums, deductibles, [and] coinsurance." 42 U.S.C. § 1397cc(e)(1)(A). And Congress has allowed States to "terminat[e]" an enrollee's "coverage under the plan" for "failure to make a premium payment" after a grace period. *Id.* § 1397cc(e)(3)(C)(i). Florida's approach is also authorized by 42 C.F.R. § 457.342(b), which the FAQs purport to "end," Ex.4, FAQs at 1.

93.    The 2023 CAA does not impose a continuous enrollment requirement. By its plain terms, the 2023 CAA requires continuous *eligibility* for CHIP benefits, not continuous *enrollment* in a CHIP plan. Florida CHIP provides what the 2023 CAA requires: Once a child is determined to be eligible for CHIP benefits, the child remains eligible for those benefits for an entire year. And if the child is disenrolled for nonpayment of premiums, the child can reenroll during the continuous eligibility period without a new eligibility determination.

94.     The FAQs are unlawful. They must be enjoined and set aside.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Violation of the APA: Contrary to Law)

95.     The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

96.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     The FAQs contradict Congress's express allowance for States to terminate coverage for nonpayment of premiums in section 2103(e)(3)(C) of the Social Security Act, 42 U.S.C. § 1397cc(e)(3)(C) (allowing States to "terminat[e]" an enrollee's "coverage" for nonpayment after a 30-day grace period). Under the FAQs, States have no opportunity to "terminat[e] . . . coverage." *Id.* They thus violate 42 U.S.C. § 1397cc(e)(3)(C) or otherwise render it a dead letter, contravening "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up).

98.     The FAQs also violate CMS's own operative regulations, which expressly permit States to terminate a participant's coverage "during the continuous eligibility period for failure to pay required premiums." 42 C.F.R. § 457.342(b). "So long as this regulation is extant it has the force of law." *United States v. Nixon*, 418 U.S. 683, 695 (1974). CMS has not amended or rescinded 42 C.F.R. § 457.342(b) through

notice-and-comment, nor can it simply "end" the provision by fiat in an FAQs. "So long as this regulation remains in force [CMS is bound by it[.]" *Nixon*, 418 U.S. at 696.

99.    The FAQs are also contrary to law because they fail to provide for plans, like Florida's, that are grandfathered into CHIP. States with grandfathered programs are permitted to maintain their existing CHIPs and have discretion to modify those programs within broad limits. 42 U.S.C. § 1397cc(a)(3), (d).

100.    Since its inception, Florida CHIP has permitted disenrollment for nonpayment of premiums, including during continuous eligibility periods. The FAQs prevent Florida from exercising its authority under the grandfathering provisions of Title XXI to maintain its existing CHIP, including disenrolling participants for nonpayment of premiums.

## COUNT TWO

### (Violation of the APA: Excess of Statutory Authority)

101.    The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

102.    The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

103.    CMS has no authority to impose a continuous enrollment requirement. The 2023 CAA provides only that a child "who is determined to be *eligible* for benefits under" a state CHIP "shall remain *eligible* for such benefits" for 12 months, unless the

child first reaches age 19 or ceases to be a state resident. 2023 CAA § 5112(a), (b), 136 Stat. at 5940 (emphases added).

104.    A child is *eligible* for CHIP benefits if the child meets the relevant state-established criteria. 42 U.S.C. § 1397bb(b)(1). For Florida CHIP, eligibility criteria include having a household income under 210% of the federal poverty level, being a U.S. citizen or qualified alien, being a Florida resident, and being uninsured. Ex. 2, Fla. CHIP Plan at 5, 80–84, 86, 177. Florida's eligibility criteria do not include any standard related to payment of premiums.

105.    Children determined *eligible* for CHIP benefits are then offered the option to *enroll* in CHIP and obtain health insurance *coverage*. Enrollment may require an eligible child's family to take additional actions, for example, paying an enrollment fee and monthly premiums. *See, e.g.,* 42 C.F.R. § 457.510 (discussing, among other permissible charges, "enrollment fees").

106.    Title XXI consistently distinguishes eligibility from enrollment. *See, e.g.,* 42 U.S.C. § 1397bb(b)(4) (discussing "barriers to the enrollment" of "eligible" individuals); *id.* § 1397hh(c)(3) ("enrollees, disenrollees, and individuals eligible for but not enrolled" in a CHIP plan); *id.* § 1397mm(a)(1) ("efforts . . . to increase the enrollment . . . of eligible children"); *id.* § 1397mm(h)(1) ("campaigns to link the eligibility and enrollment systems"); *id.* § 1397mm(h)(6) ("enrollment . . . strategies for eligible children").

107.    CMS regulations do the same. *See, e.g.,* 42 C.F.R. § 457.10 (discussing information in an "eligibility notice," including the potential impact of a

"determination of eligibility for, or enrollment in, another insurance affordability program"); *id.* § 457.60 ("[e]ligibilty standards, enrollment caps, and disenrollment policies"); *id.* § 457.300 ("[r]egulations relat[ed] to eligibility, screening, applications and enrollment"); *id.* § 457.350(i)(2)(ii)(A) ("the date on which the individual will be eligible to enroll"); *id.* § 457.525(b) (cost-sharing information must be made available to "[e]nrollees, at the time of enrollment and reenrollment after a redetermination of eligibility"); *id.* § 457.570(b) (adjustment to a "child's cost-sharing category" if "the enrollee may have become eligible ... for a lower level of cost sharing").

108.   Had Congress intended to require continuous enrollment in a state CHIP, it would have said so, as has been done in proposed but unenacted bills. *See* S. 646 § 3(b)(1) (requiring that "an individual who is determined to be eligible for benefits . . . shall remain eligible *and enrolled* for such benefits" for the duration of the specified period (emphasis added)); H.R. 1738 § 2(b)(1) (same).

109.   Nor is there is any inherent conflict in requiring continuous eligibility for CHIP while permitting disenrollment for failure to pay premiums. A participant may remain eligible for CHIP benefits even if the participant is not presently enrolled in a CHIP plan for whatever reason. During the continuous eligibility period, a participant disenrolled from a plan for nonpayment of premiums can reenroll without applying again for an eligibility determination—the participant remains "eligible" for CHIP benefits, but simply is not enrolled if the modest premium requirements are not satisfied.

110.   Indeed, CMS has long recognized by regulation that continuous eligibility and disenrollment for nonpayment of premiums comfortably co-exist. *See* 42 C.F.R. § 457.342(b) (permitting termination for nonpayment of premium during the continuous eligibility period). And Florida has successfully implemented both for decades.

111.   To the extent that there is any discernible tension between the 2023 CAA's continuous eligibility requirement and the allowance for termination of coverage for nonpayment of premiums under 42 U.S.C. § 1397cc(e)(3)(C), the specific provisions about disenrollment for nonpayment of premiums must govern. *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002) (explaining that "specific statutory language. . . control[s] more general language when there is a conflict between the two").

112.   By its plain language, the 2023 CAA unambiguously requires that a child "remain eligible for [CHIP] benefits," not that the child remain enrolled in a CHIP. 2023 CAA § 5112(a), 136 Stat. at 5940. CMS "must give effect to that clear intent." *In re Gateway Radiology Consultants*, 983 F.3d at 1256. CMS's attempt to impose a continuous enrollment requirement thus exceeds the agency's authority.

113.   It is irrelevant that CMS believes a continuous enrollment requirement may be more beneficial. *See* Ex.3, SHO Letter at 2. "[P]olicy considerations cannot create an ambiguity when the words on the page are clear." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018). The 2023 CAA is clear: States must provide continuous *eligibility*. The 2023 CAA says nothing about *enrollment* or *coverage*.

114.   Failure to account in the FAQs for existing plans, like Florida's, that are grandfathered into the federal CHIP program also exceeds CMS's authority. *See* 42 U.S.C. § 1397cc(a)(3), (d).

## COUNT THREE

### (Violation of the APA: Arbitrary or Capricious)

115.   The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

116.   The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, [or] capricious." 5 U.S.C. § 706(2)(A). Agency actions thus must be "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

117.   CMS observes that the 2023 CAA "provide[s] for limited exceptions" to the continuous eligibility requirement, namely "the child turning age 19, no longer being a state resident or, in the case of a child enrolled in a separate CHIP, becoming eligible for Medicaid." Ex.4, FAQs at 1. Because "[t]here is not an exception to [continuous eligibility] for non-payment of premiums," CMS asserts that the "existing regulatory option" for termination of enrollment for nonpayment does not survive. *Id.*

118.   It is logically inconsistent for CMS to permit three other "exceptions" to terminating eligibility—when the child dies, the child (or the child's representative) requests termination, or the agency determines eligibility was erroneously granted— none of which are provided for in the 2023 CAA. *Id.*; *see also* Ex.3, SHO Letter at 4–5. The 2023 CAA either forecloses non-statutory exceptions or it does not.

119.   The same justification that CMS offers for its preferred exceptions—that they "do not undermine the [continuous eligibility] mandate . . . and are important to protecting program integrity," Ex.4, FAQs at 1—also applies to allowing disenrollment for nonpayment of premiums. As explained above, such disenrollment does not affect eligibility for CHIP benefits. And allowing disenrollment is crucial to maintaining the integrity and long-term sustainability of programs, like Florida's, that incorporate cost-sharing as a fundamental component of their CHIPs.

120.   Moreover, "[w]hen an agency changes its existing position" it "must at least display awareness that it is changing position," "show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 221–22 (cleaned up). "[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 222.

121.   CMS completely ignores the distinction between eligibility and enrollment, including that continuous eligibility and disenrollment for nonpayment of premiums have co-existed in its regulations for nearly a decade. *See* 42 C.F.R. § 457.342(b). CMS does not explain why it elides this distinction and has reversed its long-held position that disenrollment for nonpayment is compatible with continuous eligibility. "This lack of reasoned explication for a regulation that is inconsistent with [CMS's] longstanding earlier position," is reason for the court to set aside the FAQs. *Encino Motorcars*, 579 U.S. at 224.

122.    CMS has also "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. CMS never considered the authority granted to States, like Florida, whose plans were grandfathered into the CHIP program. Under Title XXI, these States are permitted to continue operating their existing plans and have discretion to modify those plans within broad limits. 42 U.S.C. § 1397cc(a)(3), (d). Neither the SHO Letter nor the FAQs acknowledge or account for this authority.

123.    CMS similarly failed to consider that States have relied on their authority to terminate coverage for nonpayment when implementing and expanding their CHIPs. Florida, in particular, has significant reliance interests because it recently enacted legislation expanding the state CHIP to offer subsidized coverage to more children. This was based on the expectation that the expansion will be partially funded through premium payments. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, *supra,* at 6–7. "When an agency changes course," it is "arbitrary and capricious to ignore [reliance interests]." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up).

## COUNT FOUR

### (Violation of the APA: Without Observance of Required Procedure)

124.    The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

125. The APA requires agencies to provide "notice" of an intended rulemaking and "give interested persons an opportunity to participate in the rule making," typically through a comment process. 5 U.S.C. § 553(b), (c).

126.   The APA's notice-and-comment requirements apply to, among others, actions that "effectively amen[d] a prior legislative rule," *Am. Mining Cong.*, 995 F.2d at 1112. The requirements also apply to actions that "create new law, rights or duties" or "have effects *completely independent* of the statute." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (cleaned up).

127.   The FAQs are agency action subject to APA's notice-and-comment requirements because they purport to "end" 42 C.F.R. § 457.342(b), Ex.4, FAQs at 1, which is, itself, a legislative rule promulgated after notice-and-comment, *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016).

128.   The FAQs are also subject to notice-and-comment because their requirement that States guarantee enrollment for the duration of the continuous eligibility period is a "new . . . dut[y]" on States, whose "effect[t] [is] *completely independent* of the statute." *Warshauer*, 577 F.3d at 1337 (cleaned up)

129.   CMS issued the FAQs to effectively amend its regulations and impose a continuous enrollment requirement without notice and without providing interested parties opportunity to comment, as required by the APA.

## COUNT FIVE

### (Declaratory Judgment)

130.   The allegations in paragraphs 1–94 are expressly incorporated herein as if restated in full.

131.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

132.   For the same reasons described in Counts 1 through 4, Florida is entitled to a declaratory judgment that the FAQs are contrary to law, in excess of statutory authority, arbitrary and capricious, and without observance of procedure required by law, and thus do not bind or otherwise limit Florida.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.   Declare that the FAQs are unlawful, in violation of 5 U.S.C. §§ 553 and 706(2)(A), (C), (D); 42 U.S.C. § 1397gg(e)(1)(K), as amended by 2023 CAA § 5112(b), 136 Stat. at 5940; 42 U.S.C. § 1397cc(a)(3), (d), (e)(3)(C); and 42 C.F.R. § 457.342(b).

B.   Vacate and set aside the FAQs, as required by 5 U.S.C. § 706(2).

C.   Enjoin Defendants from enforcing the FAQs, including but not limited to disapproving a state CHIP plan amendment, denying a CHIP waiver, or initiating a non-compliance finding or corrective action plan based on the FAQs.

D.   Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412; and

E.   Grant Plaintiffs such other and further relief to which they are justly entitled at law and in equity.

Dated: February 1, 2024

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Natalie Christmas*
Natalie Christmas (FBN 1019180)*
COUNSELOR TO THE ATTORNEY
  GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

*\* Lead Counsel*
*Counsel for the State of Florida*

*/s/ R. Trent McCotter*
R. Trent McCotter (*pro hac vice forthcoming*)*
Jared M. Kelson (*pro hac vice forthcoming*)
Laura B. Ruppalt (*pro hac vice forthcoming*)
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

ANDREW T. SHEERAN
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*\* Lead Counsel*
*Counsel for Agency for Health Care*
  *Administration*

# Doc. 1-1

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### Case No. 8:24-cv-_____

STATE OF FLORIDA; and
FLORIDA AGENCY FOR HEALTH
CARE ADMINISTRATION,

*Plaintiffs,*

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official
capacity as Commissioner of Centers for
Medicare and Medicaid Services*;
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and XAVIER
BECERRA, *in his official capacity as
Secretary of Health and Human Services,*

*Defendants.*

---

## DECLARATION OF AUSTIN NOLL

I, Austin Noll, declare as follows:

1.     My name is Austin Noll, I am over 18 years of age, of sound mind, and

capable of making this declaration. This declaration is based on my personal

knowledge and other information known to the Florida Agency for Health Care

Administration ("AHCA"). I believe the facts stated herein to be true and correct. I

would testify to the facts stated in this declaration in open court if called upon to do

so.

1

2.      I am the Deputy Secretary for Medicaid Policy, Quality, and Operations for AHCA. In this role, I oversee the bureaus of Medicaid Policy, Medicaid Quality, Medicaid Plan Management Operations, Medicaid Recipient and Provider Assistance, and Medicaid Third Party Liability. I have held this position since February 2023. Prior to my role as Deputy Secretary, I served as the Chief Operating Officer of the Florida Healthy Kids Corporation, which operates Florida's Children's Health Insurance Program ("CHIP") under the direction of AHCA. From November 2016 to February 2023, I oversaw CHIP eligibility and enrollment, plan management operations, quality, information systems, and data analytics.

3.      As of October 2023, more than 119,000 children in low- and moderate-income families statewide receive subsidized health insurance through Florida CHIP.

4.      In fiscal year 2019–2020, Florida collected over $30 million in premium payments from CHIP participants.

5.      On June 22, 2023, Governor DeSantis signed into law Florida H.B. 121 to substantially expand the provision of subsidized health insurance to Florida children. *See* An Act Relating to Florida KidCare Program Eligibility, H.B. 121, § 1, 2023 Leg. (Fla. 2023). Florida anticipates that its expanded CHIP plan will provide subsidized health insurance to an additional 26,096 children in its first full year.

6.      Florida anticipates that the expanded CHIP will cost an additional $90 million in its first full year. That cost is expected to be funded through approximately $23.1 million in additional premium payments from families, $19.7 million in additional state funds, and $47.2 million in additional federal funds.

2

7.      Florida anticipates collecting more than $53 million in total premium payments from new and existing CHIP participants in the first full year of the expanded CHIP.

8.      In October 2023, Centers for Medicare and Medicaid (CMS) issued a Frequently Asked Questions (FAQs) that prohibits states from disenrolling CHIP participants for failure to pay premiums during the continuous eligibility period.

9.      In any given month, Florida anticipates approximately 3% of Florida CHIP participants will be disenrolled for failing to pay premiums.

10.     Florida anticipates that if it complies with the CMS FAQs, it will spend approximately $1 million each month to provide benefits to CHIP participants who would otherwise have been disenrolled for failing to pay premiums.

11.     Disenrollments from Florida CHIP occur monthly and become effective on the first day of the month after the unpaid premium was due. The next disenrollments will be effective February 1, 2024, for participants who have not paid premiums due January 1, 2024.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 31, 2024

_____
AUSTIN NOLL

3

# Doc. 1-2

# Exhibit 2

# State of Florida

# Florida KidCare Program

*Amendment to Florida's Title XXI Child Health Insurance Plan*
*Submitted to the Centers for Medicare and Medicaid Services*

*Amendment FL-22-0034-CHIP*
*March 11, 2021*





State Children's Health Insurance Program

## Table of Contents

Section 1     *General* Description and Purpose of the State Child Health Plans and State Child Health Plan Requirements.................................................................4

Section 2     General Background and Description of State Approach to Child Health Coverage and Coordination ................................................................15

Section 3     Methods of Delivery and Utilization Controls...............................................33

Section 4     Eligibility Standards and Methodology .........................................................76

Section 5     Outreach .......................................................................................................105

Section 6     Coverage Requirements for Children's Health Insurance .............................117

Section 7     Quality and Appropriateness of Care...........................................................168

Section 8     Cost Sharing and Payment ...........................................................................176

Section 9     Strategic Objectives and Performance Goals and Plan Administration.........192

Section 10    Annual Reports and Evaluations...................................................................206

Section 11    Program Integrity……………………………………………………….…... 207

Section 12    Applicant and Enrollee Protections……………………………………….208

## Tables and Charts

Florida KidCare Eligibility ......................................................................................5

Florida Medicaid Child Eligibility ..........................................................................23

Overview of FHKC Administrative Functions ........................................................27

Florida KidCare Application Process ......................................................................31

Title XXI Transfer Policy........................................................................................96

Florida KidCare Family Premiums …………………………………………………177

| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

1

State Children's Health Insurance Program

Non-Payment Waiting Period…………………………………………………………97

Florida Healthy Kids Co-payments……………………………………………………181

Title XXI Billing Methodology ...................................................202

SCHIP Budget Plan Template ...................................................204

Review Processes for Florida KidCare ...................................................210

Appendix A…KidCare Medicaid Screening Criteria ………………………….…………...215

Appendix B …Dispute Review Process……………………………………………………218

Appendix C …Florida KidCare Grievance Procedure ………………………………...225

Appendix D…Healthy Kids Dental Prior Authorization Process…………………………...230

Appendix E…Dependents of State Employee Coverage, Maintenance of Agency………...236
         Contribution

Phase 1 Effective Date:  April 1, 1998                         Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Phase 2 Effective Date:  July 1, 1998                          Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
                                                               7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04,
                                                               8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
                                                               10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
                                                               9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
                                                               3/11/2021

State Children's Health Insurance Program

# STATE CHILD HEALTH PLAN UNDER TITLE XXI OF THE SOCIAL SECURITY ACT
## STATE CHILDREN'S HEALTH INSURANCE PROGRAM

**(Required under 4901 of the Balanced Budget Act of 1997 (New section 2101(b)))**

State/Territory:＿＿＿State of Florida＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
(Name of State/Territory)

As a condition for receipt of Federal funds under Title XXI of the Social Security Act, **(42 CFR, 457.40(b))**

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Tom Wallace, Deputy Secretary for Medicaid　　　　　　Date

submits the following State Child Health Plan for the State Children's Health Insurance Program and hereby agrees to administer the program in accordance with the provisions of the approved State Child Health Plan, the requirements of Title XXI and XIX of the Act (as appropriate) and all applicable Federal regulations and other official issuances of the Department.

The following state officials are responsible for program administration and financial oversight **(42 CFR 457.40(c))**:
Name: Tom Wallace　　　　　　　　　　　Position/Title: Deputy Secretary for Medicaid
Name:　　　　　　　　　　　　　　　　　Position/Title:
Name:　　　　　　　　　　　　　　　　　Position/Title:

**According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.  The valid OMB control number for this information collection is 0938-0707.  The time required to complete this information collection is estimated to average 160 hours (or minutes) per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.  If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, P.O. Box 26684, Baltimore, Maryland 21207 and to the Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C.  20503.**

| | | |
|---|---|---|
| Phase 1 Effective Date: <u>April 1, 1998</u><br>Phase 2 Effective Date: <u>July 1, 1998</u> | 3 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98<br>Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

**Section 1.**    **General Description and Purpose of the Children's Health Insurance Plans and the Requirements**

**1.1.**         The state will use funds provided under Title XXI primarily for (Check appropriate box) (Section 2101(a)(1)); (42 CFR 457.70):

Guidance:  Check below if child health assistance shall be provided primarily through the development of a separate program that meets the requirements of Section 2101, which details coverage requirements and the other applicable requirements of Title XXI.

**1.1.1.** ☐  Obtaining coverage that meets the requirements for a separate child health program (Sections 2101(a)(1) and 2103);   OR

Guidance:  Check below if child health assistance shall be provided primarily through providing expanded eligibility under the State's   Medicaid program (Title XIX). Note that if this is selected the State must also submit a corresponding Medicaid SPA to CMS for review and approval.

**1.1.2.** ☐  Providing expanded benefits under the State's Medicaid plan (Title XIX) (Section 2101(a)(2)); OR

Guidance:  Check below if child health assistance shall be provided through a combination of both 1.1.1. and 1.1.2. (Coverage that meets the requirements of Title XXI, in conjunction with an expansion in the State's Medicaid program). Note that if this is selected the state must also submit a corresponding Medicaid state plan amendment to CMS for review and approval.

**1.1.3.** ☒  A combination of both of the above. (Section 2101(a)(2))

**1.1-DS** ☐  The State will provide dental-only supplemental coverage. Only States operating a separate CHIP program are eligible for this option. States choosing this option must also complete sections 4.1-DS, 4.2-DS, 6.2-DS, 8.2-DS, and 9.10 of this SPA template. (Section 2110(b)(5))

Major elements of Florida's Title XXI plan, known as the Florida KidCare Program, include:

**Phase 1** (*effective April 1, 1998*)

- Extending Medicaid coverage for children ages 15 to 19 in families with incomes up to 100% of the Federal Poverty Level;

- Expanding the Florida Healthy Kids program, modified to meet the requirements of Title XXI;

**Phase 2** (*effective July 1, 1998*)

- Implementing the Florida KidCare program for children in families with incomes up to 200% of the federal poverty level, except for Medicaid.  The components of the Florida KidCare program include:

---

Phase 1 Effective Date:    April 1, 1998
Phase 2 Effective Date:    July 1, 1998

4

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04**,** 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

— MediKids, ages 1 to 5;

— Florida Healthy Kids, ages 5 to 19;

— the Children's Medical Services Network for children with special health care needs, ages 0 to 19; and

— Medicaid for children under age 19.

- Initiating preventive dental coverage for selected sites for Florida Healthy Kids enrollees

- Converting children under the age of 1 in families with income up to 200% of the federal poverty level, to Title XIX Medicaid.

- Expanding comprehensive dental coverage for the Florida Healthy Kids program.

# Florida KidCare Eligibility



Phase 1 Effective Date: April 1, 1998
Phase 2 Effective Date: July 1, 1998

Revised: 1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

1.2        ☒        Check to provide an assurance that expenditures for child health assistance will not be claimed prior to the time that the State has legislative authority to operate the State plan or plan amendment as approved by CMS. (42 CFR 457.40(d))

Florida assures CMS that it will not claim expenditures for child health insurance prior to obtaining legislative authority to operate the CMS-approved plan amendment.

1.3        ☒        Check to provide an assurance that the state complies with all applicable civil rights requirements, including Title VI of the Civil Rights Act of 1964, Title II of the Americans with Disabilities Act of 1990, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, 45 CFR part 80, part 84, and part 91, and 28 CFR part 35. **(42CFR 457.130)**

Guidance: The effective date as specified below is defined as the date on which the State begins to incur costs to implement its State plan or amendment. (42 CFR 457.65) The implementation date

The state assures that it complies with all applicable civil rights requirements.

1.4        Provide the effective (date costs begin to be incurred) and implementation (date services begin to be provided) dates for this SPA (42 CFR 457.65). A SPA may only have one effective date, but provisions within the SPA may have different implementation dates that must be after the effective date.

Original Plan
Effective Date: July 1, 2018

Implementation Date: July 1, 2018

SPA #FL-19-00XX Purpose of SPA: Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care and Revisions Related to Third Party Liability Final Rule – To demonstrate compliance with the CHIP Managed Care final regulations reflecting changes in the usage of managed care delivery systems.

Proposed effective date: July 1, 2018

Proposed implementation date: July 1, 2018

SPA #1  (MediKids and CMSN Expansion)
        Effective date:        July 1, 1998
        Implementation date:  October 1998

SPA #2  (Employer-sponsored Insurance)

---

Phase 1 Effective Date:   April 1, 1998
Phase 2 Effective Date:   July 1, 1998

6

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

                    Disapproved:                November 5, 1999


SPA #3  (Healthy Kids Dental Pilot)
             Effective date:            October 1, 1999
             Implementation date:  October 1, 1999


SPA #4  (Expands Medicaid <1, MediKids Mandatory Assignment)
             Effective date:            July 1, 2000
             Implementation date:  July 1, 2000


SPA #5  (Expands Healthy Kids Dental Coverage)
             Effective date:            February 1, 2001
             Implementation date:  February 1, 2001


SPA #6  (School-based Health Services)
             Effective date:            July 1, 2002
             Implementation date:  July 1, 2002


SPA #7 (Employer-Sponsored Coverage)
             SPA Withdrawn


SPA #8  (Compliance)
             Effective date:            February 7, 2003
             Implementation date:  July 1, 2002


SPA #9  (Legislative Changes)
             Effective date:            July 1, 2003 & December 1, 2003
             Implementation date:  July 1, 2003


SPA#10 (PIC Services)
             Effective date:            March 11, 2004
             Implementation date: March 11, 2004


SPA#11 (Change in Source of State Funding)
             Withdrawn:    April 10, 2006


SPA#12 (Legislative Changes)
             Effective date:            April 1, 2004 and July 1, 2004
             Implementation date:  April 1, 2004 and July 1, 2004

---

Phase 1 Effective Date:  <u>April 1, 1998</u>                    7              Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Phase 2 Effective Date:  <u>July 1, 1998</u>                                        Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
                                                                                                       7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04,
                                                                                                       8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
                                                                                                       10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
                                                                                                       9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
                                                                                                       3/11/2021

State Children's Health Insurance Program

SPA#13 (KidCare Policy Changes)
   Effective date:    September 14, 2004
   Implementation date: September 14, 2004 and March 12, 2004

SPA#14 (Hurricane Premium Credits)
   Effective date:    September 1, 2004
   Implementation date: September 1, 2004

SPA#15 (Legislative Changes)
   Effective date:    December 21, 2004
   Implementation date: December 21, 2004

SPA #16 (Legislative Changes)
   Effective date:    June 1, 2005
   Implementation date: June 10, 2005

SPA #17 (Policy Clarifications)
   Effective Date:    October 1, 2006
   Implementation Date: October 1, 2006

SPA #18 (Legislative Changes)
   Effective Date:    July 1, 2009
   Implementation Date: July 1, 2009 and October 1, 2009 (for removal of
limitations for mental health and substance abuse services)

SPA #19 (CHIPRA Dental Compliance)
   Effective Date:    July 1, 2010
   Implementation Date: July 1, 2010

SPA #19 (Legislative Changes and Improvements)
   Effective Date:    July 1, 2011

SPA #20 (Legislative Changes and Improvements)
   SPA Withdrawn:    January 31, 2012

SPA #21 (Legislative Changes and Improvements)
   Effective Date:    July 1, 2011
   Implementation Date: July 1, 2011

---

Phase 1 Effective Date: April 1, 1998
Phase 2 Effective Date: July 1, 1998

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

SPA #22 (Legislative Changes and Clarifications)
 Effective Date:   July 1, 2012
 Implementation Date: July 1, 2012

SPA #23 (Provisional Eligibility)
 Effective Date:   October 1, 2012
 Implementation Date: October 1, 2012

SPA #24 Temporary Renewal Grace Period Extension
 Effective Date:   August 1, 2014
 Implementation Date:  August 1, 2014

## Superseding Pages of MAGI CHIP State Plan Material

| Transmittal Number | SPA Group | PDF # | Description | Superseded Plan Section(s) |
|---|---|---|---|---|
| **FL-13-0001**<br><br>Effective/ Implementation Date: January 1, 2014 | MAGI Eligibility & Methods | CS7<br><br><br>CS7<br><br><br>CS10<br><br><br>CS10<br><br>CS15 | Eligibility – Targeted Low Income Children<br><br>Eligibility – Special Program for Children with Disabilities<br><br>Children With Access to Public Employee Coverage<br><br>Maintenance of Agency Contribution<br><br>MAGI-Based Income Methodologies | Supersedes the current sections Geographic Area 4.1.1; Age 4.1.2; and Income 4.1.3: Supersede all<br><br>Sections 3.1, 3.2, 4.1.6, 4.1.9, 4.3 and 4.4.1: Supersede Information on Children's Medical Services Network<br><br>Section 4.4.1: Supersede information on dependents of employees of a public agency Appendix: Supersede current documentation<br><br>Section 4.3: Add new subsection and supersede information on income eligibility and methods Appendix A: supersedes all |
| **FL-13-0002**<br><br>Effective/ | XXI Medicaid Expansion | CS3 | Eligibility for Medicaid Expansion Program | Supersedes the current Medicaid expansion section 4.0 |

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04**,** 11/15/04,
8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
3/11/2021

State Children's Health Insurance Program

| Transmittal Number | SPA Group | PDF # | Description | Superseded Plan Section(s) |
|---|---|---|---|---|
| Implementation Date: January 1, 2014 | | | | |
| **FL-13-0003**<br><br>Effective/ Implementation Date: January 1, 2014 | Establish 2101(f) Group | CS14 | Children Ineligible for Medicaid as a Result of the Elimination of Income Disregards | Incorporate within a separate subsection under section 4.1 |
| **FL-13-0004**<br><br>Effective/ Implementation Date: January 1, 2014 | Non-Financial Eligibility | CS17<br><br>CS18<br><br>CS19<br><br>CS20<br><br>CS21<br><br>CS27 | Non-Financial Eligibility – Residency<br><br>Non-Financial – Citizenship<br><br>Non-Financial – Social Security Number<br><br>Substitution of Coverage<br><br>Non-Payment of Premiums<br><br>Continuous Eligibility | Supersedes the current section 4.1.5<br><br>Supersedes the current sections 4.1.0; 4.1-LR; 4.1.1-LR<br><br>Supersedes the current section 4.1.9.1<br><br>Supersedes the current section 4.4.4<br><br>Supersedes the current section 8.7<br><br>Supersedes the current section 4.1.8 |

SPA #25 Monthly Premium Conversion and Prospective Payment System
    Effective Date:    July 1, 2014
    Implementation Date:  July 1, 2014
    Premium change to Modified Adjusted Gross Income (MAGI) conversion will be retroactive to January 1, 2014.
    The Medicaid Prospective Payment System was implemented October 1, 2009. SPA #25 is updated to include this policy.

SPA FL-15-0026-CHIP, CS7 (Changes to Program for Children with Disabilities)
    Effective Date:    May 1, 2015

---

Phase 1 Effective Date:   April 1, 1998
Phase 2 Effective Date:   July 1, 1998

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04**,** 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

Implementation Date:          May 1, 2015

SPA FL-16-0027-CHIP, CS18 (CHIPRA Section 214 for Lawfully Residing Children)
Effective Date:          July 1, 2016
Implementation Date:          July 1, 2016

SPA  FL-17-0028-CHIP (Disaster Relief –To implement provisions for temporary adjustments to enrollment and renewal policies and cost sharing requirements for children in families living and/or working in Governor or FEMA declared disaster areas.  In the event of a natural disaster, the State will notify CMS that it intends to provide temporary adjustments to its enrollment and/or renewal policies and cost sharing requirements, the effective and duration date of such adjustments, and the applicable Governor or FEMA declared disaster areas.)
Effective Date:          September 1, 2017
Proposed Implementation Date:          September 7, 2017

SPA FL-17-0029-CHIP (Mental Health Parity and Addiction Equity Act (MHPAEA) - To implement the requirements of the Mental Health Parity and Addiction Equity Act of 2008 preventing group health plans and health insurance issuers from imposing less favorable benefit limitations on mental health or substance use disorder benefits.

Effective Date:          October 1, 2017
Proposed Implementation Date:          October 1, 2017


SPA #FL-19-0030-CHIP  - Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care and Revisions Related to Third Party Liability Final Rule  – To demonstrate compliance with the CHIP Managed Care final regulations reflecting changes in the usage of managed care delivery systems.

Proposed effective date: July 1, 2018

Proposed implementation date: July 1, 2018

SPA #FL-19-0031-CHIP  - SPA withdrawn.  The Florida Legislature removed provision from the state statute permitting the Florida KidCare Program to impose a $1 million maximum lifetime limit on covered benefits and services for children enrolled in the Florida Healthy Kids program.

SPA #FL-20-0032-CHIP - The state is revising the CHIP State Plan to include Disaster Relief Provisions for co-payments during a declared emergency.

| Phase 1 Effective Date: | April 1, 1998 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

Proposed effective date:  March 9, 2020

Proposed implementation date:  March 9, 2020

SPA #FL-2021-0033 Purpose of SPA: To demonstrate compliance with section 5022 of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT Act) in areas related to coverage of behavioral health screening prevention and treatment services, strategies to facilitate use of appropriate screening and assessment tools and the requirement that these services be provided in a culturally and linguistically appropriate manner.

Proposed effective date: July 1, 2020

Proposed implementation date: July 1, 2020

SPA #FL-2021-0034 Purpose of SPA: The purpose of this SPA is to demonstrate compliance with the American Rescue Plan Act provisions that require states to cover treatment (including treatment of a condition that may seriously complicate COVID-19 treatment), testing, and vaccinations for COVID-19 without cost sharing in CHIP.

Proposed effective date: March 11, 2021

Proposed implementation date: March 11, 2021

1.4- TC      Tribal Consultation (section 2107(e)(1)(C)  Describe the consultation process that occurred specifically for the development and submission of the State Plan Amendment, when it occurred and who was involved.

SPA #21 – Proposed Effective Date:   September 1, 2011
In accordance with out tribal consultation process described in Section 2.3-TC, letters were sent to the Seminole and Miccousukee Tribes on 9/7/2011 outlining the SPA changes.    The letters ask that comments or questions be directed to Gail Hansen at the Agency for Health Care Administration.

SPA #22 –Effective Date:          July 1, 2012
In accordance with our approved tribal consultation process described in Section 2.3-TC, the tribal notification letters were sent to the Seminole and Miccousukee Tribes on June 21, 2012, listing the SPA changes.  The letters asked that comments be directed to Gail Hansen at the Agency for Health Care Administration.  The letters advised the tribes that no response would be

---

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04,
8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
3/11/2021

State Children's Health Insurance Program

interpreted as they had no comments.  No response was received from either tribe.

SPA #23 – Effective Date:                October 1, 2012
In accordance with our approved tribal consultation process described in Section 2.3-TC, the tribal notification letters were sent to the Seminole and Miccosukee Tribes on August 13, 2012, listing the SPA changes.  The letters asked that comments be directed to Gail Hansen at the Agency for Health Care Administration.  The letters advised the tribes that no response would be interpreted as they had no comments.  No response was received from either tribe.

SPA #24 – Effective Date:                August 1, 2014
In accordance with our approved tribal consultation process described in Section 2.3-TC, the tribal notification letters were sent to the Seminole and Miccosukee Tribes on June 18, 2014, describing the SPA changes,  The letters asked that comments be directed to Gail Hansen at the Agency for Health Care Administration.  The letters advised the tribes that no response would be interpreted as they had no comments.  No response was received from either tribe.

SPA #25 – Effective Date:                July 1, 2014
In accordance with our approved tribal consultation process described in Section 2.3-TC, the tribal notification letters were sent to the Seminole and Miccosukee Tribes on December 10, 2014, describing the SPA changes.  The letters asked that comments be directed to Gail Hansen at the Agency for Health Care Administration.  The letters advised the tribes that no response would be interpreted as they had no comments.  On December 28, 2014, the Seminole Tribe requested further clarification.  The requested clarification was provided on December 28, 2014.  On December 31, 2014, a follow-up question was received, and a response was provided on December 31, 2014.  No further comments or requests were received.

SPA #26, CS7 - Effective Date:        May 1, 2015

This SPA clarifies changes to the Program for Children with Disabilities.  The tribal notification letters were sent to the Seminole and Miccosukee Tribes on  May 21, 2015, describing the State Plan Amendment changes. The letters advised the Tribes that no response would be interpreted as the Tribes having no comments.

No further comments or requests were received.

SPA#27 -Effective Date:                July 17, 2016

<u>This SPA clarifies lawfully residing children may receive CHIP coverage and will no longer be subject to a five-year waiting period as provided under section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA).</u>  The tribal notification letters were

---

| | | |
|---|---|---|
| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, |

Revised: 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

13

State Children's Health Insurance Program

sent to the Seminole and Miccosukee Tribes on April 28, 2016, describing the State Plan Amendment changes.  The letters advised the Tribes that no response would be interpreted as the Tribes having no comments

No further comments or requests were received.


SPA #28 - Effective Date:                    September 7, 2017

According to Florida's Tribal Consultation Policy, the state does not need to provide tribal consultation in the event that a SPA is not restrictive.  In the event of a natural disaster, this SPA permits the State to notify CMS that it intends to provide temporary adjustments to its enrollment and/or renewal policies and cost sharing requirements, the effective and duration date of such adjustments, in the applicable Governor or FEMA declared disaster areas.)

SPA #29 - Effective Date:                    October 17, 2017

According to Florida's Tribal Consultation Policy, the state does not need to provide tribal consultation in the event that a SPA is not restrictive. This SPA implements the requirements of the Mental Health Parity and Addiction Equity Act of 2008 preventing group health plans and health insurance issuers from imposing less favorable benefit limitations on mental health or substance use disorder benefits.


SPA #30 - Effective Date:                    July 1, 2018

This SPA demonstrates compliance with the CHIP Managed Care final regulations reflecting changes in the usage of managed care delivery systems. The tribal notification letters were sent to the Seminole and Miccosukee Tribes on June 4, 2019,  describing the State Plan Amendment changes.  The letters advised the Tribes that no response would be interpreted as the Tribes having no comments.  On June 11, 2019, the Seminole Tribe requested further clarification. The Agency provided clarification on June 18, 2019.

No further comments or requests were received.

SPA #31 - Effective Date:                    SPA Withdrawn

SPA #32 - Effective Date:                     March 9, 2020

According to Florida's Tribal Consultation Policy, the state does not need to provide tribal consultation in the event that a SPA is not restrictive. This SPA provides the state with an option

---

| Phase 1 Effective Date: | April 1, 1998 | 14 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

to waive cost sharing during a state of emergency. The SPA is not restrictive, and therefore did not require Tribal consultation."

SPA #33 - Effective Date:                    July 1, 2020

The State issued Tribal Correspondence to the Seminole and Miccosukee Tribes of Florida on May 28, 2021, describing the amendment. The State received no feedback regarding this amendment.

SPA #34 - Effective Date:                    March 11, 2021

According to Florida's Tribal Consultation Policy, the state does not need to provide tribal consultation in the event that a SPA is not restrictive. This SPA demonstrates compliance with the American Rescue Plan Act provisions that require states to cover treatment (including treatment of a condition that may seriously complicate COVID-19 treatment), testing, and vaccinations for COVID-19 without cost sharing in CHIP.

## Section 2. General Background and Description of Approach to Children's Health Insurance Coverage and Coordination

Guidance: The demographic information requested in 2.1. can be used for State planning and will be used strictly for informational purposes. THESE NUMBERS WILL NOT BE USED AS A BASIS FOR THE ALLOTMENT.

Factors that the State may consider in the provision of this information are age breakouts, income brackets, definitions of insurability, and geographic location, as well as race and ethnicity. The State should describe its information sources and the assumptions it uses for the development of its description.

- Population
- Number of uninsured
- Race demographics
- Age Demographics
- Info per region/Geographic information

2.1.    Describe the extent to which, and manner in which, children in the state including targeted low-income children and other classes of children, by income level and other relevant factors, such as race and ethnicity and geographic location, currently have creditable health coverage (as defined in 42 CFR 457.10). To the extent feasible, make a distinction between creditable coverage under

Phase 1 Effective Date:    April 1, 1998          Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Phase 2 Effective Date:    July 1, 1998           Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
                                                   7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04,
                                                   8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
                                                   10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
                                                   9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
                                                   3/11/2021

State Children's Health Insurance Program

public health insurance programs and public-private partnerships (See Section 10 for annual report requirements). (Section 2102(a)(1)); (42 CFR 457.80(a))

Guidance: Section 2.2 allows states to request to use the funds available under the 10 percent limit on administrative expenditures in order to fund services not otherwise allowable. The health services initiatives must meet the requirements of 42 CFR 457.10.

<u>Insured Children</u>

Almost 2.8 million of Florida's 3.6 million children under age 19 are insured.  Females represent 49 percent of insured children and males represent 51 percent.  White children account for 80.4 percent of insured children under age 19, and non-whites account for 19.6 percent.

At the inception of the Florida KidCare Program, the state lacked sufficient information about the distribution of the insured by geographic region.  However, the 1998 Legislature authorized funding for a comprehensive health care study, the primary goal of which was to update the estimates of Florida's insured and uninsured populations.  This study included information on insurance and uninsurance status by geographic region, race and ethnicity, employment and income level, the extent of dependent coverage, and type of coverage employees select.  (See updated information from the insurance study, on page 10)

<u>Uninsured Children</u>

Florida has one of the nation's largest uninsured populations.  An estimated 12.1 percent of Florida's 4.4 million children under age 19 are uninsured.  Of the approximately 646,430 uninsured children, males represent slightly more than one half (53 percent).  Whites account for 42.1 percent, African Americans account for 19.3 percent, Hispanics account for 36.3 percent, Asian and Pacific Islanders account for 2.2 percent, and Native Americans account for less than 0.1 percent.  As a consequence, uninsured children are typically treated for urgent or emergent conditions in inappropriate settings and do not share the continuity of care enjoyed by their insured peers.

Most of Florida's uninsured children — 42 percent — reside in the southern part of the state.  Thirty-six percent reside in Central Florida counties, and 22 percent reside in North Florida.  Estimates of the uninsured children by geographic region were obtained by assuming that the statewide uninsurance rate of 23 percent is equally distributed among all 67 Florida counties.  These estimates were derived from the 1993 RAND survey and updated by population estimates from Florida's Joint Legislative Management Committee, Division of Economic and Demographic Research, the *1997 Florida Statistical Abstract*, and the Urban Institute's *State-Level Data Book on Health Care Access and Financing*.
art of Florida's high uninsurance rate can be attributed to the characteristics of the state's business economy.  Larger firms are more likely to offer health insurance as a benefit than small firms.  More than 95 percent of Florida's businesses employ fewer than 25 individuals.

| | | |
|---|---|---|
| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

Health Insurance and Access to Care

Access to health care is crucial to a child's development.  Children who have health insurance are more likely to receive preventive care — care that helps keep them in good health.  Children who lack affordable access to a doctor are less likely to seek treatment for minor illnesses, suffering until the body heals itself or the condition becomes too severe for home treatments.  For many children, the emergency room is their primary source of care.  The Centers for Disease Control in 1991 reported that, for 13 percent of children ages 15 and under, hospital outpatient departments were their primary contact for health care services.

Another study found that uninsured children under the age of 19 are eight times more likely to receive care in an emergency room than children with insurance.  This type of care is devastating to the child.  The severe outcomes of these medical conditions reduce the child's ability to attend school and participate in the activities of a normal childhood.  The costs associated with this level of care are not limited to the child, but affect the community as a whole.  Emergency room services are expensive, especially when they are used to treat illnesses that could have been prevented by an earlier visit to a physician.  According to the *Journal of the American Medical Association*, lack of health care coverage is an important factor in the delay of seeking preventive and acute care.  Children with health insurance are more likely to be fully immunized, have more preventive care visits, fewer physician office visits for illnesses and fewer emergency room visits.  For children with a regular source of care, total health care costs are lowered by 25%.

Prior to the inception of Florida KidCare, the structure of health insurance programs left more than 823,000 Florida children uninsured.  This problem was partly a result of the system of employment-based health insurance.  Although no single approach can solve the problems, Title XXI funding for the Florida KidCare program significantly reduced the number of uninsured children.

The Institute for Child Health Policy released their Statewide Children's Health Insurance Survey dated June 2002.  The results show that approximately 15% of Florida's children are currently uninsured.  The figures varied by federal poverty level (FPL) and have increased in both the less than 100% FPL category and the greater than 200% FPL category.

The Urban Institute and Kaiser Commission on Medicaid and the Uninsured, based on estimates from the March 2002 and 2003 Current Population Surveys, determined that 16% of Florida's children are currently uninsured.

Florida KidCare Law

The 1998 Legislature enacted the Florida KidCare Act, which dramatically enhances child health insurance options under Florida's Title XXI child health insurance plan.  Florida KidCare consists of the following components:

- MediKids, a Medicaid "look-alike" program for children ages 1 to 5;

---

| | | |
|---|---|---|
| Phase 1 Effective Date: | April 1, 1998 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

17

State Children's Health Insurance Program

- Healthy Kids for children ages 5 to 19;
- The Children's Medical Services Network (CMSN) for children ages 0 to 19 who have a special health care need; and
- Medicaid for children under age 19.

Except for Medicaid, financial eligibility for the Florida KidCare program is 200 percent of the federal poverty level.  Except for Medicaid, the Florida KidCare program is not an entitlement and participants contribute to the cost of their monthly premiums.  The KidCare law also provides for six months of continuous eligibility for coverage.

The 2000 Florida Legislature authorized the following changes affecting the Title XXI Florida KidCare Program:

- Funding for 102,000 additional children in KidCare
- Mandatory Assignment for MediKids: This is a vehicle that is not intended to restrict enrollee choices.  It is a measure to speed up the actual enrollment process by assuring a provider choice is made.
- Medicaid Expansion for Children Under Age 1: This is an expanded Medicaid eligibility for children under the age of 1 to 200% of poverty.  Medicaid covers children under age 1 up to 185% FPL, and the Medicaid expansion for children under Age 1 covers children from 185% FPL to 200% FPL.  These children are not included in the MediKids program, as MediKids covers children ages one through four.
- Expedited eligibility for KidCare program components: This authorized each of the KidCare partners to seek innovative measures to speed up the eligibility process.
- Implementing a comprehensive dental benefit program for the Florida Healthy Kids Corporation for counties that contribute at least $4,000 annually in local match funds, effective February 1, 2001.  The Corporation began a staggered implementation of this program to eligible counties on February 1, 2001.

The 2001 Florida Legislature further amended the Florida KidCare program in the following areas:

- Removed the $4,000 local match requirement in order to have a comprehensive dental program in the Healthy Kids program. Healthy Kids was then required to expand this benefit statewide by June 30, 2002.
- Waived any local match requirements for the Healthy Kids program for the 2001-2002 state fiscal year.

The 2002 Florida Legislature amended the Healthy Kids' enabling statute, the Florida Healthy Kids Corporation Act, in order to address the issue of local match and to prescribe a specific

Phase 1 Effective Date:    April 1, 1998
Phase 2 Effective Date:    July 1, 1998
18
Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01,
7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04,
8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12,
10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16,
9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020,
3/11/2021

State Children's Health Insurance Program

formula for the calculation of match only on Healthy Kids' non-Title XXI enrollees.  The 2002 Legislature also provided $33.8 million in additional state funds to meet projected enrollment needs during the 2002-2003 state fiscal year.

The 2003 Florida Legislature made several statutory changes to the Florida KidCare Program's enabling legislation and adjusted the funding for the Florida KidCare Program based on several program modifications including:

- Effective July 1, 2003, the family premium payment increased from $15 per family per month to $20 per family per month for all Florida KidCare Program components (non-Medicaid).  Effective January 1, 2004, a tiered monthly premium system will be implemented as follows: the family premium will be $15 for families with income less than or equal to 150% of the federal poverty level and $20 for families with incomes above 150% to 200% of the federal poverty level ($5 credits were provided in January to those families whose incomes were less than or equal to 150% of the Federal Poverty Level for each month of coverage their children had received between August 2003 and December 2003);

- Effective July 1, 2003, dental benefits were capped at $750 per enrollee per year (July 1 – June 30) for children enrolled in the Florida Healthy Kids program; and,

- Effective October 1, 2003, co-payments are increased from $3 to $5 for certain health care services for children enrolled in the Florida Healthy Kids program.

In addition to the statutory changes, the 2003 Florida Legislature eliminated funding for outreach for the KidCare Program, and appropriated funds that will limit enrollment to the June 30, 2003 enrollment levels.

The 2004 Florida Legislature made several statutory changes to the Florida KidCare Act, as follows:

- Provides an interim appropriation for SFY 2003-2004 to fund the enrollment of children who were on the wait list on or before March 11, 2004;

- Restricts application processing and enrollment for the Florida KidCare Program to no more than two 30-day open enrollment periods per year, in September and January, subject to available funding;

- Applications for the KidCare program, except Medicaid, will be accepted and processed only during open enrollment periods; applications for Title XXI received outside of an

---

Phase 1 Effective Date:   <u>April 1, 1998</u>
Phase 2 Effective Date:   <u>July 1, 1998</u>

19

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

open enrollment period will not be processed and no wait lists will be maintained;

- Requires verification and proof of income supported by copies of any federal income tax return for the prior year, any wages and earnings statements (W-2 forms), and any other appropriate document;

- Changes eligibility criteria to include accessibility to employer-based insurance coverage and provides an affordability test allowing families whose coverage would exceed 5% of the family's income to continue to be eligible for KidCare;

- Excludes from eligibility any applicant who has voluntarily canceled employer-based coverage in the six months prior to application for Title XXI, provides an exception for children whose pre-existing condition would exclude them from their parents' employer-sponsored health insurance;

- Requires disenrollment from Title XXI Florida KidCare when the program is over-enrolled, except for those children enrolled in CMSN;
- Authorizes Children's Medical Services Network (CMSN) to enroll up to 120 additional children outside of open enrollment periods annually, within existing resources, and based on emergency disability criteria outside the open enrollment periods.  CMSN is exempt from disenrollment provisions.  Children will not be required to disenroll from other components to support the 120 CMSN enrollment slots;

- Modifies the Healthy Kids dental benefit language to require dental benefits coverage for Healthy Kids enrollees and further provides that the benefit may include all services available to children under Medicaid. Effective July 1, 2004 the dental premium rate capped at $12 per member per month;

- Provides for the withhold of benefits and prosecution of fraud for applicants and enrollees who submit fraudulent information or fail to provide evidence of eligibility;

- Establishes a 12-month continuous eligibility period, effective January 1, 2005;

- Changes the standards for Healthy Kids insurer contracting process; and

- Eliminates the statutory references related to outreach functions.

During the 2004 December special session, the Florida Legislature made a statutory change to the Florida KidCare Act, revising the income documentation requirement, as follows:

- Effective December 21, 2004, families are required to provide proof of income,

| Phase 1 Effective Date: | April 1, 1998 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

including a copy of the most recent federal income tax return.  In the absence of a federal income tax return, the family may submit wages and earnings statements, W-2 forms, or other appropriate documents.

The 2005 Florida Legislature made several statutory changes to the Florida KidCare Act, as follows:

- Upon a determination from the Social Services Estimating Conference, applications for the Florida KidCare Program will be accepted at any time throughout the year for the purpose of enrolling children eligible for all Title XXI program components.  Children will be enrolled on a first-come, first-served basis using the date the application is received.  Enrollment will cease when the enrollment ceiling is reached.  The enrollment ceiling is based on available funding.  Enrollment will resume when the Social Services Estimating Conference determines sufficient federal and state funds are available to finance the increased enrollment through federal fiscal year 2007.

- The Florida KidCare application will be valid for a period of 120 days after the date it was received.  At the end of the 120-day period, if the applicant has not been enrolled in the program, the application shall be invalid and the applicant shall be notified.  The applicant may resubmit another application, or request that a previously submitted application be reactivated.

- Eliminates the provision that Children's Medical Services Network (CMSN) may enroll up to 120 additional children outside of open enrollment periods.

- Allocates up to $40,000 in state funds for the production and distribution of information about the Florida KidCare program through the school system.  The materials are to be distributed on the first day of the 2005-2006 school year.

- Caps the dental premium rate for the Healthy Kids program at not more than $12 per member per month for the 2005/2006 state fiscal year.

The 2006 Florida Legislature made the following statutory changes to the Florida KidCare Act:

- Requires the Agency for Health Care Administration to implement a Full Pay buy-in program for MediKids-aged children by July 1, 2006.

- Allocates $1,000,000 in state funds for a KidCare community-based marketing and outreach matching grant program.  No federal matching funds will be used.

The 2009 Florida Legislature made the following statutory changes to the Florida KidCare:

---

| Phase 1 Effective Date: | April 1, 1998 | 21 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

- Requires the marketing of the program as "Florida KidCare".

- Reduces the voluntary nonpayment of premium penalty from 60 days to 30 days.

- Allows children clinically eligible for Children's Medical Services Network to opt out of the CMS Network and instead be enrolled in MediKids or Healthy Kids, depending on the child's age.

- Waives the waiting period for enrollees who cancelled employer sponsored health insurance coverage prior to application if the cost of the coverage was greater than five (5) percent of the family's income.

- Reduces the waiting period from 6 months to 60 days, if health insurance is voluntarily canceled.
- Waives the waiting period for voluntary cancellation of health insurance coverage under certain good cause exceptions.
  Requires proof of income only if income cannot be determined or substantiated electronically.

- Allows 10 working days from an adverse action notice for enrollees to request reinstatement while pending a dispute resolution; clarifying that the timeline is working days rather than calendar days.

The 2010 Florida Legislature increased funding for the Florida Healthy Kids Corporation's dental plans and eliminated the annual benefit limit on dental services.

The 2011 Florida Legislature appropriated Title XXI funding for Full Service School Health Services in addition to the Comprehensive School Health Services already included.

The 2012 Florida Legislature made the statutory change to allow dependents of state employees who meet Title XXI eligibility requirements to receive subsidized Title XXI coverage.

In 2014 with the implementation of the Affordable Care Act changes and requirements, the grace period for renewals will be extended to 60 days to allow additional time for families to comply.  This will promote continuity of care and avoid breaks in coverage.  The 60 day grace period will be in effect from August 2014 through July 2015.

In 2014 with the implementation of the Affordable Care Act, the CHIP family premium levels have changed based on MAGI conversion.  The upper income level for the $15 monthly family premium changes from 150% of the federal poverty level (FPL) to 158% FPL.  The upper income level for the

| | |
|---|---|
| Phase 1 Effective Date: | April 1, 1998 |
| Phase 2 Effective Date: | July 1, 1998 |

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

$20 monthly family premium changes from 200% FPL to 210% FPL.

2.2     Health Services Initiatives – (formerly 2.4) Describe if the States will use the health  services initiative option as allowed at 42 CFR 457.1005.  If so, describe what services or programs the State is proposing to cover with administrative funds, including the cost of each program, and how it is currently funded (if applicable, also update the budget accordingly. (Section 2105(a)(1)(D)(ii)); (42 CFR 457.10)

School Health Services
Since July 2002, Title XXI administrative funds have been used to fund Comprehensive School Health Services.  In recent years the Florida Legislature has limited the Title XXI funding to $7 million per year.  Starting July 1, 2011, the 2011 Florida Legislature appropriated a total of $7.5 million using Title XXI administrative funds for Comprehensive and Full Service School Health Services.  Increasing the number of counties therefore increases the number of students served which also increases the volume of the services provided by the school nurses.  Full-service school health services do not duplicate services offered through SNAP and TANF.  The same safeguards as explained in Section 3.1 will apply to Full Service School Health Services.

2.2.1.  The steps the state is currently taking to identify and enroll all uncovered children who are eligible to participate in public health insurance programs (i.e. Medicaid and state-only child health insurance):
Florida uses several programs to provide health care coverage to eligible low-income children:

Medicaid

The Agency for Health Care Administration is Florida's designated single state agency for the Medicaid program.  The Department of Children and Families is Florida's designated Title IV-A agency and conducts Medicaid eligibility determination and enrollment functions.

Over half of Florida's 3.8 million Medicaid recipients are children — about 2.1million.  Florida Medicaid covers children at the following income levels:

| Age | Federal Poverty Level |
|---|---|
| 0 to 1 | 192%  (Title XIX) |
| 0 to 1 | above 192% -  206% (Title XXI Medicaid Expansion) |
| 1 to 6 | 140% |
| 6 to 19 | 133% |
| 6 to 19 | 112% -133% (Title XXI Medicaid Expansion) |

Managed care is an integral part of the Florida Medicaid program.

Phase 1 Effective Date:    April 1, 1998
Phase 2 Effective Date:    July 1, 1998

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98
Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

benefit plan is greater than 5 percent of the family's gross income;

2. The parent lost a job that provided an employer-sponsored health benefit plan for children;

3. The parent who had health benefits coverage for the child is deceased;

4. The child has a medical condition that, without medical care, would cause serious disability, loss of function, or death;

5. The employer of the parent canceled health benefits coverage for children;

6. The child's health benefits coverage ended because the child reached the maximum lifetime coverage amount;

7. The child has exhausted coverage under a COBRA continuation provision;

8. The health benefits coverage does not cover the child's health care needs; or

9. Domestic violence led to loss of coverage.

State law provides an exception for children whose pre-existing condition would exclude them from participation in their parents' employer-sponsored coverage.

4.1.8. ☒ Duration of eligibility:  Florida KidCare covers children up to age 19.

Florida law provides for six months of continuous eligibility for the Florida KidCare program.  Effective January 1, 2005, enrollees will receive twelve months of continuous eligibility.  In addition:

MediKids:    A child is eligible for Title XXI subsidies until the end of the month of the child's 5th birthday.  The month following the child's fifth birthday, the child, if still eligible is transferred to the Healthy Kids program.

Healthy Kids:    A child is eligible for Title XXI subsidies up to age 19.

---

| | | |
|---|---|---|
| Phase 1 Effective Date: | April 1, 1998 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

|   |   |
|---|---|
| CMSN : | A child is eligible for Title XXI subsidies up to age 19. |

4.1.9.  ☒   Other standards (identify and describe):

|   |   |
|---|---|
| All Partners: | The Florida SCHIP requires social security numbers for applicants enrolling in Florida KidCare.  This requirement is consistent with 42 CFR 457.340(b). |
| CMSN : | A child must meet criteria indicating that the child has a special health care need.  However, CMSN clinically eligible children may opt out of CMSN and enroll in MediKids or Healthy Kids, depending on their age. |

Healthy Kids, MediKids and the CMSN :

Effective June 10, 2005, with the approval of year-round enrollment by the Social Services Estimating Conference, applications for Title XXI coverage are accepted continuously throughout the year.  Year-round enrollment shall cease when the enrollment ceiling is reached.  Enrollment may resume when the Social Services Estimating Conference determines sufficient federal and state funds are available to finance the increased enrollment through federal fiscal year 2007.  Applications received during a closed enrollment period will be screened for Medicaid and referred to the Department of Children and Families if a child appears eligible.  All other applicants will receive a letter informing them that enrollment is closed and to re-apply during the next open enrollment period.

Healthy Kids and MediKids:  Effective July 1, 2004, state law provides for mandatory disenrollments on a last-in, first-out basis, if the programs are over-enrolled or exceed budget limits.  Children enrolled in the CMSN are exempt from mandatory disenrollments.

Florida does not anticipate the need for mandatory

| Phase 1 Effective Date: | April 1, 1998 | Revised: 1/26/98, 2/19/98, 3/3/98, 3/6/98 |
|---|---|---|
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

known that the child was not eligible, or for those who assist others in committing fraud against the program.  For those accused of fraud, the Medicaid fraud provisions in state law are to be utilized for prosecution.

4.3.1   Describe the state's policies governing enrollment caps and waiting lists (if any). **(Section 2106(b)(7)) (42CFR 457.305(b))**

Effective July 1, 2003, each of the Florida KidCare components implemented a waiting list.  The waiting list was eliminated as of March 11, 2004.  Additional state funds were provided to extend coverage to those who entered the list on or before March 11, 2004.  Applicants after that date were not processed for coverage and received a letter informing them to re-apply during the next open enrollment period.  Effective June 10, 2005, the two annual open enrollment periods were eliminated by the Florida legislature and after approval by the state's Social Services Estimating Conference, Florida KidCare resumed accepting applications on a year-round basis.  Year-round enrollment shall cease when the enrollment ceiling is reached. The enrollment ceiling will be determined by the amount of funding available.  Florida will notify the federal Centers for Medicare and Medicaid (CMS) in the event that the enrollment ceiling is reached and enrollment has ceased.  Year-round enrollment may resume when the Social Services Estimating Conference determines sufficient federal and state funds are available to finance the increased enrollment through federal fiscal year 2007.  No waiting list currently exists and no future waiting lists will be maintained.

New legislation effective July 1, 2004, does allow for transfers among the KidCare program components so long as space and funding are available.  The programs are directed to establish reserves so these transfers can be managed within existing funding. Florida will notify the federal Centers for Medicare and Medicaid (CMS) in the event that transfers are no longer allowed between programs.  We do not anticipate the need for this to occur.

| Enrollee Status | Transfer to Title XXI Coverage |
|---|---|
| New Applicants – Enrollment ceiling not reached | Yes |
| New Applicants – Enrollment ceiling reached | No |

Phase 1 Effective Date:   <u>April 1, 1998</u>

Phase 2 Effective Date:   <u>July 1, 1998</u>

Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98

Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04**,** 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

| | | |
|---|---|---|
| Current Title XXI Enrollee Transferring to New Title XXI Component | Yes | |
| Current Medicaid Expansion Under 1 Year Old – Turning 1 Year Old and Losing Medicaid Eligibility | Yes | |
| Current Title XIX Under 1 Year Old – turning 1 Year Old and Losing Title XIX Eligibility | Yes | |
| Current Title XIX losing Title XIX Eligibility | Yes | |
| Title XIX CMSN Eligible Losing Title XIX Eligibility & Transferring to Title XXI CMSN | Yes | |
| Current Title XXI Enrollee who Misses a Premium Payment | Yes (after 30 days) | Families who do not pay their monthly premium on time will be disenrolled |
| Previous Title XXI Enrollee with a break in Coverage Due to Reason Other than Non-Payment of premium | Yes | |

from coverage and will not be eligible for reinstatement for a minimum of 60 days, in accordance with state law.  Effective July 1, 2009, children disenrolled due to voluntary non-payment of premium will be eligible for reinstatement after 30 days.

The following chart shows the minimum waiting period for cancellation due to non-payment of premium since the inception of the Florida KidCare program.

| Effective Date of Policy | Waiting Period Before Reinstatement – For Cancellations Due to Non-Payment of Premium |
|---|---|
| July 1998 – December 2003 | Minimum 60 day waiting period before reinstatement |
| December 2003 – October 2004 | Minimum 6 month waiting period before reinstatement |
| October 2004 – June 2009 | Minimum 60 day waiting period before reinstatement |
| July 2009 - Present | Minimum 30 day waiting period before reinstatement |

97

Phase 1 Effective Date:    April 1, 1998          Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98

Phase 2 Effective Date:    July 1, 1998           Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

At the end of any disenrollment period for non-payment of premium, the children will be reinstated, provided the premium has been paid prior to the end of the disenrollment period.  Reinstated children receive coverage without being required to re-apply for the program; however, a reinstatement date may not be assigned until the family has complied with any new eligibility requirements.

In such instances when enrollment caps are reached or Title XXI enrollment is closed, applications will continue to be accepted and will be screened for potential Medicaid eligibility.  All applicants that appear to be Medicaid eligible will be referred to DCF in the same manner as is done when enrollment is open.  If not eligible for Medicaid, the family will be notified that they must re-apply or call to re-activate their application during the next open enrollment period.  Once new enrollment can be processed, applications will be approved for coverage based on a first completed, first served basis, and based on available funding.

The number of children able to receive PIC services will be limited based on funding available at each of the pilot sites.  It is estimated that approximately 15 children will be able to receive services at each site for an expected target enrollment of 150 Title XXI children.  The goal of enrollment is to have 50 newly diagnosed children, 50 in the mid-stage of their life-threatening illness, and 50 at the end-of-their life. The total target enrollment in the pilot is 150 Title XXI children and an additional 150 Title XIX children.

☐  Check here if this section does not apply to your state.


4.4.    Describe the procedures that assure that:

4.4.1.  Through the screening procedures used at intake and follow-up eligibility determination, including any periodic redetermination, that only targeted low-income children who are ineligible for Medicaid or not covered under a group health plan or health insurance coverage (including a state health benefits plan) are furnished child health assistance under the state child health plan.  **(Section 2102)(b)(3)(A)) (42CFR 457.350(a)(1) and 457.80(c)(3))**

The Florida Healthy Kids Corporation or its third party administrator will perform Title XXI eligibility determinations for the Florida KidCare program except for Medicaid eligibility determinations.  Applications for all children

| | | |
|---|---|---|
| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

**Section 8.   Cost Sharing and Payment**   (Section 2103(e))

☐   **Check here if the state elects to use funds provided under Title XXI only to provide expanded eligibility under the state's Medicaid plan**, and continue on to Section 9.

8.1.  Is cost sharing imposed on any of the children covered under the plan? (42CFR 457.505) Indicate if this also applies for pregnant women. (CHIPRA #2, SHO # 09-006, issued May 11, 2009)

| | | |
|---|---|---|
| 8.1.1. | ☒ | YES |
| 8.1.2. | ☐ | NO, **skip to question 8.8.** |
| **8.1.1-PW** | ☐ | Yes |
| **8.1.2-PW** | ☐ | No, skip to question 8.8. |

Guidance:   It is important to note that for families below 150 percent of poverty, the same limitations on cost sharing that are under the Medicaid program apply. (These cost-sharing limitations have been set forth in Section 1916 of the Social Security Act, as implemented by regulations at 42 CFR 447.50 - 447.59). For families with incomes of 150 percent of poverty and above, cost sharing for all children in the family cannot exceed 5 percent of a family's income per year. Include a statement that no cost sharing will be charged for pregnancy-related services. (CHIPRA #2, SHO # 09-006, issued May 11, 2009) (Section 2103(e)(1)(A))  (42CFR 457.505(a), 457.510(b) and (c), 457.515(a) and (c))

8.2.   Describe the amount of cost-sharing, any sliding scale based on income, the group or groups of enrollees that may be subject to the charge and the service for which the charge is imposed or time period for the charge, as appropriate. (Section 2103(e)(1)(A))  (42CFR 457.505(a), 457.510(b) &(c), 457.515(a)&(c))

**8.2.1.** ☒   Premiums:

All Florida KidCare program components, except Medicaid, adhere to the same monthly premium provisions.  The maximum monthly premium per household is $20 beginning with the payment due July 1, 2003, regardless of

| | | |
|---|---|---|
| Phase 1 Effective Date: | April 1, 1998 | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

the number of children in the family.  Effective with the premium payment due January 1, 2004, the monthly premium per household is $15 for families with income less than or equal to 150% of the federal poverty level and $20 for families with income above 150% to 200% of the federal poverty level. Effective January 1, 2004, for families at or below 150% of the federal poverty level, Florida Healthy Kids is applying $5.00 credits per month for every month the $20.00 premium was paid for coverage during August through December 2003.

Effective January 1, 2014, the income levels for the monthly family premiums changed due to MAGI conversion.  The upper income level for the $15 monthly family premium changed from 150% of the federal poverty level (FPL) to 158% FPL.  Families with income above 158% FPL to 210% FPL will be charged a $20 monthly family premium.  Families with children at different premium levels will be charged the lesser rate for their family premium. This conversion will be implemented effective April 1, 2015 and made retroactive to January 1, 2014.  Families will receive correspondence advising them of their new premium payment.

The following table shows the changes in premium levels.

| Florida KidCare Family Premiums | | | | | |
|---|---|---|---|---|---|
| **Age** | **Time Period** | **$15 Premium** | | **$20 Premium** | |
| | | Minimum | Maximum | Minimum | Maximum |
| 1 through 5 | Effective 1/1/14 | 140% FPL | 158% FPL | Above 158% FPL | 210% FPL |
| | Prior to MAGI | 133% FPL | 150% FPL | Above 150% FPL | 200% FPL |
| 6 through 18 | Effective 1/1/14 | 133% FPL | 158% FPL | Above 158% FPL | 210% FPL |
| | Prior to MAGI | 100% FPL | 150% FPL | Above 150% FPL | 200% FPL |

For Healthy Kids and MediKids enrollees with family incomes above 210% (200% FPL prior to MAGI conversion) of the federal poverty level, and therefore not eligible under Title XXI, the family pays a non-subsidized monthly premium on a per child basis.

Families who do not make their monthly premium payments on time will be

Phase 1 Effective Date:   April 1, 1998        177        Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98

Phase 2 Effective Date:   July 1, 1998         Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021

State Children's Health Insurance Program

disenrolled from coverage and will not be eligible for reinstatement for a minimum of 30 days, in accordance with state law.

Premium payments are due on the first day of the month prior to the month of coverage. Families receive a coupon book upon enrollment that indicates the amount of the monthly premium and the day the premium is due for each month. Families that do not make a premium payment are sent a letter on the 7th of the month informing them that coverage will be cancelled if payment is not received. These letters are followed be a series of automated reminder calls and email reminders. If payment is not received by the 20th of the month a termination letter is issued effective the last day of the month. Families that make payment within the 30-days are issued a reinstatement letter informing them that coverage is still in effect. Premiums are considered late if not received by the first of the month prior to coverage. A 30 day grace period is given to families to make a payment prior to cancellation of coverage.

The late notice is generated by the TPA and also reminds the family that if the premium is not received during the grace period, the child's coverage will be canceled for the next month and a minimum of a 30 day wait before reinstatement would be imposed as required by state law.

On October 7, 2004, the Governor announced temporary changes to the KidCare program to assist families affected by the four hurricanes that impacted the state. The Governor announced that no children would be cancelled due to failure to pay premiums in the aftermath of the storms. The KidCare program adopted a temporary measure to reduce premium payments to $0 for the months of August (for September coverage), September (for October coverage) and October 2004 (for November coverage), for all children enrolled in Title XXI. Any payments received during this period are credited to future months.

Once a month, the TPA sends electronic enrollment files to the Healthy Kids health and dental plans for Healthy Kids enrollees and electronic enrollment files for MediKids to the Agency for Health Care Administration and for the CMSN to the Department of Health. The files include all eligible children who have also made a premium payment by that date. Families who have not paid by this date will receive a second letter indicating that the child's coverage will be canceled at the end of the month and that a minimum 30 day wait will be imposed before coverage can be reinstated if canceled.

A supplemental file is prepared and distributed the first week of the coverage

| | | |
|---|---|---|
| Phase 1 Effective Date: | April 1, 1998 | Revised: 1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | July 1, 1998 | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

month that will include the children for whom payment had not been received prior to the previous file but was received within the 30 day grace period.

Additionally, families also have the option of making their monthly family premium payment by credit card.  Automated telephone payments were implemented on October 20, 2003, and web payments were implemented effective November 20, 2003.  Families may make credit card payments 24 hours a day, seven days a week, either by phone or by accessing the Healthy Kids web site.  Families may also arrange to have payment automatically withdrawn (ACH) from their accounts on an ongoing basis.

Beginning in 2010, families have the option of paying their monthly premium by cash.  The vendor selected to accept cash payments has hundreds of locations throughout Florida.  Families can make their premium payment in person by providing their family account number and their cash payment.  The payment is electronically transferred to Florida Healthy Kids Corporation's third party administrator.  Another payment option starting in 2011 is for families to pay by text message.  Families choosing this payment method are provided an online link to sign up for the service.  During the sign up process the family identifies the cell phone number they will be using and the account from which the funds will be deducted and select a personal identification number (PIN).  Once enrolled, the family will receive a text message at the beginning of each month reminding them that a payment is due.  To make a payment, the family provides their PIN authorizing the payment and deduction from their account.  The funds will be automatically withdrawn from their account and the family will receive a text message confirming the payment has been made.

**Coinsurance or co-payments:**

Healthy Kids

Healthy Kids charges minimal co-payments for some managed care services. Services that require co-payments are listed in the chart below.

<u>Disaster Relief Provisions</u>

At the State's discretion, working collaboratively, and with the agreement of FHKC and/or CMS Plan, the premium due date may be extended or premiums may be waived, in addition, the State may waive or lower copayments for a specific period of time for CHIP enrollees who meet income and other eligibility

| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised: 1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

State Children's Health Insurance Program

requirements and who reside and/or work in Governor or Federally declared disaster areas or state of emergency areas (i.e. pandemic).

**8.2.2.** ☒   Deductibles:
None of the Florida KidCare components charge deductibles.

Other:

MediKids and CMS :  No other cost sharing will be applied.

Healthy Kids:  All services are provided by managed care organizations and the following co-payments are applicable.

**8.2.3.** ☒   Coinsurance or copayments:
Healthy Kids

Healthy Kids charges minimal co-payments for some managed care services. Services that require co-payments are listed in the chart below.

Effective March 11, 2021 and through the last day of the first calendar quarter that begins one year after the last day of the COVID-19 emergency period described in section 1135(g)(1)(B) of the Act, and for all populations covered in the CHIP state child health plan, the state assures the following:

COVID-19 Vaccine:
• The state provides coverage of COVID-19 vaccines and their administration without cost sharing, in accordance with the requirements of section 2103(c)(11)(A) and 2013(e)(2) of the Act.

COVID-19 Testing:
• The state provides coverage of COVID-19 testing without cost sharing, in accordance with the requirements of section 2103(c)(11)(B) and 2103(e)(2) of the Act.

COVID-19 Treatment:
• The state provides coverage of COVID-19-related treatments without cost sharing, in accordance with the requirements of section 2103(c)(11)(B) and 2103(e)(2) of the Act.

Coverage for a Condition That May Seriously Complicate the Treatment of

| | | |
|---|---|---|
| Phase 1 Effective Date: | <u>April 1, 1998</u> | Revised:  1/26/98, 2/19/98, 3/3/98, 3/6/98 |
| Phase 2 Effective Date: | <u>July 1, 1998</u> | Revised: 8/20/98, 8/24/98, 10/1/99, 7/28/00, 1/31/01, 7/02/02, 7/22/02, 1/3/03, 2/13/04, 9/27/04, 11/15/04, 8/11/05, 10/1/06, 7/1/09, 7/1/10, 7/1/11, 7/1/12, 10/1/12, 8/1/2014, 7/1/2014, 5/1/2015, 7/1/16, 9/1/2017, 10/1/17, 7/1/2018, 3/9/2020, 7/1/2020, 3/11/2021 |

# Doc. 1-3

Exhibit 3

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop: S2-26-12
Baltimore, Maryland 21244-1850



**SHO #23-004**

**RE: Section 5112 Requirement for all States to Provide Continuous Eligibility to Children in Medicaid and CHIP under the Consolidated Appropriations Act, 2023**

September 29, 2023

Dear State Health Official:

Section 5112 of the Consolidated Appropriations Act, 2023 (CAA, 2023) amended titles XIX and XXI of the Social Security Act (the Act) to require that states[1] provide 12 months of continuous eligibility (CE) for children under the age of 19 in Medicaid and the Children's Health Insurance Program (CHIP) effective January 1, 2024.  The Centers for Medicare & Medicaid Services (CMS) is issuing this State Health Official (SHO) letter to provide states with guidance on implementing this requirement.

This letter provides background on the importance of CE in preventing interruptions that impede access to health coverage to support better short- and long-term health outcomes,[2] and describes policies related to implementing CE under the CAA, 2023 amendments.  We also discuss the differences between the CE requirements that exist today and those specified in the CAA.  This letter also clarifies which states will need to submit Medicaid and CHIP state plan amendments (SPA) and reminds states that section 1115 demonstration authority may also serve as a mechanism to extend the CE period for children beyond 12 months and/or to apply CE to adults.

---

[1] For the purposes of this letter, "states" refer to the 50 states, the District of Columbia, and the United States territories of American Samoa, Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands.

[2] Brooks, T., & Gardner, A. (2021). Continuous Coverage in Medicaid and CHIP. *Georgetown University Center for Children and Families*. Retrieved from: https://ccf.georgetown.edu/wp-content/uploads/2012/03/CE-program-snapshot.pdf

## I. Background

A. Importance of CE for Medicaid and CHIP Children

CE provides coverage to children in Medicaid and CHIP for a full 12-month period regardless of changes in circumstances with certain exceptions as described in more detail throughout this letter.

Research has shown that children who are disenrolled for all or part of the year are more likely to have fair or poor health care status compared to children who have health coverage continuously throughout the year.[3]  Guaranteeing ongoing coverage ensures that children have continuous access to the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) benefit, which includes comprehensive and preventive health care services for children under age 21 who are enrolled in Medicaid.  Some states also offer EPSDT in their separate CHIP.  EPSDT is key to ensuring that children and adolescents receive appropriate preventive, dental, mental health, developmental, and specialty services.  Stable coverage enables health care professionals to provide EPSDT within a well-developed relationship with children and their parents, track their health and development, and avoid expensive emergency room visits.

In addition to improving short- and long-term health status, CE has been shown to reduce financial barriers to care for low-income families, promote health equity, and provide states with better tools to hold health plans accountable for quality care and improved health outcomes.[4]  Additionally, the literature shows that CE policies are cost-effective for both families and states by mitigating the impact of income volatility on enrollment, as children lose and then regain eligibility when their family's income fluctuates.  When families maintain coverage year-round, it reduces the administrative burden on state agencies due to repeated eligibility reviews and re-enrollment after a gap in coverage.[5]

CE has been shown to reduce rates of churn, or the percentage of children who disenroll in Medicaid and re-enroll within the year.  For example, one analysis found that the churn rate was lower in states with 12-month CE (2.9 percent) than in states without CE (5.3 percent).[6]

---

[3] Brantley, E., & Ku, L. (2022). Continuous eligibility for Medicaid associated with improved child health outcomes. *Medical Care Research and Review*, *79*(3), 404-413.

[4] Park, E., Alker, J., & Corcoran, A. (2020). Jeopardizing a Sound Investment: Why Short-Term Cuts to Medicaid Coverage During Pregnancy and Childhood Could Result in Long-Term Harm. Retrieved from: https://www.commonwealthfund.org/publications/issue-briefs/2020/dec/short-term-cuts-medicaid-long-term-harm

[5] Georgetown University. (2021). Advancing Health Equity for Children and Adults with a Critical Tool: Medicaid and Children's Health Insurance Program Continuous Coverage. Retrieved from https://ccf.georgetown.edu/wp-content/uploads/2021/10/continuity-of-coverage-final.pdf

[6] Williams, E., Corallo, B., Tolbert, J., Burns, A., & Rudowitz, R. (2021). *Implications of Continuous Eligibility Policies for Children's Medicaid Enrollment Churn*. Retrieved from https://www.kff.org/medicaid/issue-brief/implications-of-continuous-eligibility-policies-for-childrens-medicaid-enrollment-churn/

Additionally, CE helps to address racial and ethnic disparities by reducing churn rates in groups disproportionately impacted by disenrollment.[7]

Many states elected to provide CE in Medicaid and/or CHIP before enactment of the CAA in December 2022.  As of September 2023, 21 states had implemented CE for children in both Medicaid and CHIP.  An additional 11 states had implemented CE in at least one program. During the COVID-19 public health emergency (PHE),[8] CE protected families and children from experiencing gaps in coverage, and also demonstrated that CE improves access to care,[9] continuity of coverage and lowers the uninsured rate for children.[10]

## II. CE Requirements

    A.  Overview and Exceptions to CE

*Current State Plan Option*

Under section 1902(e)(12) of the Act, implemented at 42 CFR §435.926, states have long had the option to provide 12 months of CE to children under age 19 in Medicaid.  A similar option exists in CHIP at 42 CFR § 457.342.  States have had the flexibility to elect a younger age limit and/or a shorter CE period in both programs.  Currently, children under the state-specified age who are determined eligible for Medicaid or CHIP at initial application or a regularly-scheduled annual renewal remain eligible for Medicaid or CHIP for the duration of the CE period regardless of most changes in circumstances (CIC) that may affect eligibility, such as:

- Changes in income or household composition,
- Loss of Supplemental Security Income (SSI) for children eligible for Medicaid based on their eligibility for SSI, or
- Obtaining other health insurance for children enrolled in CHIP.

---

[7] Georgetown University. (2021). Advancing Health Equity for Children and Adults with a Critical Tool: Medicaid and Children's Health Insurance Program Continuous Coverage. Retrieved from https://ccf.georgetown.edu/wp-content/uploads/2021/10/continuity-of-coverage-final.pdf

[8] See Section 6008 of the Families First Coronavirus Response Act (P.L. 116-127).

[9] Vasan, A., Kenyon, C., Fiks, A. G., & Venkataramani, A. S. (June 2023). Continuous Eligibility and Coverage Policies Expanded Children's Medicaid Enrollment: Study examines state continuous eligibility and coverage policies and children's Medicaid enrollment during COVID-19. *Health Affairs*, *42*(6), 753-758.

[10] Alker, J., Osorio, A., Park, E., Guest, Brooks, T., &amp; Schneider, A. (December 2022). *Number of uninsured children stabilized and improved slightly during the pandemic*. Center for Children and Families. Retrieved from https://ccf.georgetown.edu/2022/12/07/number-of-uninsured-children-stabilized-and-improved-slightly-during-the-pandemic-2/

Medicaid and CHIP regulations[11] establish limited exceptions to this general rule, and when a CIC can result in termination of eligibility during a CE period. A child's eligibility may not be terminated during a CE period unless one of the following exceptions applies:[12]

(1) The child attains age 19 or a lower age specified by the state;
(2) The child or child's representative requests a voluntary termination of eligibility;
(3) The child ceases to be a resident of the state;
(4) The agency determines that eligibility was erroneously granted at the most recent determination, redetermination, or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or
(5) The child is deceased.

The CHIP regulation also provides two additional CHIP-specific exceptions:

(6) The child becomes eligible for Medicaid; and
(7) At state option, the family fails to pay premiums or enrollment fees.

*Changes to CE under the CAA, 2023*

Section 5112 of the CAA, 2023 amended section 1902(e)(12) and added a new paragraph (K) to section 2107(e)(1) of the Act to require one year of CE under the state plan or a waiver of the state plan for children under age 19 enrolled in Medicaid and CHIP, effective January 1, 2024. The amendments to section 1902(e)(12) of the Act explicitly provide for an exception to CE for children who:

- Reach age 19; or
- Cease to be state residents.

Section 2107(e)(1)(K) of the Act applies these exceptions through cross reference to section 1902(e)(12) of the Act.  In the case of a child transferred from CHIP to Medicaid during a CE period, the state must maintain the child's enrollment in Medicaid for the remaining duration of their current CE period (unless the child experiences another exception to the provision of CE provided under the statute).

The following current regulatory exceptions, discussed above, are not explicitly identified in the CAA, 2023.  However, states will be expected to take appropriate steps to terminate eligibility in the following situations, including providing required Medicaid and CHIP notice and appeals rights with sufficient advanced notice.[13],[14]

---

[11] §§ 435.926(d) and 457.342(b)

[12] For Medicaid, termination of coverage during a CE period must comply with notice and explanation of fair hearings process requirements at part 431 Subpart E. For separate CHIP, termination of coverage during a CE period must comply with the requirements for notice and explanation of rights to a review process at §§ 457.340(e) and 457.1180.

[13] 42 CFR part 431, subpart E and §§ 457.340(e) and 457.1180

[14] CMS is still assessing how non-payment of premiums intersects with CE under the CAA.  We intend to issue separate guidance on this topic.

- The child or child's representative requests a voluntary termination of eligibility (same as #2 above);
- The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative (same as #4 above); or
- The child is deceased (same as #5 above).

B. Populations Covered under CE

Section 1902(e)(12) of the Act, as amended by the CAA, 2023, applies to all children under age 19 who are enrolled under the state plan in a mandatory or optional Medicaid eligibility group described in section 1902(a)(10)(A) of the Act and implementing regulations at 42 CFR part 435 subparts B and C.[15]  Section 2107(e)(1)(K) of the Act, added by the CAA, 2023, applies to all targeted-low income children[16] enrolled in a separate CHIP under the state plan.  This includes targeted low-income children covered from-conception-to-end-of-pregnancy (FCEP) option. States also are required to provide CE to children enrolled in Medicaid or CHIP under a section 1115 demonstration.

States are *not* required to provide 12 months of CE to children who have *only* established eligibility through medically needy Medicaid coverage under section 1902(a)(10)(C) of the Act, or children who have been determined presumptively eligible for Medicaid or CHIP consistent with section 1920A of the Act, but who have not yet received a determination of eligibility based on a regular application.  States also are not required to provide 12 months of CE to children who, upon a renewal, are determined to only be eligible for Medicaid based on transitional medical assistance (TMA) under section 1925 of the Act. (See discussion below on "Duration of CE Period.")

Effective January 1, 2024, states will no longer have the option to limit CE in both Medicaid and CHIP to children under an age (up to age 19) specified by the state, or apply CE to a subset of children in CHIP.

C. Duration of CE Period

---

[15] This includes children eligible under the mandatory group codified at § 435.121 for individuals age 65 or over or who have disabilities or blindness in section 209(b) states as well as children who are eligible under section 1902(e)(3) of the Act and § 435.225 (relating to individuals under age 19 who would be eligible for Medicaid if they were in a medical institution, commonly referred to as the "Katie Beckett" group). Section 1902(f) generally requires that individuals eligible in a 209(b) state's mandatory eligibility group for individuals 65 years old or who have blindness or disabilities be considered eligible under section 1902(a)(10)(A) of the Act. Similarly, section 1902(e)(3) of the Act requires that Katie Beckett enrollees be treated as SSI beneficiaries.
[16] Targeted low-income child is defined in Section 2110(b) of the Act and § 457.310.

Effective January 1, 2024, states that have adopted a period of less than 12 months under existing policy will need to extend the CE period for children to 12 months as this policy is no longer permissible under the CAA.

*Beginning of CE Period for New Applicants*

Current Medicaid regulations[17] specify that the CE period for new applicants determined eligible for coverage begins on the effective date of the individual's eligibility – either the date of application or the first day of the month when the application is submitted, depending on the state's election.[18]  Current CHIP regulations[19] specify that the CE period begins on the effective date of the child's eligibility.[20]  States have the flexibility to determine the effective date of eligibility based on the date of application or another reasonable methodology that ensures coordinated transition of children between CHIP and other insurance affordability programs as family circumstances change to avoid gaps or overlaps in coverage.

Sections 1902(e)(12) and 2107(e)(1)(K) of the Act, as amended by the CAA, 2023, do not expressly address when a child's CE period begins.  Therefore, the current Medicaid and CHIP regulations governing the beginning of the CE period for new applicants will continue to apply to children enrolled in Medicaid or CHIP on or after January 1, 2024, when the requirement to provide CE to children under age 19 in Medicaid and CHIP goes into effect.

*Beginning of CE Period Following a Periodic Renewal of Eligibility*

States must renew eligibility for Medicaid and CHIP beneficiaries whose financial eligibility is determined using Modified Adjusted Gross Income (MAGI)-based methodologies every 12 months and no more frequently than once every 12 months.[21]  States must renew eligibility for Medicaid beneficiaries excepted from MAGI-based financial methodologies at least once every 12 months, but may conduct regular renewals more frequently but no more frequently than every six months.[22]  We refer to the period between regular renewals as the "eligibility period."

For children whose Medicaid or CHIP eligibility is being redetermined at a regular renewal, current regulations provide that the CE period begins on the effective date of the individual's renewal, which begins a new eligibility period.[23]  Because almost all children have 12-month eligibility periods and the 12-month CE period begins on the effective date of the child's most recent determination or redetermination of eligibility, a child's CE period generally will align with their renewal cycle.[24]

---

[17] § 435.926
[18] § 435.915
[19] § 457.342
[20] §457.340(g)
[21] §§ 435.916(a) and 457.343
[22] §435.916(b)
[23] §§ 435.926 and 457.342
[24] The only exception would involve children enrolled in Medicaid whose eligibility is not based on MAGI if the state has elected a shorter renewal period permitted under § 435.916(b). For these individuals, states may only act on changes in circumstance that fall into one of the exceptions to the provision of CE discussed in section II.A of this SHO letter.

*Current Enrollees Whose Eligibility Period Ends After January 1, 2024*

Because the CE period is based on the effective date of the child's last eligibility determination (either at initial application or last renewal), for states newly implementing CE children under age 19 enrolled in Medicaid and CHIP will receive CE for the remainder of their eligibility period based on the date of their last determination. For example, Elijah is enrolled in a state that implements CE for the first time on January 1, 2024. Elijah's most recent determination of eligibility was completed in September 2023, and his current eligibility period began on October 1, 2023. Effective January 1, 2024, the state must provide Elijah with CE for the remainder of his 12-month eligibility period (through September 30, 2024), unless he experiences one of the exceptions to the provision of CE discussed in section II.A of this SHO letter. States that already implement CE for a 12-month period will continue to provide CE through a child's existing CE period. States that currently provide less than 12 months of CE will have to extend a child's CE period to 12 months.

*Interaction of CE and Continuous Enrollment during the COVID-19 PHE Unwinding Period*

Congress enacted the Families First Coronavirus Response Act (FFCRA) at the start of the COVID-19 Public Health Emergency (PHE) on March 18, 2020. Section 6008 of the FFCRA allowed states to claim a temporary 6.2 percentage point increase in Federal Medical Assistance Percentage (FMAP) if they met certain conditions, including a continuous enrollment condition to keep nearly all individuals, including children, continuously enrolled in Medicaid for most of the period while the COVID-19 PHE was in effect. The CAA, 2023 amended section 6008 of the FFCRA to end the continuous enrollment condition on March 31, 2023. While the continuous enrollment provision was not applicable to separate CHIPs, some states obtained authority through a CHIP disaster relief SPA to delay processing renewals or through a section 1115 demonstration to authorize continuous coverage in CHIP, which had the similar result of maintaining continuous enrollment of children in CHIP.

CMS recognizes that states will be in the process of unwinding when mandatory CE for children becomes effective. As a result, states likely will have some children whose eligibility was not renewed during the 12-month period preceding January 1, 2024.

For children who have not had a determination or renewal of eligibility within the 12 months preceding January 1, 2024, and whose renewal during the unwinding period is conducted on or after that date, states will begin a new CE period when the renewal during the state's unwinding occurs, provided that the child is determined to be eligible at that time. For example, Mia's last redetermination was August 1, 2021. The state initiates a renewal for Mia during its unwinding period in December 2023. The state typically takes three months to complete the renewal for a given cohort, such that Mia's coverage is expected to end or be renewed effective March 1, 2024. The state determines that she is still eligible for Medicaid. Mia's CE period will align with her new eligibility period, beginning March 1, 2024, and extending through February 28, 2025.

Conversely, if the state had determined Mia was ineligible when the state completed her renewal, Mia's coverage would end effective March 1, 2024. Mia no longer gets the benefit of CE

because her last redetermination was completed more than 12 months ago (August 1, 2021) and the state has determined that she no longer meets eligibility requirements.

D.  Acting on Information from Electronic Data Sources During a CE Period

*Changes in Circumstances Experienced Between Renewal Periods*

As noted above, states must renew eligibility for CHIP and MAGI-based Medicaid beneficiaries once a year and may renew eligibility for MAGI-excepted Medicaid beneficiaries more frequently.[25]  States also are expected to have procedures in place designed to ensure that beneficiaries make timely and accurate reports of any CICs that may affect their eligibility, and to redetermine eligibility when such changes are reported.[26]  States also can elect to obtain information from reliable outside sources (e.g., through conducting periodic data matches (PDM) with electronic data sources) between regular renewals to detect CICs that may impact eligibility.

For children entitled to a 12-month CE period, states may not terminate eligibility based on CICs either reported by the family or detected through a PDM prior to the child's regularly scheduled renewal (which is conducted at the end of the child's eligibility period), unless the change relates to one of the exceptions to CE listed in section II.A of this letter.

Since children are protected from termination due to most CICs, but adults are not, states cannot delay acting on CICs that may impact eligibility for adults ages 19 or older that are also enrolled in Medicaid or CHIP.  When both children and adults in a given household are enrolled in Medicaid or CHIP, states must ensure that, when acting on a CIC that impacts the eligibility of a household member age 19 or older, the eligibility of a child in a CE period is not impacted unless the change relates to one of the exceptions to CE in section II.A of this letter.

*Post-Enrollment Verification*

In processing applications, states have the option to enroll individuals based on self-attested information and conduct required verifications post-enrollment, consistent with the state's verification plan.[27]  This process is commonly referred to as "post-enrollment verification." Children who have been determined eligible for Medicaid or CHIP based on attested information are entitled to a 12-month CE period. States may *not* terminate coverage for such children during a CE period if, in conducting post-enrollment verification, the state obtains information that indicates that the child does not meet all of the eligibility requirements unless the information indicates that one of the limited exceptions to CE discussed in section II.A of this letter applies (e.g., the child turns age 19 or ceases to be a state resident).  Such information is considered a CIC, and the child's coverage may not be terminated.  Rather, the child must remain eligible for coverage through the end of the 12-month period following the effective date of eligibility based

---

[25] As mentioned earlier, if states conduct renewals for MAGI-excepted beneficiaries more than once a year, states may only act on changes in circumstance that fall into one of the exceptions to the provision of CE discussed in section II.A of this SHO letter.

[26] § 435.916(c) and (d), and § 457.343

[27] Per §§ 435.945(j) and 457.380(j), states are required develop, and update as needed, a verification plan that describes the verification policies and procedures.

on the initial determination.  As long as the attested information indicates that the child is eligible, the state is not considered to have made an erroneous determination, even if there is an inconsistency between the attested information and information subsequently obtained from electronic data sources after enrollment.[28]

## III. Considerations for Specific Populations

### A.  Summary of Existing Medicaid Incarceration Policies

*Medicaid: Eligibility for Children who Become Incarcerated*

Federal law provides that incarceration status does not preclude eligibility for Medicaid. Individuals who are incarcerated are eligible for Medicaid if they otherwise meet all eligibility requirements under the state plan.  However, the provision of federal financial participation (FFP) for inmates of a public institution under Medicaid, including children, is limited to inpatient services that are furnished to the individual while admitted to a medical institution for at least a 24-hour inpatient stay.[29]  This policy does not apply to children who have attested to being a U.S. citizen or in a satisfactory immigration status,[30] and who are receiving benefits during a reasonable opportunity period (ROP),[31] if the state is unable to verify the child's status during the ROP.

To comply with the FFP limitation, states historically have either terminated or suspended coverage for Medicaid beneficiaries who become incarcerated.  However, the Substance Use Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act (SUPPORT Act) prohibits the termination of "eligible juveniles" who are incarcerated and instead requires states to suspend their Medicaid coverage for the duration of

---

[28] Children whose citizenship or satisfactory immigration status is not verified have not been determined eligible for Medicaid or CHIP. If a state is unable to verify a child's status prior to the end of the ROP, the state must take action within 30 days, to terminate benefits in accordance with §§ 435.956(b)(3) and 457 380(b)(1)(ii).

[29] For additional information on when individuals are considered an inmate of a public institution see § 435.1010 and State Health Official Letter # 16-007 available at https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf. Subdivision (A) of the matter following section 1905(a)(30) of the Act limits the provision of FFP to inpatient services provided to individuals who are incarcerated. For purposes of this payment exclusion, "medical institutions" include hospitals, nursing facilities, intermediate care facilities for individuals with intellectual disabilities, and to facilities pursuant to the inpatient psychiatric services available for individuals under age 21 through the EPSDT benefit, including psychiatric residential treatment facilities. To qualify for the medical institution exception, services must be covered under the state's Medicaid plan, delivered in a prescribed setting in a way that is consistent with other terms of the state's Medicaid plan, and provided by a certified or enrolled provider that maintains compliance with federal requirements.

[30] Applicable regulations are at §§ 435.406(a) and 457.320(d),

[31] Applicable reasonable opportunity period regulations are at §§ 435.956(b) and 457.380(b)(1)(ii).

their incarceration.[32],[33]  To comply with these requirements, states can elect to either suspend benefits or eligibility when a child in Medicaid is incarcerated:[34]

- Under a benefits suspension, individuals who become incarcerated continue to be eligible for Medicaid, but coverage is limited only to inpatient services.  When benefits are suspended, the state must complete regular annual renewals and redetermine eligibility when the incarcerated individual experiences a CIC that may impact their eligibility for the duration of the individual's incarceration.

- Under an eligibility suspension, the individual's Medicaid eligibility is not terminated, but is effectively paused.  Eligibility can be reinstated if the individual needs covered inpatient services.  Depending on when the individual's last full determination was conducted (i.e., at application or most recent regular renewal), the state may need to conduct a renewal prior to reinstating eligibility.  When eligibility is suspended, a state may, but is not required to, conduct regular annual renewals.  We also note that states electing to suspend eligibility will need to conduct a redetermination prior to release[35] for individuals who were determined eligible more than 12 months prior to the date of release, if the state has not redetermined eligibility within the 12-month period preceding release.

*Medicaid: CE for Children who Become Incarcerated*

Current Medicaid regulations[36] do not include incarceration as a permissible reason to end a child's CE period in Medicaid if a state has elected to provide CE.  The CAA, 2023 does not change the current policy.  Therefore, if a child becomes incarcerated during their CE period, the child remains eligible for the remainder of the CE period while incarcerated.

During a CE period, states that implement a *benefits suspension* for children in Medicaid who become incarcerated may not act on CICs that occur, unless the CIC triggers one of the exceptions to CE listed in section II.A of this SHO letter.  This means that the child would be eligible for any necessary inpatient services under Medicaid until the end of their CE period.  The state would complete an annual renewal at the end of a child's CE period.

During a CE period, states that implement an *eligibility suspension* would not take CICs into account if a child in Medicaid needed inpatient services while incarcerated prior to their annual renewal.  Under an *eligibility suspension*, if a child in a carceral setting needed inpatient services, the state only would consider whether the child's last eligibility determination was within the

---

[32] Section 1001 of the SUPPORT Act, Public Law 115-271, enacted October 24, 2018, added section 1902(a)(84) of the Act.

[33] An "eligible juvenile" is defined as an individual who is under 21 years of age or an individual eligible under the mandatory eligibility group for former foster care children who was determined eligible for Medicaid prior to becoming or while an inmate of a public institution.

[34] See SMDL #21-002 "Implementation of At-Risk Youth Medicaid Protections for Inmates of a Public Institution (Section 1001 of the SUPPORT Act)" (available at https://www.medicaid.gov/sites/default/files/2021-12/smd21002.pdf) for additional information regarding suspension strategies available under Medicaid.

[35] States are required to redetermine eligibility for eligible juveniles prior to their release from a carceral facility consistent with section 1902(a)(84)(B) of the Act. See SMDL #21-002 for more information.

[36] § 435.926

previous 12 months, such that the child is still in their CE period.  If it has been more than 12 months since the child's last eligibility determination, the child's CE period would have expired, and the state would need to redetermine their eligibility prior to providing inpatient services.

B.  Summary of CHIP Incarceration Policies

*CHIP: Eligibility for Children who Become Incarcerated*
Unlike in Medicaid, incarceration status *is* a factor of eligibility in CHIP.  A child who is an inmate of a public institution is excluded from the statutory definition of a targeted low-income child and therefore, without CE, a child who is in a carceral setting is ineligible for a separate CHIP.[37]

*CHIP: CE for Children who Become Incarcerated*

Under current CHIP regulations,[38] incarceration is not an exception to CE.  Thus, in the case of a child currently enrolled in CHIP, incarceration is not a permissible reason to terminate coverage during a CE period.  This means that children determined eligible for CHIP at initial application or renewal who later become incarcerated during a CE period, remain eligible.  In addition, these children continue to receive services that are covered under the CHIP state plan through the end of their CE period, if the services are not otherwise provided by the carceral setting.  However, if a child remains incarcerated at the end of their CE period, the state must terminate the child's CHIP coverage because they no longer meet the definition of a targeted low-income child.

*CHIP: Modifications under the CAA, 2023 to CHIP Eligibility for Children who Become Incarcerated*

The CAA, 2023 amendments to sections 1902(e)(12) and 2107(e)(1)(K) of the Act do not explicitly change the incarceration policy for CHIP enrollees in a CE period. However, another provision in the CAA, 2023, has led us to reconsider the policy for operationalizing CE for children enrolled in a separate CHIP who become incarcerated.  Specifically, section 5121 of the CAA, 2023 added a new section 2102(d) of the Act to require, effective January 1, 2025, that "[s]tate[s] shall not terminate eligibility for child health assistance under the State child health plan for a targeted low-income child because the child is an inmate of a public institution, but may suspend coverage during the period the child is such an inmate."

The language added at section 2102(d) of the Act is virtually identical to the existing Medicaid requirements at section 1902(a)(84) of the Act, which require states to suspend coverage rather than terminate individuals because they are an inmate of a public institution.  Due to the similarity of the language, we look to the current interpretation of section 1902(a)(84) of the Act and its interaction with CE for children enrolled in Medicaid in considering the appropriate CE policy for children who become incarcerated while enrolled in CHIP.

---

[37] Section 2110(b)(2)(A) of the Act and regulations at § 457.310 define targeted low-income child.
[38] § 457.342

States may continue to utilize a suspension option for children who are incarcerated before or after the January 1, 2025 effective date of section 5121 of the CAA.  Prior to January 1, 2024, only states with CE may elect this suspension option, but after January 1, 2024, all states may elect suspension when CE becomes mandatory.  States may revise their state plans at any time to demonstrate that they suspend CHIP coverage.  States electing to suspend CHIP coverage may choose one of the suspension options discussed in detail under the subheading above entitled "Medicaid: Eligibility for Children who Become Incarcerated."  States will also retain the option to continue to provide all CHIP-covered services to incarcerated youth not otherwise paid for by the carceral setting through the end of their CE period.

Regardless of whether the state elects to suspend coverage or to provide benefits during a CE period, states must maintain children in CHIP who become incarcerated for the duration of their CE period, unless they experience an exception to CE.  If a targeted low-income child is released from the carceral setting before the CE period ends, the state would be required to reinstate coverage and benefits without conducting a redetermination of eligibility.  However, if a child remains incarcerated when their CE period ends, states must redetermine eligibility and terminate the child's CHIP eligibility.  This policy will change on January 1, 2025, the effective date of section 5121 of the CAA, 2023.  At that time, states will no longer be permitted to terminate eligibility of an incarcerated child at the end of the CE period, but they may suspend coverage.

Additional guidance related to section 2102(d) of the Act and section 5121 of the CAA, 2023 will be forthcoming.

### C. From-Conception-to-End-of-Pregnancy Option

Under § 457.10, states have the option to provide coverage in order to provide prenatal care and other pregnancy-related benefits from conception to end of pregnancy to pregnant individuals, if they are not eligible for Medicaid or CHIP.[39]

Under section 2107(e)(1)(K) of the Act, states must provide CE to those eligible under the FCEP option in the same manner as CE for targeted low-income children.  The duration of the CE period, however, will depend on how states pay for labor and delivery services.

Currently, states generally must enroll the pregnant individual, if eligible, for coverage of services necessary to treat an emergency medical condition, which includes labor and delivery ("Emergency Medicaid").  The only exception to this general rule is if the pregnant individual is ineligible for Emergency Medicaid or the state uses a bundled or global payment[40] to cover prenatal, labor and delivery, and postpartum care in CHIP.

The duration of CE depends on whether a state enrolls the pregnant individual into Medicaid for coverage of labor and delivery or pays for the delivery under CHIP, as follows:

---

[39] See the October 2, 2002 final rule at https://www.federalregister.gov/documents/2002/10/02/02-24856/state-childrens-health-insurance-program-eligibility-for-prenatal-care-and-other-health-services-for

[40] See CMS SHO #02-004; available at https://healthlaw.org/wp-content/uploads/2018/09/cms_release_on_prenatal_care_for_fetuses.pdf

- *Emergency Medicaid pays for labor and delivery.* Under the Medicaid deemed newborn requirement, the newborn will be deemed eligible for Medicaid at birth (regardless of family income), so the child is automatically eligible for continuous coverage in Medicaid until their first birthday.[41]  Because the newborn is eligible for Medicaid, the CHIP CE period that began on the effective date of coverage under the FCEP option ends at birth.

- *CHIP pays for labor and delivery.* Many newborns will be eligible for Medicaid, if their family's income is at or below the Medicaid income standard for infants, even though labor and delivery was covered by CHIP.  Therefore, the state must screen the newborn for potential eligibility for Medicaid at birth.  Such screening must be based on information available to the state without contacting the individual, unless additional information is needed to verify the specific change in circumstances.[42]  Depending on the result of this screen, the state must take a different action:

  a. *The screening identifies potential eligibility for Medicaid.* The state must transition the newborn to Medicaid for the remainder of their 12-month CE period (beginning on the effective date of coverage under the FCEP option) consistent with section 2107(e)(1)(K) of the Act.  Alternatively, the state may choose to provide a new 12-month CE period in Medicaid from the date of the determination if the state has enough information available to it to determine eligibility with respect to all eligibility criteria without requiring additional information or documentation from the family.[43]

  b. *The screening does not indicate potential eligibility for Medicaid.* The state must maintain the newborn's coverage in CHIP for the duration of the 12-month CE period (beginning on the effective date of coverage under the FCEP option). [44]  If the screening indicates the child remains eligible for CHIP, the state may begin a new 12-month CE period if it has enough information available to redetermine CHIP eligibility with respect to all eligibility criteria without requiring additional information or documentation from the family.[45]

We note that, while states may continue using bundled payments to provide postpartum care to those eligible under the FCEP option, states can also provide postpartum care through a health services initiative (HSI).[46]  Covering labor and delivery under Medicaid and postpartum care for

---

[41] Requirements for deemed newborns are at § 435.117. When the deemed newborn reaches their first birthday, the state must conduct a renewal of eligibility in accordance with § 435.916.
[42] See §457.350(b) for CHIP screening and enrolling procedures.  § 457.350(b) cites to § 457.343, which incorporates Medicaid regulations about changes in circumstances by cross referencing § 435.916(d)(1).
[43] § 435.916(d)(1)(ii)
[44] If the newborn continues to appear eligible for CHIP, states may move the child from the FCEP eligibility category to another CHIP eligibility category for the remainder of their 12-month CE period as long as the change does not result in a loss of benefits or an increase in cost sharing. States may not contact the child's family for additional information in order to move the newborn to a new CHIP eligibility category.
[45] § 457.343, which incorporates by cross reference § 435.916(d)(1)(ii))
[46] January 12, 2017 Health Services Initiatives FAQs (https://www.medicaid.gov/federal-policy-guidance/downloads/faq11217.pdf) for more information.

the parent through an HSI may be beneficial for both the parent and child.  Infants whose birth is not paid for as part of a bundled payment that are deemed eligible for Medicaid[47] are entitled to Medicaid eligibility for one year and receive the mandatory EPSDT benefit in Medicaid, which is an optional benefit in CHIP.  States also generally impose lower premiums and cost sharing charges under Medicaid compared to CHIP.  Additionally, by using an HSI for postpartum care, states can provide the same comprehensive postpartum coverage to all pregnant individuals across Medicaid and CHIP for up to 12 months, not just the postpartum services covered through a bundled payment.

## IV. State Plan Amendments (SPAs)

All states that must newly adopt CE for children in Medicaid and/or CHIP will need to submit a Medicaid and/or CHIP SPA.

In addition, states that currently have CE will need to submit a Medicaid and/or CHIP SPA to come into compliance with new sections 1902(e)(12) and 2107(e)(1)(K) of the Act, if the state imposes CE restrictions that are no longer permissible effective January 1, 2024 – that is, if, under the state's current CE policy:

- CE only applies to a subset of children under age 19, such as targeting a specific age range; or
- The CE period is shorter than 12 months.

States that currently provide CE in a manner that is consistent with sections 1902(e)(12) and 2107(e)(1)(K) of the Act, as amended by the CAA, 2023, will not be required to submit a SPA. States whose Medicaid CE SPA was approved prior to MACPro (i.e., the state submitted a paper-based SPA), will need to attest to being in compliance in MACPro.

States must submit CE-related SPAs for Medicaid through MACPro and CHIP SPAs through the Medicaid Model Data Lab (MMDL).

For Medicaid, to have an effective date of January 1, 2024, states will need to submit their SPA no later than March 31, 2024, in accordance with Medicaid regulations.[48]  For CHIP, to have an effective date of January 1, 2024, states must submit their SPA no later than the end of the state fiscal year in which January 1, 2024 falls.[49]

## V. Section 1115 Demonstration Authority

States may also request CE for children for more than a 12-month period, or multi-year CE, through section 1115 demonstration authority.  CMS has approved demonstration authority in a

---

[47] § 435.117
[48] §§ 430.12 and 430.20
[49] §§ 457.60 and 457.65

few states to provide CE for longer than 12 months, including CE for children determined eligible until they reach age six, and a two-year CE period for children ages six and older. We recognize that CE for adults also supports consistent coverage and continuity of care by keeping adults and children enrolled for a longer period of time regardless of income fluctuations or most other changes that otherwise would affect eligibility.  These types of demonstrations are expected to minimize coverage gaps and to help maintain continuity of access to program benefits, and thereby help improve health outcomes of beneficiaries.  CE is also an important aspect of reducing the rate of uninsured and underinsured adults.  For more information about the section 1115 demonstration application process, states may contact their CMS Section 1115 Project Officer or refer to the "1115 Application Process" webpage on Medicaid.gov at https://www.medicaid.gov/medicaid/section-1115-demonstrations/1115-application-process/index.html

**VI. Closing**

CMS looks forward to its continued work with states on the implementation of CE in all states and ensuring that all children enrolled in Medicaid and CHIP have continuous access to the coverage they need and to which they are entitled.  States should consult with CMS if they have questions related to the guidance in this letter.  We also encourage you to reach out to your Medicaid state lead or CHIP project officer with any questions related to SPA submission.  If you have additional questions about the policies described in this letter, you may contact Meg Barry, Director of the Division of State Coverage Programs at 410-786-1536 or meg.barry@cms.hhs.gov.

# Doc. 1-4

# Exhibit 4

**Mandatory Continuous Eligibility for Children in Medicaid and CHIP**
**Frequently Asked Questions**
**October 27, 2023**

**Q1. On or after January 1, 2024, can states terminate CHIP coverage during a continuous eligibility (CE) period due to non-payment of premiums?**

A1. No. Sections 1902(e)(12) and 2107(e)(1)(K) of the Social Security Act (the Act), as modified by Section 5112 of the Consolidated Appropriations Act, 2023 (CAA, 2023), provide for limited exceptions to the requirement that all states provide 12 months of continuous eligibility for children regardless of any changes in circumstances that otherwise would result in loss of coverage.  These exceptions include the child turning age 19, no longer being a state resident or, in the case of a child enrolled in a separate CHIP, becoming eligible for Medicaid.  There is not an exception to CE for non-payment of premiums.  Thus, the existing regulatory option at 42 CFR § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception to CE will end on December 31, 2023, and states will not be permitted to terminate the Medicaid or CHIP eligibility of a child under age 19 during a CE period for non-payment of premiums.  We note that states do not have the option to terminate a child's Medicaid eligibility during a CE period under current Medicaid CE regulations at 42 CFR § 435.926.

We recognize that the State Health Official (SHO) Letter we issued on September 29, 2023, *Section 5112 Requirement for all States to Provide Continuous Eligibility to Children in Medicaid and CHIP under the Consolidated Appropriations Act, 2023,* provides for three exceptions to CE that are included in the current regulations at 42 CFR § 435.926(d), incorporated by cross reference in the CHIP regulations at 42 CFR § 457.342(a), but which are not identified in Section 5112 of the CAA, 2023.  Specifically, under the SHO, states may terminate coverage of an individual under age 19 before the end of their 12-month CE period if: 1) the child dies, 2) the child or their representative requests disenrollment or 3) the agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative. These three exceptions, which permit states to terminate coverage for a child who is deceased, who no longer wants to receive coverage, or who did not actually meet the eligibility requirements at their last determination, do not undermine the CE mandate in section 5112 of the CAA, 2023, and are important to protecting program integrity.

States will continue to have the option to institute an enrollment fee in CHIP and require payment of the enrollment fee prior to enrollment.  States also will continue to have the option to require payment of the first month's premium prior to enrolling a child who is determined eligible at application.

States that have already adopted CE for children and treat nonpayment of premiums as an exception to CE in CHIP will need to submit a CHIP SPA as outlined in Section IV of SHO Letter #23-004.

**Q2. If a state or managed care entity covers unpaid premium amounts for a child whose coverage must be maintained during a CE period despite nonpayment of premiums, can the state receive FFP (Federal financial participation) for such amounts?**

A2. No. CMS cannot provide FFP for unpaid premiums covered by the state or any other entity, including managed care entities. Existing requirements at 42 CFR § 447.56(e)(1) and 457.224(a)(1) exclude FFP for any cost sharing amounts, including premiums, that beneficiaries are expected to pay, and are unchanged by the CAA, 2023.

Currently, some states or managed care entities choose to absorb the costs of unpaid premiums so that a child can remain enrolled even if the state would otherwise terminate coverage due to non-payment of premiums.  Any such payment of premiums of by states or managed care entities continues to be ineligible for FFP.

# Doc. 2

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

### Case No. 8:24-cv-317

STATE OF FLORIDA; and FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION,

*Plaintiffs*,

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official capacity as
Administrator for the Centers for Medicare and
Medicaid Services*; DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
XAVIER BECERRA, *in his official capacity as
Secretary of Health and Human Services*,

*Defendants*.

---

## MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION**

On June 22, 2023, Governor DeSantis signed into law Florida H.B. 121 to substantially expand the provision of subsidized health insurance to children in the State of Florida. *See* An Act Relating to Florida KidCare Program Eligibility, H.B. 121, 2023 Leg. (Fla. 2023). That program, and especially its expansion, depends on the collection of monthly premiums. The Biden Administration unlawfully seeks to undermine that requirement and turn the program into a free-for-all, threatening its solvency, long-term stability, and ability to reach even more children in need.

For more than three decades, Florida has provided subsidized health insurance to children in low- and moderate-income families who do not qualify for Medicaid. Since 1998, Florida has administered this insurance as part of the Children's Health Insurance Program ("CHIP"), a federal-state partnership under Title XXI of the Social Security Act, Pub. L. No. 105-33, 111 Stat. 251 (1997). Florida has always required modest premiums as a condition of enrollment, currently ranging from $15 to $20 per family regardless of the number of children enrolled. These premiums offset program costs, ensure Florida maintains a balanced budget as mandated by its state constitution, and preserve Florida CHIP as a bridge between Medicaid and private insurance rather than an entitlement program.

Title XXI allows States to disenroll CHIP participants for nonpayment of premiums. *See* 42 U.S.C. § 1397cc(e)(3)(C). The Centers for Medicare and Medicaid Services ("CMS"), which administers CHIP on behalf of the federal government, has allowed disenrollment for the same reason, including during periods of "continuous

eligibility." *See* 42 C.F.R. § 457.342(b). *Eligibility* is the determination that someone qualifies to participate in CHIP—e.g., meets the State's income, residency, and age requirements—and States generally don't reconsider that determination during periods of "continuous eligibility." *Enrollment* means the participant is not only eligible but has agreed to participate in CHIP and will pay the enrollment cost and monthly premiums as required. A person can be eligible for CHIP benefits but not enrolled.

In late 2023, CMS issued a State Health Official ("SHO") Letter, Ex.3, notifying States that they could no longer disenroll CHIP participants during periods of "continuous eligibility," except in certain circumstances. A subsequent Frequently Asked Questions ("FAQs") document, Ex.4, specifically prohibited disenrollment during continuous eligibility for nonpayment of premiums. Both the SHO Letter and FAQs cited the Consolidated Appropriations Act, 2023 ("2023 CAA"), which amended Title XXI to require that States provide CHIP participants with 12 months of "continuous eligibility." Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022). But the 2023 CAA says nothing about premiums or CHIP enrollment.

The FAQs are contrary to law and exceed CMS's statutory authority. Title XXI expressly allows "termination of coverage" by a State for a participant's "failure to make a premium payment." 42 U.S.C. § 1397cc(e)(3)(C)(ii)(I). Requiring States to continue enrollment despite a participant's failure to pay premiums violates that statute. The 2023 CAA did not change that authority, requiring only that States provide 12 months of "continuous eligibility." CMS "must give effect to that clear intent," *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1256 (11th Cir. 2020),

as Congress certainly knows how to distinguish between "eligibility" and "enrollment," and has long done so.[1] CMS must also follow its own regulations until they are amended or repealed. *United States v. Nixon*, 418 U.S. 683, 695–696 (1974). Those regulations have long recognized the distinction between eligibility and enrollment,[2] and expressly allow disenrollment for nonpayment of premiums during periods of continuous eligibility. *See* 42 C.F.R. § 457.342(b).

CMS's newfound position is also arbitrary and capricious because it lacks a reasoned explanation and fails to consider important aspects of the problem. CMS further purported to amend its regulations by "end[ing]" the provision at 42 C.F.R. § 457.342(b), effective December 31, 2023, without undergoing the notice-and-comment rulemaking required under the Administrative Procedure Act ("APA"). Ex.4, FAQs at 1. CMS has tried to simply make the change by agency fiat.

Plaintiffs State of Florida and its Agency for Health Care Administration, which oversees Florida CHIP (collectively, "Florida"), are caught between CMS and state law. Florida faces actual and imminent injury to its sovereign interest in implementing and enforcing its laws, and in the form of unrecoverable monetary loss. The public is also best served by an injunction that ensures the proper administration and long-term sustainability of a program enacted by the people's representatives in Florida, including avoiding incentives that undermine the program, limit its reach, or jeopardize its expansion to more children in need. Those considerations far outweigh

---

[1] *See* note 8, *infra*, and accompanying text.
[2] *See* note 9, *infra*, and accompanying text.

any harm to CMS because the federal government has no legitimate interest in unlawful agency action. *See Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Accordingly, this Court should enjoin Defendants[3] from prohibiting CHIP disenrollment for nonpayment of premiums, as set forth in the FAQs.

## BACKGROUND

### A.   Children's Health Insurance Program

CHIP is a cooperative federal-state program codified in Title XXI of the Social Security Act. Under Title XXI, States develop and administer their own CHIPs, and the federal government provides funds to help defray the costs of programs that satisfy certain baseline insurance coverage. *See* 42 U.S.C. §§ 1397aa–1397mm. States have considerable flexibility to implement CHIP, including selecting the standards they use "to determine the eligibility of targeted low-income children." *Id.* § 1397bb(b)(1). Congress also grandfathered programs in three states—Florida, New York, and Pennsylvania—into CHIP because they already provided "comprehensive … coverage" to children before 1997, allowing those States to both maintain and modify their existing programs within broad limits. *Id.* § 1397cc(a)(3), (d).

Once a child is determined to be *eligible* for the relevant state CHIP, the child may *enroll* and obtain insurance coverage. Title XXI allows States to require cost-sharing as a condition of enrollment and coverage, including by charging "premiums,

---

[3] Plaintiffs have sued CMS, the CMS Administrator, HHS, and the HHS Secretary.

deductibles, [and] coinsurance." *Id.* § 1397cc(e)(1)(A). It also allows States to "terminat[e]" an enrollee's "coverage" for nonpayment of premiums after a 30-day grace period, subject to certain disenrollment protections. *Id.* § 1397cc(e)(3)(C); *see* 42 C.F.R. § 457.570.

Under a 2016 rule, States were given the *option* of providing a period of "continuous eligibility" to children enrolled in CHIP. 42 C.F.R. § 457.342(a); *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016). During the continuous eligibility period, however, continuous *enrollment* is not guaranteed. The regulation provides that "a child may be terminated during the continuous eligibility period" for the "reasons provided" in 42 C.F.R. § 435.926(d)—a regulation that permits termination of Medicaid "eligibility" during periods of "continuous eligibility"[4]—and *also* "for failure to pay required premiums or enrollment fees," *id.* § 457.342(b).

In 2022, Congress amended the Social Security Act to *require* States to provide 12 months of continuous eligibility to CHIP participants. 2023 CAA § 5112, 136 Stat. 4459, 5940; *see* Part C, *infra*.

**B.    Florida's Children's Health Insurance Program**

In 1990, pre-dating CHIP, Florida established one of the first state-sponsored programs that offered subsidized health insurance to children in low- and moderate-income families who did not qualify for Medicaid. The program began in Volusia

---

[4] Title 42 C.F.R. § 435.926(d) allows the termination of Medicaid "eligibility" if (1) "[t]he child attains the maximum age specified," (2) "[t]he child or child's representative requests a voluntary termination of eligibility," (3) "[t]he child ceases to be a resident of the State", (4) the State "determines that eligibility was erroneously granted ... because of agency error or fraud, abuse, or perjury," or (5) "[t]he child dies."

County as a demonstration project under the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6407, 103 Stat. 2106, 2266 (1989), which required States to charge premiums to participating families, *id.* § 6407(c)(2), 103 Stat. at 2266. By 1995, the federal funding had ended, but Florida continued its efforts and expanded the program to additional counties, funded by state, local, and private sources. Ex.5, Demonstration Report at 1–2, 26.

In 1997, Congress grandfathered Florida's program into CHIP. 42 U.S.C. § 1397cc(a)(3), (d)(1). Florida subsequently transferred administration of that program to "Florida KidCare," an umbrella program created to oversee Florida Medicaid and CHIP. Florida CHIP continued to require premium payments, and also provided a 6-month period of continuous eligibility for CHIP participants (later extended to 12 months). Ex.2, Fla. CHIP Plan at 83, 91–92. Eligible participants could still be disenrolled for nonpayment of premiums. *Id.* at 97–98, 177–78.

As of October 2023, more than 119,000 children in low- and moderate- income families statewide receive subsidized health insurance through Florida CHIP. Children who do not qualify for Medicaid and whose household incomes are up to 210%[5] of the federal poverty level are eligible to participate.[6] Families who enroll at least one child must pay monthly premiums between $15 and $20 dollars, depending on family income. *Id.* at 22–23, 176–77. A child whose family fails to pay the premium

---

[5] Income thresholds for current programs are specified in terms of modified adjusted gross incomes (MAGI). *See* 42 U.S.C. § 1396a(e)(14).

[6] Florida also permits any family, regardless of income, to purchase children's health insurance through Florida KidCare at full, but affordable, rates. Ex.2, Fla. CHIP Plan at 5, 23, 177.

will be disenrolled from coverage after a 30-day grace period, but can reenroll following a short lock-out period without undergoing a new eligibility determination. *Id.* at 97–98, 177–78.

The scope of Florida CHIP is also set to expand. Governor Ron DeSantis recently signed into law Florida H.B. 121, which makes Florida children with household incomes up to 300% of the federal poverty level eligible for the subsidized insurance. H.B. 121, 2023 Leg. § 1. This expansion is projected to increase enrollment in Florida CHIP by an additional 26,000 Florida children in its first year, alone. Ex.1, Noll Declaration ¶ 5.

Cost-sharing is vital to the operation and sustainability of Florida CHIP. In fiscal year 2019–2020, Florida collected over $30 million in premium payments, which helped offset program costs and ensured that Florida met the balanced budget requirement in the Florida Constitution. Ex.1, Noll Declaration ¶ 4; Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d). Cost-sharing is also crucial to Florida's planned expansion of CHIP, which will be partially funded through the collection of premium payments and will increase the number of Florida children in need who receive health insurance coverage. Florida anticipates collecting more than $53 million in premium payments from existing and new participants in the first full year of the expanded plan. Ex.1, Noll Declaration ¶ 7. Without those premiums, the cost to Florida of expanding its CHIP coverage would double. *Id.* ¶ 6.

Requiring modest cost-sharing also reflects a conscious policy choice by the Florida Legislature that those receiving state-subsidized healthcare should be

financially invested in the benefits they receive. Florida CHIP is a personal responsibility program, intended to bridge the gap between families with low incomes who receive free health insurance through Medicaid and families with higher incomes who must obtain insurance on their own. *See* Fla. Stat. §§ 409.812–.813; Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), http://www.leg.state.fl.us/data/Publications/2000/House/reports/interim_reports/pdf/kidcare.pdf.

## C.   CMS's September 29, 2023, SHO Letter

The 2023 CAA amended the Social Security Act to *require* States to provide 12 months of "continuous eligibility" for children enrolled in Medicaid and CHIP. In relevant part, it provides:

> The State plan (or waiver of such State plan) shall provide that an individual who is under the age of 19 and *who is determined to be eligible* for benefits under a State plan (or waiver of such plan) approved under this title … *shall remain eligible* for such benefits until the earlier of—
> > (A) the end of the 12-month period beginning on the date of such determination;
> > (B) the time that such individual attains the age of 19; or
> > (C) the date that such individual ceases to be a resident of such State.

2023 CAA § 5112(a), 136 Stat. at 5940 (emphases added) (amending 42 U.S.C. § 1396a(e)(12)); *see id.* § 5112(b), 136 Stat. at 5940 (adding 42 U.S.C. § 1397gg(e)(1)(K) to apply § 1396a(e)(12) to CHIP).

On September 29, 2023, CMS issued a SHO Letter "to provide states with guidance on implementing" the new continuous eligibility requirement. Ex.3, SHO Letter at 1. CMS observed that the 2023 CAA "explicitly provide[s]" only two

"exception[s]" to continuous eligibility: for children who "[r]each age 19" or "[c]ease to be state residents." *Id.* at 4. Nonetheless, CMS explained that States "will be expected to" continue terminating eligibility during the continuous eligibility period for three other reasons: when termination is voluntarily requested, when the agency determines eligibility was erroneously granted, or when the child dies. *Id.* at 4–5. Together, these five reasons coincide with the reasons for terminating *eligibility* listed in CMS's current regulations. *See* 42 C.F.R. §§ 435.926(d), 457.342(b). CMS added that it was "still assessing how non-payment of premiums intersects with [continuing eligibility] under the CAA." Ex.3, SHO Letter at 4 n.14.

CMS was clear that States must "submit Medicaid and CHIP state plan amendments" to conform to the requirements in the SHO Letter. *Id.* at 1.

### D.  CMS's October 27, 2023, "Frequently Asked Questions"

On October 27, 2023, CMS issued FAQs that (despite the title) purport to effect a change in CMS's regulations on CHIP enrollment. The FAQs state that under the new continuous *eligibility* requirement of the 2023 CAA, States cannot "terminate CHIP *coverage* during a continuous eligibility … period due to nonpayment of premiums." Ex.4, FAQs at 1 (emphasis added). As a result, eligible children can obtain health insurance through CHIP for a full 12 months—the duration of the continuous eligibility period—by enrolling and paying the first month's premium only. *Id.* States must "absorb the costs of unpaid premiums" for the next 11 months, because those shortfalls do not qualify for federal reimbursement. *Id.* at 2.

The FAQs then announced that the "existing regulatory option at 42 CFR

§ 457.342(b) for states … to consider non-payment of premiums as an exception to [continuous eligibility] will end on December 31, 2023." *Id.* at 1. CMS maintains, however, that the five other regulatory reasons for termination remain available, either because they are expressly included in the 2023 CAA, or because they "do not undermine the [continuous eligibility] mandate … and are important to protecting program integrity." *Id.*[7] CMS reiterated that States "will need to submit a CHIP [state plan amendment]" to conform to the FAQs. *Id.*

### E.  Secretary Becerra's December 18, 2023, Letter

On December 18, 2023, Secretary Becerra sent a letter to Governor DeSantis, Ex.6, discussing trends in Medicaid and CHIP enrollment and "urg[ing]" him "to ensure that no child in [Florida] who still meets eligibility criteria for Medicaid or CHIP loses their health coverage due to 'red tape' or other avoidable reasons," *id.* at 1. The letter listed several recommended "proactive actions to prevent eligible children from losing Medicaid and CHIP," and closed with encouragement to "[e]xpand Medicaid." *Id.* at 1–2. The letter also included an ominous warning that the U.S. Department of Health and Human Services ("HHS") "takes its oversight and monitoring role … extremely seriously and will not hesitate to take action to ensure states' compliance with federal Medicaid requirements." *Id.* at 1.

---

[7] While 42 C.F.R. § 435.926(d)(2), cited by CMS, permits termination of "eligibility" during the continuous eligibility period whenever "[t]he child or child's representative requests a voluntary *termination of eligibility*" (emphasis added), the FAQs permit States to "terminate *coverage*" whenever "the child or their representative requests *disenrollment*," Ex.4, FAQs at 1 (emphases added), conflating "eligibility" with "enrollment."

**F.    Procedural History**

On February 1, 2024, Florida sued Defendants, alleging the FAQs violate 42 U.S.C. §§ 1397cc(e)(3)(C), 42 C.F.R. § 457.342(b), the grandfathering provisions of Title XXI, and the APA. Florida moves for a preliminary injunction because it faces imminent, irreparable harm from CMS's unlawful prohibition on disenrolling CHIP participants for nonpayment of premiums.

## ARGUMENT

A party seeking a preliminary injunction must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). To establish a "substantial likelihood of success on the merits," Florida need only show its claims are "*likely* or probable" to succeed. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005).

"The first two factors are 'the most critical.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

**I.    Florida is Substantially Likely to Prevail on the Merits**

The APA requires courts to "hold unlawful and set aside" any final agency action that is "in excess of statutory … authority," 5 U.S.C. § 706(2)(C), "arbitrary, capricious, … or otherwise not in accordance with law," *id.* § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D). Florida prevails under each

of these provisions.

### A.   The FAQs Are Final Agency Action Subject to APA Review

The FAQs are final agency action subject to review under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). *First*, they "mark the 'consummation' of [CMS's] decisionmaking process" with respect to implementing the CAA 2023 and disenrolling CHIP participants during periods of continuous eligibility. *Id.* The FAQs are unequivocal and represent the culmination of CMS's "assess[ment]" of "how non-payment of premiums intersects with [continuous eligibility] under the [2023] CAA." Ex.3, SHO Letter at 4 n.14. *Second*, they impose new "'obligations'" under CHIP, *Bennett*, 520 U.S. at 178, because they prohibit Florida from disenrolling participants who fail to pay their premiums during the continuous eligibility period and require it to "absorb the costs of unpaid premiums." Ex.4, FAQs at 2. Moreover, "'legal consequences … flow'" from the FAQs, *Bennett*, 520 U.S. at 178, because they purport to amend CMS regulations, exposing Florida to withholding of federal funds by CMS, *see* 42 U.S.C. § 1397ff(d). Secretary Becerra already sent Governor DeSantis a letter emphasizing HHS's intent to aggressively enforce compliance in programs serving low-income children. Ex.6, Becerra Letter at 1.

### B.   The FAQs Are Contrary to Law or Otherwise Exceed CMS's Authority

"Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). As a "mere creatur[e] of statute," CMS "must point to explicit Congressional authority justifying [its] decisions." *Clean Water Action v.*

*EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019). The FAQs, which impose a continuous-*enrollment* requirement, violate 42 U.S.C. §1397cc(e)(3), 42 C.F.R. § 457.342(b), and the grandfathering provisions of Title XXI.

Title XXI expressly allows for "termination of coverage" for "failure to make a premium payment within the [30-day] grace period." 42 U.S.C. §1397cc(e)(3)(C)(ii)(I). Under the FAQs, however, States cannot "terminat[e] ... coverage" for nonpayment for the 11 months after initial enrollment. *Id.* This clearly violates 42 U.S.C. §1397cc(e)(3)(C). Because Congress expressly allows Florida to disenroll recipients for nonpayment, CMS cannot turn around and prohibit Florida from doing that very same thing. *See Legal Env't Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1473 (11th Cir. 1997) ("A regulation ... [that] create[s] a rule out of harmony with the statute, is a mere nullity." (quoting *Dixon v. United States*, 381 U.S. 68, 74 (1965)).

The FAQs further violate CMS's own regulations, which expressly permit States to terminate coverage "during the continuous eligibility period for failure to pay required premiums." 42 C.F.R. § 457.342(b). "So long as this regulation is extant it has the force of law" and "[s]o long as this regulation remains in force [CMS] is bound by it[.]" *Nixon*, 418 U.S. at 695–96. CMS has not amended or rescinded 42 C.F.R. § 457.342(b) through notice-and-comment, nor can it simply "end" the provision by fiat in an FAQ. *See* Part I.D, *infra*.

The FAQs also fail to provide for programs, like Florida's, that are statutorily grandfathered into CHIP. Title XXI permits Florida to maintain its program as it existed when CHIP was created in 1997 and modify that program within broad limits.

42 U.S.C. § 1397cc(a)(3), (d). Florida has permitted termination of coverage—i.e., disenrollment—for nonpayment of premiums since 1991, and Florida is entitled to retain that policy. CMS lacks authority to compel changes to a grandfathered plan that provided for disenrollment for nonpayment of premiums when CHIP was established.

The 2023 CAA does nothing to change this analysis. It provides only that a child "who is determined to be *eligible* for benefits under" a state CHIP "shall remain *eligible* for such benefits" for 12 months, with several specified exceptions. 2023 CAA § 5112(a), 136 Stat. at 5940 (emphases added). Under Title XXI, *eligibility* is not *enrollment*. To be "eligible" means to be "qualified to participate or be chosen." *Eligible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/eligible (visited Jan. 29, 2024). To "enroll" means to "insert, register, or enter in a list, catalog, or roll." *Enroll*, Merriam-Webster, https://www.merriam-webster.com/dictionary/enroll (visited Jan. 29, 2024).

A child is eligible for CHIP upon meeting the relevant state-established criteria, which typically relate to a child's age, residency, and household income. *See* 42 U.S.C. § 1397bb(b)(1). Eligible children are then offered the option to *enroll* in CHIP to obtain insurance coverage. Enrollment may require that an eligible child's family take additional actions, for example, paying an enrollment fee or monthly premiums. *See* 42 C.F.R. § 457.510. But the 2023 CAA says nothing about *enrollment* or *coverage*.

Congress chose its language carefully. Title XXI consistently distinguishes between eligibility and enrollment. *See, e.g.,* 42 U.S.C. § 1397bb(b)(4) (discussing

"barriers to the enrollment" of "eligible" individuals).[8] CMS regulations have as well. *See, e.g.*, 42 C.F.R § 457.60 (distinguishing "[e]ligibilty standards, enrollment caps, and disenrollment policies").[9]

Had Congress intended to require continuous CHIP *enrollment* in the 2023 CAA, it would have said so. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (courts "generally seek to respect Congress' decision to use different terms to describe different categories of people or things"). In fact, Congress considered that possibility but didn't enact it. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. § 3(b)(1) (2021) (requiring that "an individual who is determined to be eligible for benefits … shall remain eligible *and enrolled* for such benefits" for the duration of the specified period (emphasis added)); Stabilize Medicaid and CHIP Coverage Act, H.R. 1738, 117th Cong. § 2(b)(1) (2021) (same).

Moreover, the 2023 CAA must be interpreted consistent with the other provisions of Title XXI, including 42 U.S.C. § 1397cc(e)(3)(C). It is "one of the most basic interpretive canons, that a statute should be construed so that effect is given to

---

[8] *See also, e.g.*, 42 U.S.C. § 1397hh(c)(3) ("enrollees, disenrollees, and individuals eligible for but not enrolled" in a CHIP plan); *id.* § 1397mm(a)(1) ("efforts … to increase the enrollment … of eligible children"); *id.* § 1397mm(h)(1) ("campaigns to link the eligibility and enrollment systems"); *id.* § 1397mm(h)(6) ("enrollment … strategies for eligible children").
[9] *See also, e.g.,* 42 C.F.R. § 457.10 (discussing information in an "eligibility notice," including the potential impact of a "determination of eligibility for, or enrollment in, another insurance affordability program"); *id.* § 457.300 ("[r]egulations relat[ed] to eligibility, screening, applications and enrollment"); *id.* § 457.350(i)(2)(ii)(A) ("the date on which the individual will be eligible to enroll"); *id.* § 457.525(b) (cost-sharing information must be made available to "[e]nrollees, at the time of enrollment and reenrollment after a redetermination of eligibility"); *id.* § 457.570(b) (adjustment to a "child's cost-sharing category" if "the enrollee may have become eligible … for a lower level of cost sharing."

all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up). The 2023 CAA does not purport to amend or preempt 42 U.S.C. § 1397cc(e)(3)(C), so both must be read consistent with each other.

When, after "us[ing] all the ordinary tools of statutory construction" and "the intent of Congress is clear, ... both [the court] and the agency must give effect to that clear intent." *In re Gateway Radiology Consultants*, 983 F.3d at 1255–56 (cleaned up). The 2023 CAA unambiguously requires that a child "remain *eligible* for [CHIP] benefits," not that CHIP participants remain *enrolled* regardless of premium payment requirements. 2023 CAA § 5112(a), 136 Stat. at 5940 (emphasis added). CMS thus has no authority to transform the 2023 CAA's unambiguous continuous eligibility requirement into a continuous, free-of-charge, enrollment requirement. *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1062–63 (11th Cir. 2008) (quoting *IRS v. FLRA*, 494 U.S. 922, 933 (1990)).

Even if the 2023 CAA were ambiguous (and it is not), that still would not justify the FAQs. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Ambiguity in the 2023 CAA's continuous eligibility requirement would render that provision unconstitutional, not justify a redefinition. "Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted would be inconsistent with the Constitution's meticulous separation of powers. ... [T]he needed clarity under the Spending Clause must come directly from

the statute." *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (cleaned up).

There is also no inherent conflict in requiring continuous eligibility while permitting disenrollment for failure to pay premiums. CMS has long recognized that continuous eligibility and disenrollment for nonpayment of premiums during that period comfortably co-exist. *See* 42 C.F.R. § 457.342(b). Florida has likewise implemented both, side by side, for decades. *See* Part B, *supra*. A child may remain eligible to enroll in a state CHIP and obtain benefits, even if the child is not presently enrolled for whatever reason. And a child disenrolled for nonpayment of premiums can reenroll without applying again for an eligibility determination. Ex.2, Fla. CHIP Plan at 97–98.

### C. The FAQs Are Arbitrary and Capricious

The FAQs are also arbitrary and capricious. Agency action must be "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). The FAQs are unreasonable, lack reasoned explanation, and fail to consider important aspects of the problem.

*First,* the FAQs arbitrarily preserve non-statutory reasons for terminating CHIP coverage, while prohibiting disenrollment for nonpayment of premiums. CMS asserts that the "existing regulatory option" for terminating enrollment for premium nonpayment is no longer available because "[t]here is not an exception to [continuous eligibility in the 2023 CAA] for non-payment of premiums." Ex.4, FAQs at 1. But CMS still permits States to terminate eligibility for three reasons not included in the

2023 CAA: when the child dies, the child (or the child's representative) requests termination, or the agency determines eligibility was erroneously granted. *Id.*; Ex.3, SHO Letter at 4–5; *see* 42 C.F.R. §§ 435.926(d), 457.432(b). It is logically inconsistent for CMS to argue that non-statutory exceptions to terminating eligibility are foreclosed while nonetheless retaining other non-statutory exceptions. The 2023 CAA either forecloses additional exceptions or it does not. And it was further illogical to exclude disenrollment for nonpayment of premiums when Congress has allowed it.

Moreover, CMS does not explain why the justifications that it offers for its preferred exceptions—that they "do not undermine the [continuous eligibility] mandate ... and are important to protecting program integrity," Ex.4, FAQs at 1—do not apply equally to allowing disenrollment for nonpayment of premiums. Such disenrollment does not interfere with maintaining eligibility for CHIP benefits—in fact, it does not affect *eligibility* at all. And allowing disenrollment for nonpayment of premiums is crucial to maintaining the integrity and long-term sustainability of programs, like Florida's, that incorporate cost-sharing as a fundamental component. The FAQs are thus neither "reasonable [nor] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021).

*Second*, CMS provided no explanation for reversing the long-held distinction between eligibility and enrollment, evident in both Title XXI and CMS's regulations. CMS has also long acknowledged that continuous eligibility can co-exist with disenrollment for nonpayment of premiums. *See* 42 C.F.R. § 457.342(b). "This lack of reasoned explication for a regulation that is inconsistent with [CMS's] longstanding

18

earlier position" requires setting aside the FAQs. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); *id.* at 221.

*Finally*, CMS "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. CMS never considered the authority granted to States, like Florida, whose plans were grandfathered into CHIP. Under Title XXI, these States are permitted to continue operating their existing plans and have discretion to modify those plans within broad limits. 42 U.S.C. § 1397cc(a)(3), (d). The FAQs do not acknowledge or account for this authority, let alone provide an explanation for how the FAQs possibly comply with that congressional edict.

CMS also never considered that States have relied on their authority to terminate coverage for nonpayment of premiums when implementing and expanding their state CHIPs. Florida has significant reliance interests because it recently enacted legislation expanding its program to offer subsidized coverage to more children based on the expectation that the expansion will be substantially funded through premium payments. *See Florida H.R. Staff Final Bill Analysis: H.B. 121*, at 6 (June 23, 2023), https://www.flsenate.gov/Session/Bill/2023/121/Analyses/h0121z1.HRS.PDF. "When an agency changes course," it is "arbitrary and capricious to ignore [reliance interests]." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up); *Encino Motorcars,* 579 U.S. at 221–22 ("[I]n explaining its changed position, an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'").

**D.      The FAQs Failed to Follow Required Procedures**

With limited exceptions, "under the APA ... an agency must afford interested persons notice of proposed rulemaking and an opportunity to comment." *Florida v. HHS*, 19 F.4th 1271, 1286 (11th Cir. 2021); *see* 5 U.S.C. § 553(b), (c). The requirement applies to so-called "legislative" rules, which include agency actions that (1) "effectively amen[d] a prior legislative rule," *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995); (2) "'create new law, rights or duties,'" *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009); or (3) "'have effects *completely independent* of the statute,'" *id.* "The distinction between an interpretive rule," which is not subject to notice-and-comment, and a legislative rule, which is, generally "turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.* (cleaned up); *see* 5 U.S.C. § 553(b)(A).

The FAQs constitute a legislative rule subject to the APA's notice-and-comment requirements. Most notably, the FAQs purport to amend 42 C.F.R. § 457.342(b), which is itself a legislative rule promulgated after notice and comment. Ex.4, FAQs at 1 (announcing "the existing regulatory option at 42 CFR § 457.342(b) ... to consider non-payment of premiums as an exception to [continuous eligibility] will end on December 31, 2023"); *see* 81 Fed. Reg. 86,382 (Nov. 30, 2016) (finalizing 42 C.F.R. § 457.342(b) after notice and comment). It is well established that notice and comment is required when an agency "adopt[s] a new position inconsistent with ... existing regulations." *Shalala*, 514 U.S. at 100; *Am. Mining Cong.*, 995 F.2d at 1112.

Moreover, the FAQs "create new [continuous enrollment] duties" for States, with "effects completely independent of" the 2023 CAA. *Warshauer*, 577 F.3d at 1337 (cleaned up). The FAQs stray far beyond "remind[ing] affected parties of existing duties required by the plain language of the statute," *id.* at 1338 (cleaned up), and instead attempt to create a new "'binding norm'" for States operating CHIPs, *Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir. 1983).

CMS's characterization of the FAQs as "Frequently Asked Questions" is not relevant. *Warshauer*, 577 F.3d at 1337. Courts frequently conclude that CMS's so-called "guidance," including FAQs, are legislative rules subject to notice-and-comment rulemaking and judicial review. *See, e.g.*, *Baptist Mem'l Hosp.-Golden Triangle, Inc. v. Azar*, No. 3:17-cv-491, 2018 WL 3118703, at *1 (S.D. Miss. June 25, 2018) (FAQs) (collecting cases); *Alabama v. CMS,* 780 F. Supp. 2d 1219, 1228–32 (M.D. Ala. 2011) (SHO Letter).

Accordingly, because CMS issued the FAQs without notice or opportunity for comment, they must be set aside. 5 U.S.C. § 706(2)(D).

## II.     Florida Will Suffer Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies," and the harm must be "'actual and imminent'" to merit a preliminary injunction. *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Unless enforcement of the FAQs is enjoined, Florida will remain caught between CMS and Florida law, facing actual and imminent injury to its sovereign interests and unrecoverable monetary loss.

Florida law requires disenrolling CHIP participants for nonpayment of premiums. Fla. Stat. § 624.91(5)(b)(9). Disenrollments from Florida CHIP occur monthly and become effective on the first day of the month after the unpaid premium was due. Ex.1, Noll Declaration ¶ 11.

It is well established that "a state's 'inability to enforce [the state's] duly enacted plans clearly inflicts irreparable harm on the State.'" *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)); *see Texas v. Becerra*, 577 F. Supp. 3d 527, 557 (N.D. Tex. 2021) ("irreparable harm exists when a federal regulation prevents a state from enforcing its duly enacted laws").[10] Florida is faced with the imminent and recurring dilemma of violating the laws enacted by its legislature or violating the FAQs. This forced choice itself "demonstrates a likely irreparable harm to sovereign interests absent" an injunction. *Nelson*, 576 F. Supp. 3d at 1040; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 582 (1985) (recognizing "the injury of being forced to choose between relinquishing any right to compensation … or engaging in an unconstitutional adjudication").

That the state legislature *could* repeal its disenrollment requirement does not make the harm less actual or imminent. Florida has a sovereign "interest in not being pressured to change its law." *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir.

---

[10] *See also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'" (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

2015). The state legislature established Florida CHIP as a personal-responsibility program, not an entitlement, and Florida has a sovereign interest in carrying out that decision. *Id.* at 749 ("States have a sovereign interest in the power to create and enforce a legal code" (cleaned up)).

No matter which course it takes, Florida faces further imminent, irreparable harm. If Florida suspends disenrollments to comply with the FAQs, it will violate its own laws and incur unrecoverable costs. Florida must "absorb the costs of unpaid premiums," Ex.4, FAQs at 2, and expend state funds to provide insurance benefits contrary to Florida law. Florida anticipates that compliance with the FAQs will cost approximately $1 million each month to provide benefits to CHIP participants who should have been disenrolled. Ex.1, Noll Declaration ¶ 10. The lost funds will further accelerate because the inability to disenroll participants for nonpayment of premiums will predictably induce even more nonpayment, threatening the vast majority of the tens of millions of dollars in premiums that Florida CHIP collects each year and requiring even greater expenditures for insurance coverage not authorized under Florida law.[11] Recovery of these funds from CMS is barred by sovereign immunity, *Odebrecht Constr., Inc. v. Fla. Dep't Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013), and federal regulations limit Florida's ability to collect past-due premiums from participants, 42 C.F.R. § 457.570(c)(3). This "unrecoverable monetary loss is an

---

[11] Because Florida cannot disenroll for nonpayment, participants can pay the initial month's premium and obtain coverage for an entire year, which would reduce the State's annual premium collection by more than 90%.

irreparable harm." *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Alternatively, if Florida continues disenrollments in violation of the FAQs, it faces withholding of the federal funds it receives for CHIP. *See* 42 U.S.C. § 1397ff(d); 42 C.F.R. § 457.204(a). CMS has made clear its intention to police compliance. The FAQs direct States like Florida "that have already adopted [continuous eligibility] for children and treat nonpayment of premiums" as a reason for terminating coverage "to submit a CHIP [state plan amendment]" by the end of the state fiscal year. Ex.4, FAQs at 1; Ex.3, SHO Letter at 14. CMS informed Florida that it would need to submit a plan amendment to comply with the FAQs. Compl. ¶ 79. And Secretary Becerra already sent Governor DeSantis a letter emphasizing HHS's intent to aggressively enforce compliance in programs serving low-income children. Ex.6, Becerra Letter at 1. Unless and until CMS avers otherwise, the only reasonable presumption is imminent enforcement. *See, e.g.*, *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) ("That the federal government has not disavowed enforcement of [a provision] is evidence of an intent to enforce it.").

Moreover, the FAQs stand in the way of Florida's legislatively mandated CHIP expansion, which relies on premium payments to offset program costs. If Florida loses those premium payments, the cost to Florida of expansion would more than double, threatening the State's ability to fulfill its constitutional obligation to maintain a balanced budget. *See* Ex.1, Noll Declaration ¶ 6; Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d). Requiring Florida to delay—or abandon—its CHIP expansion is, itself,

irreparable harm, blocking the State from implementing a duly-enacted law and preventing thousands of Florida children from accessing health insurance coverage.

## III.   Balance of Harms and Public Interest Favor Plaintiffs

The balance of harms and public interest factors merge when the government is the defendant, *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020); *cf. Nken*, 556 U.S. at 435, and they strongly favor Florida. Absent an injunction, Florida will suffer harm to its sovereign interests and unrecoverable monetary loss. The public, too, has an interest in ensuring the proper administration and long-term sustainability of a program enacted by the people's representatives in Florida, including avoiding incentives that undermine the program, limit its reach, or jeopardize its expansion to more children in need. *See, e.g., Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1177 n.20 (M.D. Ala. 2010) (action that "could undermine" state benefit program is not in the public interest).

By contrast, CMS has no legitimate interest in unlawful agency action, because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n*, 141 S. Ct. at 2490; *see also BST*, 17 F.4th at 618 ("Any interest [the government] may claim in enforcing an unlawful [rule] is illegitimate.").

## CONCLUSION

The Court should preliminarily enjoin CMS from enforcing the FAQs and prohibiting Florida from disenrolling CHIP participants for nonpayment of premiums.

Dated: February 1, 2024

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

/s/ Natalie Christmas
Natalie Christmas (FBN 1019180)*
COUNSELOR TO THE ATTORNEY
 GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

* Lead Counsel
Counsel for the State of Florida

/s/ R. Trent McCotter
R. Trent McCotter (*pro hac vice forthcoming*)*
Jared M. Kelson (*pro hac vice forthcoming*)
Laura B. Ruppalt (*pro hac vice forthcoming*)
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

ANDREW T. SHEERAN
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

* Lead Counsel
Counsel for Agency for Health Care
 Administration

## CERTIFICATE  OF SERVICE

I hereby certify that on February 1, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action, and sent via certified mail to:

Xavier Becerra
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Merrick B. Garland
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530-0001

Civil Process Clerk
U.S. Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Chiquita Brooks-LaSure
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

Dated: February 1, 2024              */s/ R. Trent McCotter*
                                     R. Trent McCotter

# Doc. 22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

STATE OF FLORIDA, et al.,

                Plaintiffs,

      v.

CENTERS FOR MEDICARE &
MEDICAID SERVICES, et al.,

                Defendants.

No. 8:24-cv-317-WFJ-AAS

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

I.     The Medicaid and CHIP Programs ................................................3

II.    Continuous Eligibility in State Medicaid and CHIP Plans ...........................4

       A.     Prior Law ................................................................4

       B.     The Consolidated Appropriations Act, 2023 ........................................5

       C.     The Challenged Guidance ................................................6

III.   This Case ................................................................7

LEGAL STANDARD ................................................................................7

ARGUMENT ................................................................................8

I.     This Court lacks jurisdiction to hear this case. ................................................8

       A.     Florida's claim is not ripe for judicial review. ................................................8

       B.     This Court lacks jurisdiction under the CHIP statute. ........................13

II.    Florida does not face irreparable harm. ................................................16

III.   Florida is unlikely to succeed on the merits. ................................................19

       A.     The FAQs properly interpret the CAA's amendments to CHIP. .........19

       B.     CMS's interpretation of the CAA is not arbitrary and capricious. .......25

       C.     The FAQs constitute an interpretive rule exempted from the
              APA's rulemaking requirements. ................................................27

IV.    The equities and the public interest weigh against injunctive relief. ...............28

CONCLUSION ................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Gardner,*
  387 U.S. 136 (1967) ................................................................... 9, 12

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985) .............................................................18

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ........................................................................19

*Davidoff & CIE, S.A. v. PLD Int'l Corp.,*
  263 F.3d 1297 (11th Cir. 2001) ...........................................................8

*De La Fuente v. Kemp,*
  679 F. App'x 932 (11th Cir. 2017) ......................................................17

*Dismas Charities, Inc. v. U.S. Dep't of Just.,*
  401 F.3d 666 (6th Cir. 2005) .............................................................28

*Doe v. Fed. Aviation Admin.,*
  432 F.3d 1259 (11th Cir. 2005) ..................................................... 14, 15

*Duarte v. Mayorkas,*
  27 F.4th 1044 (5th Cir. 2022) ...........................................................22

*Elend v. Basham,*
  471 F.3d 1199 (11th Cir. 2006) ...........................................................9

*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) ..................................................................... 14, 16

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ........................................................................24

*Florida v. HHS,*
  19 F.4th 1271 (11th Cir. 2021) ...........................................................19

*Flowers Indus. v. FTC,*
  849 F.2d 551 (11th Cir. 1988) ...........................................................13

*Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco,*
  512 F.3d 1112 (9th Cir. 2008) ...........................................................29

*Gonzalez v. McNary*,
    980 F.2d 1418 (11th Cir. 1993) ............................................................23

*Great Plains Coop v. Commodity Futures Trading Comm'n*,
    205 F.3d 353 (8th Cir. 2000) ..............................................................15

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981) ...........................................................................19

*Ipharmacy v. Mukasey*,
    268 F. App'x 876 (11th Cir. 2008) .......................................................9

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ..........................................................13

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ...........................................................................22

*La. Env't Action Network v. U.S. EPA*,
    382 F.3d 575 (5th Cir. 2004) ..............................................................26

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .............................................................................9

*Metropolitan Sch. Dist. v. Davila*,
    969 F.2d 485 (7th Cir. 1992) ..............................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) .............................................................................26

*Nat'l Advert. Co. v. City of Miami*,
    402 F.3d 1335 (11th Cir. 2005) ..........................................................10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) .......................................................................9, 13

*New Jersey v. HHS*,
    670 F.2d 1262 (3d Cir. 1981) .............................................................16

*New Jersey v. U.S. Dep't of Health & Hum. Servs.*,
    2008 WL 4936933 (D.N.J. Nov. 17, 2008)..........................8, 11, 12, 19

*New York v. U.S. Dep't of Health & Hum. Servs.*,
    2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) ................................*passim*

iii

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................... 9, 13

*Orengo Caraballo v. Reich*,
    11 F.3d 186 (D.C. Cir. 1993) ........................................................ 27

*Pittman v. Cole*,
    267 F.3d 1269 (11th Cir. 2001) ...................................................... 9

*Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*,
    736 F.2d 19 (2d Cir. 1984) ........................................................... 12

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ....................................................................... 28

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ..................................................... 17

*St. Marie v. Ludeman*,
    2010 WL 924420 (D. Minn. Mar. 11, 2010) ................................... 18

*Tennessee v. U.S. Dep't of State*,
    329 F. Supp. 3d 597 (W.D. Tenn. 2018), *aff'd*,
    931 F.3d 499 (6th Cir. 2019) ............................................ 8, 12, 14, 16

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .................................................................. 14, 15

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ....................................................................... 23

*United States v. Castro*,
    837 F.2d 441 (11th Cir. 1988) ....................................................... 22

*United States v. Jefferson Cnty.*,
    720 F.2d 1511 (11th Cir. 1983) ....................................................... 8

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ..................................................................... 29

*Warshauer v. Solis*,
    577 F.3d 1330 (11th Cir. 2009) ................................................ 27, 28

*West Virginia v. Thompson*,
    475 F.3d 204 (4th Ci. 2007) .......................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................. 7, 17

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) .......................................................18

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
   141 S. Ct. 2434 (2021) ...............................................................23

## FEDERAL STATUTES

5 U.S.C. § 553 ...........................................................................27

30 U.S.C. § 816 .........................................................................15

42 U.S.C. § 1315 ........................................................................11

42 U.S.C. § 1316 ...........................................................10, 11, 13, 15

42 U.S.C. §§ 1396 *et seq.* ................................................................3

42 U.S.C. § 1396a ........................................................................3

42 U.S.C. § 1396a (2022) .......................................................... 4, 20, 21

42 U.S.C. §§ 1397aa *et seq.* .............................................................3

42 U.S.C. § 1397aa .......................................................................3

42 U.S.C. § 1397bb .......................................................................3

42 U.S.C. § 1397cc .............................................................. 24, 25, 27

42 U.S.C. § 1397ff ......................................................................10

42 U.S.C. § 1397gg ..................................................................*passim*

42 U.S.C. § 1397jj .......................................................................3

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (2022).........................................*passim*

## STATE STATUTES

Fla. Stat. § 624.91 .....................................................................18

## REGULATIONS

42 C.F.R. § 435.916 ..................................................................................23

42 C.F.R. § 435.926 ...................................................................4, 5, 20, 26

42 C.F.R. § 435.930 ......................................................................4, 20, 22

42 C.F.R. § 457.50 ......................................................................................3

42 C.F.R. § 457.60 ....................................................................................10

42 C.F.R. §§ 457.80-457.140 .....................................................................3

42 C.F.R. § 457.160 ..................................................................................10

42 C.F.R. § 457.203 ............................................................................10, 11

42 C.F.R. § 457.204 ............................................................................10, 11

42 C.F.R. § 457.206 ..................................................................................10

42 C.F.R. § 457.208 ............................................................................11, 13

42 C.F.R. § 457.342 .........................................................................5, 7, 20

## OTHER AUTHORITIES

Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021),
    Congress.gov,
    https://www.congress.gov/bill/117th-congress/senate-bill/646/
    all-actions?overview=closed&s=5&r=20&q=%7B%22search%22%3A%22S.
    +646%22%7D#tabs .........................................................................................23

## INTRODUCTION

The Children's Health Insurance Program ("CHIP") is a cooperative federal-state program enacted to expand health insurance coverage to low-income children whose families' incomes are too low to buy private insurance but too high to qualify for Medicaid. To receive federal funding under CHIP, a state must have a state plan that meets federal requirements. When a state plan is in "substantial noncompliance" with those requirements, the Centers for Medicare & Medicaid Services ("CMS") may withhold federal funding, but only after an extensive administrative process. And any judicial review of such a finding must take place in the Courts of Appeals.

Previously, federal law provided that states "may" include in their Medicaid and CHIP plans a period of "continuous eligibility," during which a child's coverage generally may not be terminated, subject to certain exceptions. While Medicaid has never permitted states to terminate coverage for nonpayment of premiums during a period of continuous eligibility, in 2016, CMS created a regulatory exemption to allow for such terminations in the CHIP program. In the Consolidated Appropriations Act, 2023 ("CAA"), Pub. L. No. 117-328, § 5112, 136 Stat. 4459, 5940 (2022), Congress changed this scheme in two fundamental ways. First, it provided that states "shall" provide for continuous eligibility in both their Medicaid and CHIP plans, something that had previously been optional. Second, it provided that the continuous eligibility requirement "shall" apply to CHIP "in the same manner" as it does to Medicaid, meaning that the prior, CHIP-specific regulatory exception could not survive. These changes were intended to reduce "churn"—cycles of termination and reenrollment

that increase administrative costs and cause coverage lapses for vulnerable children.

The CMS guidance at issue here—a set of FAQs—simply sets out this understanding of the statute, and it is both correct and procedurally sound. But the Court need not reach the merits of those issues, as Florida's preliminary injunction motion fails for more fundamental reasons. To start, the State's claims are not ripe. Florida in essence asks the Court to enjoin CMS from withholding CHIP funding or taking other corrective action based on the interpretation set out in the FAQs. But the CHIP statute and its regulations set forth a lengthy administrative process that would have to take place before CMS could do any such thing—a process that has not even begun. And even if that process had run its course, the Court would lack jurisdiction for an additional reason, because judicial review of issues concerning state plans that do not comply with federal requirements is confined to the Courts of Appeals.

Even if there were jurisdiction, Florida fails to show that the Court should exercise its emergency equitable powers to upend the ordinary administrative process. The State identifies no irreparable harm that would be forestalled by an injunction at this time. Its claimed injury is fundamentally monetary—a hypothetical withholding of federal funding—and hardly imminent, given the absence of any administrative proceedings. Florida's delay in seeking emergency relief—more than three months have passed since the FAQs were issued—also belies the notion that judicial intervention is urgently needed. And the equities and public interest tilt decidedly against an injunction, which would not only circumvent the careful administrative

scheme that Congress prescribed but will leave low-income children without medical coverage. Florida's motion for a preliminary injunction should be denied.

## BACKGROUND

### I.    The Medicaid and CHIP Programs

Medicaid, enacted in 1965 as Title XIX of the Social Security Act, is a cooperative federal-state program in which the federal government makes payments to states to assist them in providing medical assistance to certain low-income individuals. 42 U.S.C. §§ 1396 *et seq*. To participate in the Medicaid program, a State must submit a plan for medical assistance for approval by the Secretary of Health and Human Services. *Id.* § 1396a(b). A State plan defines the categories of individuals that can receive benefits and the specific kinds of services the State covers as medical assistance for each category. *Id*. § 1396a(a)(10), (a)(17).

In 1997, Congress created CHIP under Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa *et seq*. CHIP provides federal funds to enable states to expand health insurance coverage to uninsured children whose families' incomes are too high to qualify for Medicaid. *See id.* § 1397jj. Like Medicaid, a state must have an approved state plan to receive federal funding under CHIP. *Id.* § 1397aa(b); 42 C.F.R. § 457.50. Each plan must meet certain federal requirements. *See* 42 U.S.C. § 1397bb; *see also* 42 C.F.R. §§ 457.80-457.140.

3

## II.  Continuous Eligibility in State Medicaid and CHIP Plans

### A.  Prior Law

Under prior law, the Medicaid statute gave states the option to include in their state plans a "continuous eligibility" period of up to 12 months for children under 19. 42 U.S.C. § 1396a(e)(12) (2022). During this period, a child "determined to be eligible for benefits under" a state plan generally had to remain "eligible for those benefits." *Id.*

In 2016, CMS promulgated a regulation implementing this section of the Medicaid statute. *See* 42 C.F.R. § 435.926. The regulation specified that "[a] child's [Medicaid] eligibility may not be terminated during a continuous eligibility period, regardless of any changes in circumstances, unless" one of five exceptions was met: "(1) The child attains the maximum age specified in accordance with paragraph (b)(1) of this section; (2) The child or child's representative requests a voluntary termination of eligibility; (3) The child ceases to be a resident of the State; (4) The agency determines that eligibility was erroneously granted at the most recent determination, redetermination or renewal of eligibility because of agency error or fraud, abuse, or perjury attributed to the child or the child's representative; or (5) The child dies." *Id.* § 435.926(d). Notably, this regulation did not permit termination of Medicaid coverage for nonpayment of premiums during periods of continuous eligibility, consistent with preexisting Medicaid regulations. *See id.* § 435.930(b) (providing that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until

4

they are found to be ineligible").

At the same time, CMS also issued a regulation permitting states to include a similar period of continuous eligibility in their CHIP plans. *Id.* § 457.342. This regulation stated that, "[i]n addition to the reasons provided at § 435.926(d) of this chapter"—that is, the five exceptions set forth above permitting termination of Medicaid eligibility—an additional exception applied in the CHIP context, where "a child may be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees required under the State plan," *id.* § 457.342(b). This exception did not apply to Medicaid—it was unique to CHIP.

### B.    The Consolidated Appropriations Act, 2023

On December 29, 2022, Congress enacted the CAA. Pub. L. No. 117-328, 136 Stat. 4459 (2022). The CAA made two fundamental changes relevant here. First, it amended Section 1902(e)(12) of the Medicaid statute to provide that State plans "shall" include a 12-month continuous eligibility period, which had previously been optional. *See id.* § 5112(a). Second, it amended the CHIP statute to incorporate this Medicaid continuous eligibility requirement by reference. *Id.* § 5112(b). As a result, the CHIP statute now reads that Section 1902(e)(12) of the Medicaid statute, as amended by Section 5112(a) of the CAA, "shall apply to States under this subchapter [i.e., CHIP] in the same manner as [it] appl[ies] to a State under subchapter XIX [i.e., Medicaid]." 42 U.S.C. § 1397gg(e)(1)(K). The sole exception to this "in the same manner" directive is that CHIP coverage may end if a child "becomes eligible for full

benefits" and is "transferred to the [state's] Medicaid program . . . for the remaining duration of the 12-month continuous eligibility period." CAA § 5112(b).

## C.   The Challenged Guidance

On September 29, 2023, CMS issued a "State Health Official" Letter addressing the CAA's changes to the continuing eligibility requirement. *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot.") Ex. 3, ECF No. 2-3 ("SHO Letter"). The SHO Letter explained that the CAA "amended section 1902(e)(12)" of the Medicaid statute to "require one year of [continuous eligibility] under the state plan . . . for children under age 19," and "added a new paragraph (K) to section 2107(e)(1)" of the CHIP statute that, "through cross reference to section  1902(e)(12)" of the Medicaid statute, applied the same continuing eligibility requirement—with the same exceptions—to CHIP. SHO Letter at 4.

The SHO Letter also discussed the importance of the continuing eligibility period for children in Medicaid and CHIP, which has been shown to "improv[e] short- and long-term health status" of children as well as "reduce financial barriers to care for low-income families, promote health equity, and provide states with better tools to hold health plans accountable for quality care and improved health outcomes." *Id.* at 2. The SHO Letter noted that CMS was "still assessing how non-payment of premiums intersects with [continuous eligibility]" in light of the CAA. *Id.* at 4 n.14.

On October 27, 2023, CMS issued FAQs that addressed whether states may "terminate CHIP coverage during a continuous eligibility (CE) period due to non-

payment of premiums." *See* Pls.' Mot. Ex. 4 at 1, ECF No. 2-4 ("FAQs"). The FAQs set forth CMS's understanding of the effect of the CAA's amendments to the Medicaid and CHIP statutes. In short, because the CAA imposed the same continuing eligibility requirement in both "[s]ections 1902(e)(12) and 2107(e)(1)(K) of the Social Security Act"—i.e., in Medicaid and CHIP—and did "not" incorporate the previous CHIP-specific "exception to [continuous eligibility] for non-payment of premiums," the "existing regulatory option at 42 C.F.R. § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception" could not survive. *Id*.

## III.   This Case

More than three months after the FAQs were issued, Florida (and its state CHIP agency) filed a complaint and preliminary injunction motion. *See* Compl., ECF No. 1; Pls.' Mot., ECF No. 2. Florida contends that its existing CHIP state plan is inconsistent with the interpretation reflected in the FAQs, and that changes to state law will require it to submit a state plan amendment that is also inconsistent with that interpretation. *See, e.g.*, *id*. at 10, 22-24. In its preliminary injunction motion, Florida seeks to "enjoin CMS from enforcing the FAQs" on the grounds that they contradict the CHIP statute and are procedurally infirm under the Administrative Procedure Act. *Id*. at 25.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To

justify this "drastic remedy," the movants must "clearly establish[]" (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (citation omitted). Florida bears the burden of persuasion on each element. *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). Florida has not met any of the factors and its motion should be denied.

## ARGUMENT

### I.    This Court lacks jurisdiction to hear this case.

#### A.    Florida's claim is not ripe for judicial review.

Florida's claim fails at the threshold because it is unripe. CMS has neither disapproved a proposed state plan amendment—which Florida has not even submitted yet—nor taken any action to find Florida's existing plan to be noncompliant, whether for the reasons addressed in the FAQs or otherwise. Two courts have already held that similar challenges to a CHIP SHO Letter were not ripe. *New Jersey v. U.S. Dep't of Health & Hum. Servs.*, 2008 WL 4936933 (D.N.J. Nov. 17, 2008); *New York v. U.S. Dep't of Health & Hum. Servs.*, 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008); *see also Tennessee v. U.S. Dep't of State*, 329 F. Supp. 3d 597, 617 (W.D. Tenn. 2018), *aff'd*, 931 F.3d 499 (6th Cir. 2019) (holding unripe challenge to federal requirement for Medicaid, which has nearly identical administrative process). Like those courts found, in the absence of a final agency determination adversely affecting Florida in a concrete way, judicial

review is premature.

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08 (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Ipharmacy v. Mukasey*, 268 F. App'x 876, 878 (11th Cir. 2008).

To determine whether an agency action is ripe, courts evaluate two factors: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967); *see also Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006). This requires an assessment of (1) "whether judicial intervention would inappropriately interfere with further administrative action;" (2) "whether the courts would benefit from further factual development of the issues presented;" and (3) "whether delayed review would cause hardship to the plaintiffs." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001).

Here, judicial intervention would interfere with the carefully prescribed administrative review process that must occur before CMS could take any enforcement

action in the first place. *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339-40 (11th Cir. 2005) (concluding case was not ripe because plaintiff never properly pursued its claim through the administrative process made available by city ordinance). Under the CHIP statute and regulations, when a state amends its state plan, that plan is considered approved unless CMS notifies the state within 90 days that it is disapproved or that additional information is needed. 42 U.S.C. § 1397ff(c); 42 C.F.R. § 457.160(b). Any state "dissatisfied" with CMS's disapproval of a state plan amendment may request reconsideration and is entitled to a hearing. 42 U.S.C. § 1316(a)(2); 42 C.F.R. § 457.203(a).

The CHIP statute and regulations also provide for a separate administrative process that must occur before an existing state plan is deemed to be in noncompliance with federal requirements. *See* 42 C.F.R. §§ 457.204, 457.60(a). Before CMS could impose any financial sanctions, the state is entitled to notice, a reasonable opportunity for correction, and an opportunity for a hearing. 42 U.S.C. § 1397ff(c), (d); 42 C.F.R. §§ 457.203, 457.204. CMS generally does not hold a hearing until it has made a reasonable effort to resolve the issue through conferences and discussions. *Id.* § 457.204(a)(2). If a compliance hearing nonetheless becomes necessary, the state is afforded the full panoply of trial-type procedural protections. *Id.* § 457.206. After the hearing, CMS may withhold payments, in whole or in part, only if the Administrator finds that the state plan is in "substantial noncompliance" with federal requirements. *Id.* § 457.204(a).

Any state dissatisfied with "the Administrator's final determination on approvability of plan material (§ 457.203) or compliance with Federal requirements (§ 457.204) has a right to judicial review." *Id.* § 457.208(a); *see also* 42 U.S.C. § 1397gg(e)(2)(B); *id.* § 1316(a), (b). Specifically, the CHIP statute provides that the administrative and judicial review provisions for Medicaid, *i.e.*, Section 1116 of the Social Security Act, also apply to CHIP. *Id.* § 1397gg(e)(2)(B); *see also id.* § 1316(a). To obtain judicial review, "[t]he State must file a petition for review with the U.S. Court of Appeals for the circuit in which the State is located." 42 C.F.R. § 457.208(b)(1); *see also* 42 U.S.C. § 1316(a).

None of these required steps has happened yet. Florida has not submitted any state plan amendment to CMS, nor has the Administrator denied any such plan amendment.[1] The Administrator has not taken any action to initiate proceedings that could result in a finding that Florida's existing plan is in "substantial noncompliance." Any determination that Florida's plan is noncompliant could "be promptly challenged through an administrative procedure, which in turn is reviewable by a court." *New Jersey*, 2008 WL 4936933, at *10. This review provides "an adequate forum for testing" the policy "in a concrete situation." *Id.* (citation omitted); *accord New York*, 2008 WL 5211000, at *12.

---

[1] Florida's potential request for a "section 1115 waiver" does not change the analysis. Florida asserts that it was told that it must apply for a waiver under Section 1115 of the Social Security Act, 42 U.S.C. § 1315(a), to implement the expanded CHIP program contemplated by Florida H.B. 121, Compl. ¶ 79, and suggests that it intends to do so, *id.* ¶ 81. But Florida acknowledges that it must still submit a state plan amendment. *See id.* ¶ 79. Florida has submitted neither a waiver application nor a state plan amendment.

11

Further, the issues presented in this case would benefit from further factual development. For example, Florida makes the speculative claim that it "*anticipates* that compliance with the [CMS] FAQs will cost approximately $1 million each month," Pls.' Mot. at 23 (emphasis added), but provides no specifics about how it arrived at this figure. And while Florida may claim that it challenges only the legality of the FAQs, that is not sufficient to establish the claim is ripe. *See New Jersey*, 2008 WL 4936933, at *11 (claim was unripe despite the fact that the "rulemaking claim [was] predominantly legal").

Delayed review would pose no significant hardship to Florida. "[I]n weighing the hardship to the parties of withholding court consideration," the fact that "there are available administrative remedies which are not even referred to, much less shown to have been exhausted," is "crucial." *Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 28 (2d Cir. 1984). Florida has "not established that [it] face[s] significant hardship" because "no administrative proceedings against the State or withholding of funds for noncompliance have begun." *Tennessee*, 329 F. Supp. 3d at 618; *see also New York*, 2008 WL 5211000, at *14 ("If Plaintiffs choose not to abide by the SHO Letter guidance, it is not clear that they will face any penalties, other than the possible rejection of their []CHIP plan amendment, which can be challenged in federal circuit court.")

Moreover, unlike the formal regulations at issue in *Abbott Laboratories*, which were "effective immediately upon publication," 387 U.S. at 152, the FAQs are not

self-executing. They do not on their own "grant, withhold, or modify any formal legal license, power, or authority" or "subject anyone to any civil or criminal liability." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 809 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733). Like the CHIP SHO Letter at issue in *New York* and *New Jersey*, the FAQs do "not create obligations or legal consequences" for Florida—indeed, "[a] state does not face any legal obligation to change its plan until the CMS Administrator initiates non-compliance proceedings." *New York*, 2008 WL 5211000, at *13. The FAQs merely constitute an interpretive rule intended to provide states with guidance on what CMS understands the effect of the CAA's amendments to be. *See Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983). Because CMS has taken no action against Florida— something it could do only by proceeding through the administrative process and making a final determination, a process that has not even begun—Florida's claims are not ripe. *See Flowers Indus. v. FTC*, 849 F.2d 551, 552-53 (11th Cir. 1988) (holding challenge to FTC letter was not ripe because the FTC could only effectuate letter by bringing an enforcement action seeking civil penalties).

### B.     This Court lacks jurisdiction under the CHIP statute.

This Court also lacks jurisdiction because the CHIP statute assigns judicial review of issues concerning plan compliance to the Courts of Appeals. *See* 42 U.S.C. §§ 1397gg(e)(2)(B), 1316; *see also* 42 C.F.R. § 457.208(a), (b). Where it is "fairly discernible" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside

that scheme is precluded. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (citation omitted). In such circumstances, claims may only proceed outside that scheme if they are not "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212. Courts "presum[e] that Congress does not intend to limit . . . jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (citation omitted).

Florida "cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion." *Doe v. Fed. Aviation Admin.*, 432 F.3d 1259, 1263 (11th Cir. 2005); *see also New York,* 2008 WL 5211000, at *15 (holding that review of challenges to federal CHIP plan requirements is limited to the court of appeals); *Tennessee*, 329 F. Supp. 3d at 620 (same for Medicaid, which involves same statutory review provision). Florida's motion seeks to enjoin Defendants from "enforcing the FAQs and prohibiting Florida from disenrolling CHIP participants for nonpayment of premiums." Pls.' Mot. at 25; *see also* Compl., Prayer for Relief (seeking injunction against "enforcing the FAQs" by, *e.g.*, "disapproving a state CHIP plan amendment, denying a CHIP waiver, or initiating a non-compliance finding or corrective action plan based on the FAQs"). But as previously described, CMS could not take any such action before completing a lengthy administrative process that has

14

not even begun. And Congress has created an exclusive remedy for states to challenge any final determination reached after such an administrative process, culminating with review in the Court of Appeals. *See supra* Section I.A. As in *Thunder Basin*, 510 U.S. at 206, allowing Florida to challenge a guidance document prior to any concrete agency action against the state would disrupt this comprehensive statutory review scheme and hamper CMS's effective administration of CHIP. *See Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000).

Each *Thunder Basin* factor weighs in favor of the conclusion that Congress meant to limit jurisdiction over the claims at issue here. First, precluding judicial review now would not foreclose meaningful review later. To the contrary, the comprehensive administrative and judicial review scheme in the CHIP statute is analogous to that of the Mine Act in *Thunder Basin*. *Compare* 42 U.S.C. § 1316 *with Thunder Basin*, 510 U.S. at 208 (citing 30 U.S.C. § 816(a)(1)). Because "the validity of agency policymaking can be reviewed under § 1316," *New York*, 2008 WL 5211000, at *16, Florida may raise the same arguments it does here when it appeals from any denial of a state plan amendment or other determination of noncompliance.

Florida's claims are also not "wholly collateral" to the administrative review scheme but go to the heart of the statute and regulations that CMS enforces. *See Doe*, 432 F.3d at 1263. Florida's claimed harm centers on whether its current or proposed amended state plans are consistent with the interpretation set forth in the FAQs. *See, e.g.*, Pls.' Mot. at 24 ("[I]f Florida continues disenrollments in violation of the FAQs,

it faces withholding of the federal funds it receives for CHIP."). This is precisely the type of plan-conformity dispute that Congress specified should be reviewed only by the Courts of Appeals. *See New York*, 2008 WL 5211000, at *16; *see also New Jersey v. HHS*, 670 F.2d 1262, 1272-77 (3d Cir. 1981) (explaining that when a dispute concerns whether a Medicaid plan conforms to federal requirements, "initial appellate-level review" is appropriate); *Tennessee*, 329 F. Supp. 3d at 620 (rejecting the plaintiffs' argument that Section 1316 did not apply to whether federal "Medicaid requirements comply with the United States Constitution"). And finally, the State's claims, which concern the proper interpretation of the Medicaid and CHIP statutes, fall squarely within the agency's expertise, particularly given the well-recognized complexities of the regulatory scheme. *See Elgin*, 567 U.S. at 23 (considering in expertise analysis that "the challenged statute may be one that [the agency] regularly construes"); *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Ci. 2007) (the "Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration"). In sum, Section 1316(a) precludes this Court's review of Florida's challenge here.

## II.   Florida does not face irreparable harm.

Even if this Court had jurisdiction, Florida's request for a preliminary injunction should be denied. "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163,

16

1176 (11th Cir. 2000). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted); *see also Winter*, 555 U.S. at 22. Florida has made no such showing here.

*First*, Florida has not shown that any actual or imminent loss of funding will occur absent a preliminary injunction. As detailed above, an extensive administrative process must take place before CMS could take any action to withhold federal funding from Florida's CHIP, *see supra* Section I.A, and none of the requisite steps have been taken here. The Administrator has not initiated any process to find Florida's plan is in substantial noncompliance. And regardless of whatever changes have been made to Florida state law, Florida has not submitted any plan amendment or waiver request to CMS regarding its purported CHIP expansion. "A district court should not issue a preliminary injunction unless it concludes that the movant will suffer immediate harm if relief is delayed until the case is finally resolved on the merits." *De La Fuente v. Kemp*, 679 F. App'x 932, 934 (11th Cir. 2017). Even if Florida could conceivably suffer irreparable harm at some point in the future, it has offered no reason to believe that harm "will occur before the district court can rule on [its] requests for a permanent injunction and declaratory relief." *Id.*

*Second*, Florida offers no explanation why it waited so long to seek a preliminary injunction, severely undermining its claim that irreparable injury is imminent. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v.*

17

*Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Here, Florida waited more than three months after the FAQs were issued in October 2023 to seek emergency relief. That the State "pursued its preliminary-injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time" severely undermines any argument that the State will be imminently harmed in the absence of preliminary relief. *Id.* at 1246; *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay undercut the claim of irreparable harm); *St. Marie v. Ludeman*, 2010 WL 924420, at *4 (D. Minn. Mar. 11, 2010) (three-week delay "undermines [plaintiff's] claims of imminent irreparable harm").

*Third*, Florida's alleged "sovereign injury" does not support a claim of irreparable harm. It asserts that Fla. Stat. § 624.91(5)(b)(9) "requires disenrolling CHIP participants for nonpayment of premiums," so it is "caught between CMS and Florida law." Pls.' Mot. at 21-22. However, the statutory provision Florida cites does not say this. Instead, it merely provides that Florida's CHIP plan shall "[e]stablish enrollment criteria that include penalties or waiting periods of 30 days for reinstatement of coverage upon voluntary cancellation for nonpayment of family premiums." Fla. Stat. § 624.91(5)(b)(9). The statute says nothing about continuous eligibility, let alone that Florida law requires disenrollment for nonpayment of premiums. In any event, mere preemption of state law does not amount to irreparable harm. "[I]t is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida*

18

*v. HHS*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). As the Eleventh Circuit has explained, "to conclude otherwise would mean that a state would suffer irreparable injury from all . . . federal laws with preemptive effect." *Id.* at 1292.

*Fourth*, Florida claims that it will incur monetary harm because it "anticipates that compliance with the FAQs will cost approximately $1 million each month." Pls.' Mot. at 23. As noted, any "anticipated" monetary loss is speculative at this juncture. *See Clapper v. Amnesty International USA*, 568 U.S. 398, 418 (2013). And other courts have flatly rejected claims that a state confronts an "untenable dilemma" when deciding whether to "conform its plan, at great expense, to the requirements of" CMS policy or instead to risk the "possibility of corrective action and the loss of its []CHIP funding." *New Jersey*, 2008 WL 4936933, at *9. Were the law otherwise, a state could claim irreparable harm virtually any time it disagreed with CMS's view of the regulatory scheme. Accordingly, Florida has not shown imminent irreparable harm.

## III.   Florida is unlikely to succeed on the merits.

Florida is also unlikely to succeed on the merits of any of its claims, as the FAQs both correctly interpret the statute and are procedurally sound.

### A.   The FAQs properly interpret the CAA's amendments to CHIP.

In the CAA, Congress for the first time directed that continuing eligibility in CHIP "shall" be applied "in the same manner" as in Medicaid, where states are not permitted to terminate coverage for nonpayment of premiums during periods of

continuing eligibility. This meant that the prior, CHIP-only regulatory exception could not survive, an understanding that CMS correctly explained in the FAQs.

This conclusion follows from the statute's plain text. Under prior law, the Medicaid statute provided that states "may" offer continuing eligibility for a period of up to 12 months, during which time a child "determined to be eligible for benefits under a State plan . . . shall remain eligible for those benefits." 42 U.S.C. § 1396a(e)(12) (2022). CMS subsequently promulgated two regulations that are relevant here.

Under the first regulation, which concerned Medicaid, a "child's eligibility may not be terminated during a continuous eligibility period" unless one of five exceptions is met. 42 C.F.R. § 435.926(d). Consistent with preexisting Medicaid regulations, which provided that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible," *id.* § 435.930(b), the continuous eligibility regulation for Medicaid contained no exception permitting termination for nonpayment of premiums during a continuous eligibility period.

The second regulation, which concerned CHIP, contained an additional exception unique to that program. It provided that, "[i]n addition to the" exceptions in 42 C.F.R. § 435.926(d) permitting termination of Medicaid eligibility, in CHIP "a child may be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees under the State plan." *Id.* § 457.342(b). This exception did not apply to Medicaid.

In the CAA, Congress fundamentally altered this scheme. In addition to making

continuing eligibility mandatory, rather than optional, for both Medicaid and CHIP, it provided that the requirement "shall" be applied "in the same manner" in both programs. Specifically, in a section of the CAA titled "Continuous Eligibility for Children Under Medicaid and CHIP," Congress amended the Medicaid statute to require that a "State plan . . . shall provide" that children "determined to be eligible for benefits under a State plan" generally "shall remain eligible for such benefits" for a 12-month period. CAA § 5112(a) (amending 42 U.S.C. § 1396a(e)(12)). And in the same section of the CAA, Congress amended the CHIP statute to incorporate this Medicaid requirement by reference. *Id.* § 5112(b) (amending 42 U.S.C. § 1397gg(e)(1)). As a result, the CHIP statute now provides that, with one exception, the continuing eligibility requirement in Section 1902(e)(12) of the Medicaid statute, as amended by the CAA, "shall apply to States under this subchapter [i.e., CHIP] in the same manner as they apply to a State under subchapter XIX [i.e., Medicaid]." 42 U.S.C. § 1397gg(e)(1)(K).

Given these changes to the statutory framework, CMS rightly understood that the prior CHIP-specific regulatory exception permitting termination of coverage for nonpayment of premiums during periods of continuing eligibility could not survive. Indeed, the sole exception that Congress provided to its "in the same manner" directive—that CHIP coverage may end if the child "becomes eligible for full benefits under" and is "transferred to" the state's Medicaid program for the remainder of the continuing eligibility period, CAA § 5112(b)—confirms this conclusion. *See United*

*States v. Castro*, 837 F.2d 441, 442 (11th Cir. 1988) ("A general guide to statutory construction states that the mention of one thing implies the exclusion of another." (citation omitted)).

Florida's arguments to the contrary cannot overcome the statute's plain text. The State principally contends that the FAQs improperly equate the words "eligibility" and "enrolled." Pls.' Mot. at 14-15. But that ignores the statutory and regulatory scheme that Congress was legislating against. In Medicaid, it has long been the case that states "must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible," 42 C.F.R. § 435.930(b); accordingly, in that program, there has never been an exception to continuing eligibility for termination for nonpayment of premiums, *see id.* § 435.926(d). "Congress can be presumed to be aware of relevant administrative interpretations when reenacting or amending a statute[.]" *Duarte v. Mayorkas*, 27 F.4th 1044, 1059 (5th Cir. 2022). Thus, when requiring in the CAA that continuing eligibility be applied "in the same manner" in the two programs, Congress necessarily understood that CHIP beneficiaries would now receive uninterrupted coverage during the continuous eligibility period, as Medicaid beneficiaries already did. *See also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (courts must look to "the language and design of the statute as a whole").[2]

---

[2] Florida relies on text of a draft bill that states that "an individual who is determined to be eligible for [such] benefits . . . shall remain eligible *and enrolled* for such benefits for the duration of the specified period." Pls.' Mot. at 15 (citation omitted). However, a draft bill text that never advanced out of committee, let alone became law, is of minimal probative value. *See* Stabilize Medicaid and CHIP Coverage Act of 2021, S. 646, 117th Cong. (2021), Congress.gov,

22

Indeed, Florida's interpretation would effectively render the continuous eligibility requirement in Medicaid superfluous. In the State's telling, the phrase "shall remain eligible for such benefits," CAA § 5112(a), does no more than prohibit states from conducting an eligibility redetermination during the 12-month continuous eligibility period. But existing Medicaid regulations prohibit states from requiring a renewal of eligibility more frequently than every 12 months. 42 C.F.R. § 435.916(a). For the phrase "shall remain eligible for such benefits" to have the practical effect of stabilizing coverage for low-income children, it must mean that states are required to maintain coverage during the continuous eligibility period, absent an exception. *See TRW Inc. v. Andrews*, 534 U.S. 19, 29, 31 (2001) (refusing to adopt interpretation that "would in practical effect render that exception entirely superfluous in all but the most unusual circumstances"); *see also Gonzalez v. McNary*, 980 F.2d 1418, 1420 (11th Cir. 1993). Accordingly, when read in the context of the broader Medicaid statute and its regulations, the phrase "shall remain eligible for such benefits" in CAA § 5112(a) means that states cannot terminate coverage, not that they must merely consider beneficiaries to meet the eligibility criteria. *See Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021) ("The most grammatical reading of a sentence in a vacuum does not always produce the best reading in context.").

Florida's contention that the FAQs conflict with 42 U.S.C. § 1397cc(e)(3) also

---

https://www.congress.gov/bill/117th-congress/senate-bill/646/all-actions?overview=closed&s=5&r=20&q=%7B%22search%22%3A%22S.+646%22%7D#tabs   (last accessed Feb. 19, 2024).

fails. As the title of that provision indicates, it addresses "Premium grace period[s]," not the distinct issue of whether CHIP coverage may be terminated during a continuing eligibility period. Specifically, Section 1397cc(e)(3) provides that a state must give CHIP beneficiaries "a grace period of at least 30 days from the beginning of a new coverage period to make premium payments" before coverage may be terminated, *id*. § 1397cc(e)(3)(C)(i), with "new coverage period" defined as "the month immediately following the last month for which the premium has been paid," *id*. § 1397cc(e)(3)(C)(ii)(II). Contrary to Florida's suggestion, this provision can be read in harmony with the CAA's amendments: If a beneficiary fails to make premium payments at some point within the continuous eligibility period, the grace period would still begin the following month and last for "at least 30 days," until the end of the continuous eligibility period. *See id*. § 1397cc(e)(3)(C)(i). And the state would still be required to provide notice "not later than 7 days" from the start of the grace period that failure to make a missed premium payment "within the grace period"—*i.e.*, by the end of the continuous eligibility period—"will result in termination of coverage." *Id*. § 1397cc(e)(3)(C)(ii)(I). "It is this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018), and it can readily do so here.

Finally, the FAQs do not violate the grandfathering provisions of the CHIP statute. It is true that Florida's program was grandfathered into CHIP when it was created in 1997, *see id*. § 1397cc(d)(1)(C), but that does not give Florida *carte blanche* to

24

refuse to update its CHIP plan to comply with federal law. The provision cited by Florida concerns the package of benefits that a CHIP plan must offer, not eligibility for coverage. Specifically, Section 1397cc, which is titled "Coverage requirements for children's health insurance," begins by defining the "[r]equired scope of health insurance coverage," *id.* § 1397cc(a), such as the "basic services" it must include and their "actuarial value," *id.* § 1397cc(a)(2)(A)-(B). The statute then grandfathers in "existing" plans, including Florida's, considered to have sufficiently "comprehensive . . . coverage," *id.* § 1397cc(d), and permits states to make "modifications" to such plans that "do[] not reduce the actuarial value of the coverage," *id.* § 1397cc(d)(2). These scope-of-benefits issues are fundamentally different from the eligibility issues addressed by the FAQs. Section 1397cc(a)(3) thus has no relevance here.

### B.   CMS's interpretation of the CAA is not arbitrary and capricious.

Florida claims the FAQs are arbitrary and capricious for three reasons. *See* Pls.' Mot. at 17-19. It is wrong at each turn.

*First*, it was hardly "illogical" for CMS to reason that the regulatory exceptions to continuous eligibility common to Medicaid and CHIP survived the CAA's amendments, but the exception unique to CHIP could not. As explained, *see supra* Section III.A., the CHIP statute now states that the Medicaid statute's continuous eligibility requirement applies to CHIP "in the same manner" as it applies to Medicaid, necessarily signaling the end of the CHIP-only exception. *See* CAA § 5112(b); 42 U.S.C. § 1397gg(e)(1)(K). By contrast, nothing in the CAA casts doubt on the

25

regulatory exceptions common to Medicaid and CHIP that remain. Indeed, it is common sense that a state would not preserve the eligibility of someone who either (1) has requested termination; (2) has been granted eligibility through error, fraud, abuse, or perjury; or (3) is deceased, 42 C.F.R. § 435.926(d)—measures "important to protecting program integrity," as the agency explained. FAQs at 1. This readily meets the "minimum standards of rationality" required on arbitrary and capricious review. *La. Env't Action Network v. U.S. EPA*, 382 F.3d 575, 582 (5th Cir. 2004); *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (a court must "uphold a decision" of even "less than ideal clarity" so long as "the agency's path may reasonably be discerned").

*Second*, contrary to Florida's claims, CMS did not "reverse[]" its position on any "distinction between eligibility and enrollment," Pls.' Mot. at 18. As explained, in Medicaid, termination of coverage for nonpayment of premiums during periods of continuous eligibility has long been prohibited, and in the CAA, Congress extended this policy to CHIP. *See supra* Section III.A. Thus, as CMS explained in the FAQs, the "existing regulatory option" for states "to consider non-payment of premiums as an exception" to continuous eligibility "will end." FAQs at 1. The FAQs therefore do not amount to a policy change by CMS—they merely communicate that the CAA does not permit the former regulation for the nonpayment of premiums exception to remain in effect. *See infra* Section III.C. Florida's complaint that CMS failed to consider its reliance interests is misdirected, *see* Pls.' Mot. at 19, since it is Congress and not CMS

26

that chose to change course.

*Third*, Florida's argument that CMS failed to consider that Florida's program was grandfathered into CHIP lacks merit. As described, *supra* at 24-25, these provisions only apply to the list of benefits covered by the state plans. *See* 42 U.S.C. § 1397cc(a)(3), (d). This is wholly irrelevant to whether Florida's CHIP program must comply with federal law and the CAA's requirements for continuous eligibility.

## C. The FAQs constitute an interpretive rule exempted from the APA's rulemaking requirements.

The APA's rulemaking requirements do not apply to "interpretative rules." 5 U.S.C. § 553(b)(A). "A statement [by an agency] seeking to interpret a statutory or regulatory term is . . . the quintessential example of an interpretive rule." *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993). The FAQs constitute an interpretive rule that sets forth CMS's interpretation of the CAA, so notice and comment was not required.

Courts look to several general principles when determining whether a rule is interpretive. "First, although not dispositive, the agency's characterization of the rule is relevant to the determination. . . . Second, [a]n interpretative rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties. On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (citation omitted).

The FAQs merely set out CMS's understanding of the CAA's effect on the

27

Medicaid and CHIP, and do not establish a legislative rule. Notably, the agency itself described them only as "guidance." SHO Letter at 1 (CMS "is issuing this [SHO] letter to provide states with guidance" on the CAA); *id.* at 4 n.14 (indicating CMS's intent to "issue separate guidance" on how "nonpayment of premiums intersects with CE under the CAA"). At no point do the FAQs purport to have the force of law. Nor do they purport to exercise delegated power to enact policy. *See Metropolitan Sch. Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992). Instead, CMS's interpretation is drawn directly from the statutory provisions cited. *See Warshauer*, 577 F.3d at 1337-38. Like a "prototypical example of an interpretive rule," CMS issued them "to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quotations omitted).

Further, as explained, *supra* at 12-13, any binding effect the FAQs have flows from the CAA, not the FAQs. An interpretive rule can be binding when the effect is "not by virtue of the promulgation of the regulation (as in the case of a legislative regulation), but by virtue of the binding nature of the interpreted statute." *Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 681 (6th Cir. 2005). Because the FAQs do not create any rights or obligations independent of the statutory provisions they interpret, they constitute an interpretive rule.

## IV. The equities and the public interest weigh against injunctive relief.

Finally, Florida has not shown that the balance of equities and the public interest support a preliminary injunction. A "court sitting in equity cannot ignore the

judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (citation omitted). Indeed, where the elected branches have enacted a statute based on their understanding of what the public interest requires, this Court's "consideration of the public interest is constrained . . . for the responsible public officials . . . have already considered that interest." *Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008). Here, Congress has acted to expand continuous eligibility in the CHIP program, and an injunction would risk restricting medical coverage for one of the country's neediest populations: low-income children. "In addition to improving short- and long-term health status, [continuous eligibility] has been shown to reduce financial barriers to care for low-income families, promote health equity, and provide states with better tools to hold health plans accountable for quality care and improved health outcomes." SHO Letter at 2. The public interest would not be served by entering an injunction here, particularly in the absence of any administrative proceedings threatening any concrete harm to Florida.

## CONCLUSION

For the foregoing reasons, Florida's motion for a preliminary injunction should be denied.

DATED: February 20, 2024

*Of Counsel*:

SAMUEL R. BAGENSTOS
General Counsel

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PAUL R. RODRÍGUEZ
Deputy General Counsel

JANICE L. HOFFMAN
Associate General Counsel

SUSAN MAXSON LYONS
Deputy Associate General
Counsel for Litigation

LINDSAY S. GOLDBERG
Attorney
U.S. Dept. of Health & Human Services
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 619-2795
Lindsay.Goldberg@hhs.gov

ERIC B. BECKENHAUER
Assistant Director

/s/ Madeline McMahon
MADELINE M. MCMAHON (DC
Bar No. 1720813)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, D.C. 20005
(202) 451-7722
madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*

# Doc. 23

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

## Case No. 8:24-cv-317-WFJ-AAS

STATE OF FLORIDA; and FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION,

*Plaintiffs,*

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, *in her official capacity as
Administrator for the Centers for Medicare and
Medicaid Services*; DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
XAVIER BECERRA, *in his official capacity as
Secretary of Health and Human Services,*

*Defendants.*

---

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

i

## INTRODUCTION

Plaintiffs are entitled to a preliminary injunction. PI.Mot.11–25. CMS does not dispute that its October 27, 2023, Frequently Asked Questions ("FAQs") about the Children's Health Insurance Program ("CHIP") under Title XXI of the Social Security Act are final agency action. Nor does CMS dispute that Florida has standing.

Instead, CMS tries to persuade this Court that straightforward questions of law under the Administrative Procedure Act ("APA") about that admittedly-final agency action are somehow unripe, Opp.8–13, and that this Court lacks jurisdiction because CMS could potentially reach some of the same issues in *future* agency proceedings, Opp.13–16. Neither argument is persuasive. The FAQs are clear that States cannot "terminate CHIP coverage during a continuous eligibility … period due to non-payment of premiums," and even purport to "end" an existing regulatory provision at 42 C.F.R. § 457.342(b) that provides otherwise. Ex.4, FAQs at 1. Future agency proceedings are also not guaranteed, anyway.

If CMS had taken the necessary steps to amend or rescind its regulations, Florida would unquestionably be able to sue *now* under the APA. But instead, CMS has tried to change its regulations by fiat and now cites that unlawful procedure to justify circumventing judicial review. This Court should reject that charade.

CMS also has no answer on the merits for why it abandoned the well-established distinction between "eligibility" and "enrollment," pervasive throughout Title XXI and CHIP regulations, and instead implausibly suggests that Congress subtly transformed CHIP into an entitlement program in an omnibus appropriations

1

bill—without even amending the statutory provision that expressly states CHIP is *not* an entitlement program. Opp.19–24. Nor can CMS negate Florida's sovereign injury and ongoing, unrecoverable costs to comply with the FAQs. *See* Opp.16–18.

This Court should grant the preliminary injunction.

## I.    This Case is Justiciable

### A.    Florida's Claims Are Ripe

"In cases involving pre-enforcement review, like this one, the standing and ripeness analysis tend to converge." *Baughcum v. Jackson*, 92 F.4th 1024, 1036 (11th Cir. 2024). CMS has not challenged Florida's standing, and, in any event, where "the plaintiff is himself an object of the action (or forgone action) at issue … , there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). That is the end of the matter here: the claims are ripe.

A systematic march through the ripeness doctrine reinforces that conclusion. The inquiry "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). Courts must "assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Every consideration weighs in favor of adjudicating this case.

*First*, Florida raises purely legal issues, making them quintessential questions

"fit for judicial decision." *Club Madonna, Inc. v. City of Mia. Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). "A facial challenge presenting a purely legal argument … 'is presumptively ripe for judicial review' because that type of argument does not rely on a developed factual record." *Id.*; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). CMS defends the FAQs based "purely [on] congressional intent," and has "made no effort to justify the [FAQs] in factual terms" or identify any pertinent issue that would benefit from factual development. *Abbott Lab'ys*, 387 U.S. at 149; *see* Opp.19–28.[1] Nor is factual development necessary to determine whether CMS followed the procedures required by the APA. These claims are all within the core competency of this Court, not future CMS proceedings. *See infra* Part I.B. In other words, "[t]he lines are drawn, the positions taken, and the matter is ripe for judicial review." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

*Second*, because the claims here are "fit for judicial decision," "the absence of a 'hardship' cannot tip the balance against judicial review." *Club Madonna*, 924 F.3d at 1380 (cleaned up). But to be clear, withholding review *will* cause Florida "substantial hardship," which also satisfies the ripeness inquiry. *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995). The FAQs "set a collision course with Florida law," *Weinberger*, 492 F.2d at 492, and Florida is "forced to choose between foregoing lawful activity and risking substantial legal sanctions," *Cheffer*, 55 F.3d at 1524. If Florida complies with

---

[1] CMS's sole example—Florida's estimate of compliance costs, Opp.12—is irrelevant to ripeness. Those costs demonstrate Florida's imminent injury to justify a preliminary injunction, *see infra* Part III, but have no bearing on whether the FAQs are lawful or otherwise comply with the APA.

the FAQs, it will incur approximately $1 million in unlawful CHIP expenditures each month. Ex.1, Noll.Decl. ¶ 10. If Florida ignores the FAQs, it faces the loss of millions of dollars in federal CHIP reimbursements. This case aligns perfectly with binding precedent rejecting a ripeness challenge in *Weinberger*, 492 F.2d at 492:

> [The FAQs are] final and ... actually in effect.... [Florida] is presently faced with the dilemma whether to bow to [CMS's] volte-face and amend its laws and procedures, with all the likely financial outlay and certain legislative and administrative effort which that process entails, or to risk the at least temporary loss of funding which [noncompliance] could well produce.... In the process of [issuing the FAQs], [CMS] has already necessarily determined that [they] compl[y] with the [Consolidated Appropriations Act, 2023 ("2023 CAA")], and if [they] d[o], plainly Florida law does not.... The calamitous prospect of such a loss of funding, even for a short period, to the state ... is so grave as to suffice for such hardship as may be required. Faced with the serious risk of such sanctions, there is no need for Florida to stand by while [CMS] ticks, hoping that [it] will not go off.

CMS is wrong to suggest the FAQs are not "self-executing." Opp.12–13. They purport to "end" 42 C.F.R. § 457.342(b) and prohibit States from "consider[ing] non-payment of premiums" as grounds for CHIP disenrollment after December 31, 2023. Ex.4, FAQs at 1. Like the regulations the Supreme Court found ripe for review in *Gardner v. Toilet Goods Ass'n*, the FAQs "have an immediate and substantial impact" by placing Florida "in a quandary." 387 U.S. 167, 171–72 (1967). Florida is not required to "refuse to comply ... and test the [FAQs] by defending against" civil suits or CMS enforcement, or to "submit to the [FAQs]" and the financial and sovereign injuries they impose, just to obtain judicial review. *Id.*

CMS relies heavily on two unpublished, out-of-circuit district court opinions—*New Jersey v. HHS*, 2008 WL 4936933 (D.N.J. Nov. 17, 2008), and *New York v. HHS*,

4

2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008)—which are foreclosed by the binding precedent discussed above, and in any event are easily distinguishable. Opp.8, 11–13. Both involved challenges to a State Health Official ("SHO") Letter about procedures to ensure state CHIPs did not "crowd out" private insurance. *New Jersey*, 2008 WL 4936933, at *5; *New York*, 2008 WL 5211000, at *5. Both held that this SHO Letter was not "final agency action," and that CMS had already shown "flexibility" in considering and approving state CHIPs with "alternative approaches." *New Jersey*, 2008 WL 4936933, at *6, 12–13; *New York*, 2008 WL 5211000, at *11–13. And both concluded that factual development was needed to see how the SHO Letter would apply and whether its provisions were "impossible or unduly burdensome." *New Jersey*, 2008 WL 4936933, at *11; *New York*, 2008 WL 5211000, at *12–13.

None of those characteristics are present here. CMS does not dispute that the FAQs are final agency action, nor would the claims here benefit from factual development. The FAQs are clear that States cannot "terminate CHIP coverage during a continuous eligibility … period due to non-payment of premiums," and purport to "end"—*with no further action needed*—an existing regulatory provision that provides otherwise. Ex.4, FAQs at 1. CMS has not disclaimed this position or its intent to enforce the FAQs, but now implausibly feigns ignorance about how they will apply.

CMS also ignores cases that challenge agency statements unequivocally articulating positions and that raise purely legal claims that would not benefit from factual development. Courts have had no trouble concluding those claims are ripe, including challenges to CMS "guidance." *See Texas v. Brooks-LaSure*, 2023 WL

4304749, at *7 (E.D. Tex. June 30, 2023) ("purely legal" substantive and procedural APA challenges to CMS "informational bulletin" are ripe).[2]

    For all these reasons, the claims here are undoubtedly ripe.

### B.    This Court Has Jurisdiction Under the APA

    Judicial review of agency action is presumptively available under the APA. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). CMS responds that this Court's jurisdiction is impliedly precluded because the Social Security Act provides for CMS review of a "determination" related to a particular state plan or plan amendment, followed by review in the U.S. Courts of Appeals. Opp.13–16 (citing 42 U.S.C. §§ 1316, 1397gg(e)(2)(B)). Implied preemption by a "special statutory review scheme," however, "does not necessarily extend to every claim concerning agency action," but only to those "'of the type Congress intended to be reviewed within [the] statutory structure.'" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185–86 (2023). Florida is not challenging any plan-related "determination." There's zero indication Congress intended administrative review under the Social Security Act to foreclose purely legal APA claims in district court.

    Courts considering implied preclusion have also looked to three factors articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), all of which favor

---

[2] *See also, e.g.*, *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 52–53 (D.D.C. 2020) (HHS guidance); *Texas v. HHS*, 2023 WL 4629168, at *11 (W.D. Tex. July 12, 2023) (HHS guidance); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380–81 (D.C. Cir. 2002) (EPA guidance); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1026–30 (N.D. Cal. 2020) (IRS FAQs); *Alabama v. CMS*, 2010 WL 1268090, at *4–5 (M.D. Ala. Mar. 30, 2010) (procedural APA challenges to CMS SHO letter); *Seafood Exps. Ass'n of India v. United States*, 479 F. Supp. 2d 1367, 1376–81 (Ct. Int'l Trade 2007) (customs directive).

jurisdiction here.[3] *First*, "preclusion could foreclose all meaningful judicial review." *Id.* at 212–13. Even the mere possibility that judicial review would be unavailable is enough to rule out implied preclusion. *Cochran v. SEC*, 20 F.4th 194, 209–10 (5th Cir. 2021), *aff'd sub nom. Axon*, 598 U.S. 175. If Florida complies with the FAQs, it won't receive a CMS "determination" reviewable under the Social Security Act, leaving Florida "'unable to seek redress.'" *Brooks-Lasure*, 2023 WL 4304749, at *9. Florida's only option would be to "bet the farm" and ignore the FAQs "before testing [their] validity," which is not "a 'meaningful' avenue of relief." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490–91 (2010) (cleaned up); *see Weinberger*, 492 F.2d at 492.

*Second*, Florida's claims are "wholly collateral" to the Social Security Act review scheme. *Thunder Basin*, 510 U.S. at 212 (cleaned up). Again, Florida is not challenging a "determination" about its CHIP plan, *contra* Opp.15–16, but instead whether the FAQs are lawful. That is standard fare for APA review.

*Third*, Florida's claims are "outside [CMS's] expertise." *Thunder Basin*, 510 U.S. at 212. CMS has no advantage in applying general rules of statutory interpretation or adjudicating the requirements of the APA. Those "are instead standard questions of administrative law, which the courts are at no disadvantage in answering." *Free Enter. Fund*, 561 U.S. at 491.

Finally, this Court should consider the remarkable reach of CMS's argument

---

[3] All factors need not favor Florida to conclude the district court has jurisdiction. *Axon*, 598 U.S. at 186. Even if a party can "(eventually) obtain review of ... claims through an appeal from an adverse agency action to a court of appeals," *id.* at 190–91, district court jurisdiction may still be warranted.

that the existence of *any* administrative review scheme effectively "divests district courts of their ordinary jurisdiction over" *all* APA claims. *Axon*, 598 U.S. at 185–86. That was not Congress's intent. *Id.* at 186.

If CMS had taken *any* steps to properly amend its regulations, i.e., by publication in the Federal Register, 5 U.S.C. § 552(a)(1), Florida undoubtedly could challenge that agency action in district court. CMS instead violated the APA to "end" a regulation by fiat and now cites that unlawful procedure to justify circumventing the judicial review that would otherwise be available. The D.C. Circuit anticipated this very maneuver when it held that notice and comment is required, and judicial review is available, whenever an agency even "effectively amends a prior legislative rule." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993); *see Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995). This Court should do the same.

## II.    Florida Is Likely to Prevail on the Merits

### A.    The FAQs Are Contrary to Law and Exceed CMS's Authority

The FAQs violate Title XXI's express provision for the disenrollment of CHIP participants for nonpayment of premiums, 42 U.S.C. § 1397cc(e)(3)(C), Title XXI's grandfathering provisions, *id.* § 1397cc(a)(3), (d), and CHIP regulations, 42 C.F.R. § 457.342(b). They also exceed the plain language of the 2023 CAA. PI.Mot.12–17.

CMS has no persuasive response. It ignores that Title XXI and CHIP regulations have for decades carefully distinguished between "eligibility" for CHIP

benefits and "enrollment" in a CHIP plan. PI.Mot.14–15 & nn.8–9.[4] Instead, CMS myopically focuses on its own Medicaid regulations that require States to "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930(b). No such requirement exists for CHIP, and for good reason. Congress expressly provided that CHIP, unlike Medicaid, is *not* an entitlement program. 42 U.S.C. § 1397bb(b)(5) ("Nothing in [Title XXI] shall be construed as providing an individual with an entitlement to child health assistance under a State child health plan."). "Eligibility" thus has different consequences for the two programs: individuals eligible for Medicaid are entitled to state-provided health insurance coverage, 42 C.F.R. § 435.930(b), while individuals eligible for CHIP have the opportunity to enroll in a state-subsidized health plan, *see, e.g.*, *id.* § 457.340(d)(3).

Section 5112(a) of the 2023 CAA didn't change that difference. It requires only that States refrain from redetermining a child's eligibility for Medicaid—for example, based on a change in family income—for an entire year. 42 U.S.C. § 1396a(e)(12). Applying that provision to CHIP "in the same manner" means only that States cannot redetermine a child's eligibility for CHIP for an entire year, either. *Id.* § 1397gg(e)(1).

CMS would instead "fundamentally alte[r]" CHIP, transforming it into an entitlement program. Opp.20. Not only does that violate the clear statement in 42 U.S.C. § 1397bb(b)(5) that CHIP is *not* an entitlement program, it contravenes the familiar canon that Congress doesn't "hide elephants in mouseholes," *Whitman v. Am.*

---

[4] The difference is not a foreign concept or unique to CHIP. For example, every attorney knows that eligibility for fee shifting does not necessarily mean entitlement or receipt.

*Trucking Ass'ns*, 531 U.S. 457, 468 (2001), or, in this case, a passing revision buried in a 1,653-page omnibus *appropriations* bill, *see* 2023 CAA § 5112, 136 Stat. at 5940.

CMS continues that surely Congress was aware of CMS regulations guaranteeing Medicaid benefits during periods of continuous eligibility, and thus intended to extend that to CHIP. Opp.22. That is precisely the wrong inference. Congress was surely aware of the longstanding distinction between "eligibility" and "enrollment," *see* PI.Mot.14–15 & nn.8–9, and that Title XXI and CMS regulations allow CHIP participants to be disenrolled for nonpayment of premiums, PI.Mot.13. Congress nonetheless chose to legislate continuous *eligibility*, not continuous *enrollment*, *coverage*, or *benefits*. In fact, different bills would have legislated continuous enrollment, which never became law. PI.Mot.15. This proves Congress was not only aware of the distinction but also rejected the plan that CMS now tries to accomplish.

CMS is also wrong that a straightforward reading of the 2023 CAA would render it "superfluous" because a Medicaid regulation already "prohibit[s] states from requiring a renewal of eligibility more frequently than every 12 months." Opp.23 (citing 42 C.F.R. § 435.916(a)). Replacing a *regulatory* Medicaid requirement with a *statutory* one is not a superfluous endeavor, especially when simultaneously enacting new statutory requirements for CHIP. *United States v. Miles*, 75 F.4th 1213, 1223 (11th Cir. 2023). CMS has a habit of conflating its own regulations with actual statutes.

In any event, the 2023 CAA doesn't restate 42 C.F.R. § 435.916, which actually requires States to "promptly redetermine eligibility between regular renewals of eligibility ... whenever it receives information about a change in a [participant's]

10

circumstances that may affect eligibility." *Id.* § 435.916(a)(1), (d)(1). Medicaid continuous eligibility was previously *optional*. *See* 42 U.S.C. § 1396a(e)(12) (2022); 42 C.F.R. § 435.926; Opp.4. The 2023 CAA now generally prohibits States from redetermining eligibility during a *mandatory* continuous eligibility period.

CMS's attempt to "harmonize" the FAQs with 42 U.S.C. § 1397cc(e)(3) also falls flat. Opp.24. CMS reasons that States must still notify CHIP participants that failure to pay premiums "will result in termination of coverage," and that the "grace period" is whatever remains of the continuous eligibility period. *Id.* But CMS abruptly stops its analysis there and never explains when a State actually *can* terminate coverage (i.e., disenroll) or lock out participants for nonpayment of premiums. Nor does CMS even attempt to reconcile this argument with its simultaneous assertions that continuous eligibility in CHIP must have the same effect as in Medicaid, which allows for no such notices, disenrollment, or lock-out periods. *See* 42 C.F.R. § 435.930(b).

That isn't the only place where CMS's argument collapses under its own weight. If applying continuous eligibility "in the same manner" has the same effect on receiving benefits, then CHIP benefits could not be conditioned on paying enrollment fees or the first month's premium, which the FAQs allow. Ex.4, FAQs at 1. Nor could CHIP require copayments, 42 U.S.C. § 1397cc(e)(1), which CMS leaves untouched.

Finally, CMS is wrong that the Title XXI grandfathering provisions apply only to "the package of benefits" a plan offers, and so are irrelevant to "eligibility issues" in the FAQs. Opp.25. Those statutory provisions give broad authority to qualifying States like Florida to retain and modify grandfathered plans that maintain minimum

11

coverage requirements. 42 U.S.C. § 1397cc(a)(3), (d). The statutory text doesn't limit that authority to "benefits." Nor are the FAQs concerned only with "eligibility issues," as they require States to extend *benefits* to non-paying participants. CMS also ignores that Florida has been providing continuous eligibility, contingent on payment of premiums, since long before Congress enacted CHIP, and continued to do so as a grandfathered plan before CMS allowed for that possibility by regulation in 2016. PI.Mot.6. The 2023 CAA did nothing to change 42 U.S.C. § 1397cc(a)(3), (d).

### B.  The FAQs are Arbitrary and Capricious

The FAQs are not "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). They are illogical, reverse the well-established distinction between CHIP eligibility and enrollment, and fail to consider reliance interests or grandfathering provisions. PI.Mot.17–19; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

CMS's response only further reveals the inconsistency of its position. CMS maintains that "nothing in the CAA casts doubt on the regulatory exceptions" to continuous eligibility that it chose to retain, Opp.25–26, but nothing in the 2023 CAA authorizes those exceptions, either. By using the term "eligibility" rather than "enrollment" and leaving untouched 42 U.S.C. § 1397bb(b)(5)—which provides that CHIP is not an entitlement program—the 2023 CAA actually provides more support for allowing disenrollment for premium nonpayment than for keeping CMS's preferred exceptions. Despite CMS's claims otherwise, Opp.26, the FAQs abandon CMS's longstanding recognition of that distinction, PI.Mot.15 & n.9.

CMS also acted arbitrarily by ignoring grandfathering provisions and the reliance interests of States. PI.Mot.19. CMS claims those considerations were unnecessary because Congress imposed the ongoing provision of benefits, Opp.26–27, but Congress didn't do that, *see supra* Part II.A, and CMS cannot assert flexibility to retain its preferred regulatory exceptions while inconsistently claiming to be handcuffed when it comes to other considerations or exceptions.

### C.  The FAQs Violate the APA's Procedural Requirements

The FAQs are a legislative rule subject to the APA's notice-and-comment requirements. *See* PI.Mot.20–21. CMS mischaracterizes the FAQs by claiming they "merely set out CMS's understanding of the CAA's effect on … Medicaid and CHIP." Opp.27–28. That is wrong. They expressly purport to "end" 42 C.F.R. § 457.342(b). Ex.4, at 1. CMS is bound by that regulation until amended or repealed, *United States v. Nixon*, 418 U.S. 683, 695–96 (1974), and such change must be through notice-and-comment rulemaking, as is required whenever an agency "adopt[s] a new position inconsistent with ... existing regulations," *Shalala*, 514 U.S. at 100.

Even if the FAQs were exempt from notice and comment, CMS was *still* required to amend 42 C.F.R. § 457.342(b) through publication in the Federal Register, 5 U.S.C. § 552(a)(1), which would be final agency action subject to judicial review. CMS cannot avoid this Court by violating the very procedures that would indisputably lead to its review. This failure is alone enough to require the FAQs be set aside.

### III.  Florida Will Suffer Irreparable Injury

Florida will suffer ongoing, irreparable injury absent injunctive relief.

PI.Mot.21–25. *First*, Florida faces recurring harm each month when it is forced to choose between following its own laws or CMS's unlawful FAQs. Although no irreparable harm results from the *valid* federal preemption of a state law, Opp.18–19, a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039–40 (M.D. Fla. 2021). Florida's sovereign injury is thus intertwined with the merits of its claim that the FAQs are unlawful.[5]

*Second*, Florida independently faces irreparable harm through unrecoverable costs. Florida officials estimate that complying with the FAQs will cost the State approximately $1 million per month. Ex.1, Noll.Decl. ¶ 10. Even if that precise *amount* were "speculative," Opp.12—and it is not—CMS never disputes that Florida faces impending financial costs that are unrecoverable and thus constitute irreparable harm. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Nor does the timing of this case indicate a lack of imminence. *See* Opp.17–18. The FAQs were issued on October 27, 2023, and purported to "end" an existing regulation on December 31, 2023. Ex.4, FAQs at 1. Even though CMS unexpectedly subverted CHIP premium requirements, Florida filed suit only a month later on February 1, 2024, and simultaneously requested emergency relief because the irreparable injury is ongoing and will repeat each month.

---

[5] CMS questions whether Florida law requires disenrollment. Opp.18. Florida Statute § 624.91(5)(b)(9) provides that "nonpayment of family premiums" is "voluntary cancellation" as a matter of law, which necessarily results in disenrollment. PI.Mot.22. CHIP cost-sharing is also crucial to ensuring Florida meets its constitution's balanced-budget requirement. PI.Mot.7.

Florida did not lightly make the decision to sue, and it used those few weeks to assess the legality of the FAQs, the consequences of compliance, and the necessity of legal action. There's not even a plausible assertion of inexplicable delay. CMS invokes a case about a delay of "a few months," Opp.17, but the plaintiff there waited months *after filing suit* before seeking preliminary relief.[6] That's certainly not true here.

## IV.   The Balance of Harms and Public Interest Favor Florida

The balance of harms and public interest weigh in favor of a preliminary injunction. PI.Mot.25. CMS has no legitimate interest in unlawful agency action, and that is the end of the matter. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).

Further, Florida isn't asking this Court to "'ignore the judgment of Congress, deliberately expressed in legislation,'" Opp.28–29, but to enjoin a rogue agency action that, itself, brazenly ignores the plain meaning of statutory terms and infringes on Florida's sovereignty. Florida and its residents are best served by preserving the integrity and long-term sustainability of a program that serves some of the most vulnerable members of the community.

## CONCLUSION

The Court should preliminarily enjoin CMS from enforcing the FAQs.

---

[6] *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247–49 (11th Cir. 2016) ("unexplained five-month delay" in moving for preliminary relief after filing complaint). The significant delay other courts have deemed material confirms that Florida's actions here were not dilatory. *Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912, at *1 (11th Cir. May 30, 2023) (six-month delay in moving for preliminary relief after filing complaint); *Powers v. Nielsen*, 806 F. App'x 958, 959–60 (11th Cir. 2020) (four-year delay in filing suit and one-year delay in moving for preliminary relief after filing complaint); *Berber v. Wells Fargo Bank, N.A.*, 760 F. App'x 684, 687 (11th Cir. 2019) (three-year delay in filing suit); *Powers v. Sec'y, Fla. Dep't. of Corr.*, 691 F. App'x 581, 583–84 (11th Cir. 2017) ("unexplained" three-year delay in filing suit); *see also Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 151, 158–59 (11th Cir. 2021) (four-to-five-month delay in filing counterclaims and moving for preliminary relief after being sued *did not* undermine irreparable harm).

Dated: March 5, 2024

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

/s/ Natalie Christmas
Natalie Christmas (FBN 1019180)*
COUNSELOR TO THE ATTORNEY
   GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Natalie.Christmas@myfloridalegal.com

*Lead Counsel*
*Counsel for State of Florida*

/s/ R. Trent McCotter
R. Trent McCotter (*pro hac vice*)*
Jared M. Kelson (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

Andrew T. Sheeran
GENERAL COUNSEL
Florida Bar No. 0030599
Agency for Health Care Administration
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
Andrew.Sheeran@ahca.myflorida.com

*Lead Counsel*
*Counsel for Agency for Health Care*
   *Administration*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action.

Dated: March 5, 2024

*/s/ R. Trent McCotter*
R. Trent McCotter

# Doc. 31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| STATE OF FLORIDA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CENTERS FOR MEDICARE &<br>MEDICAID SERVICES, et al.,<br><br>Defendants. | No. 8:24-cv-317-WFJ-AAS |

## ANSWER

Defendants Centers for Medicare & Medicaid Services ("CMS"), Chiquita Brooks-LaSure, in her official capacity as Administrator for the Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services, and Xavier Becerra, in his official capacity as Secretary of Health and Human Services, hereby answer Plaintiffs' complaint as follows:

## INTRODUCTION

1.     Defendants admit that on June 22, 2023, Governor DeSantis signed Florida H.B. 121. Defendants deny any characterization of H.B. 121, which speaks for itself, and respectfully refer the Court to the cited provision for a complete and accurate statement of its contents. The balance of this paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent that a response is deemed necessary, Defendants deny the allegations.

2.     Admitted.

3.      Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations in this paragraph.

4.      This paragraph contains argument and characterizations of Florida's Children's Health Insurance Program (CHIP) Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

5.      This paragraph contains argument, conclusions of law, and characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

6.      This paragraph contains conclusions of law and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

7.      This paragraph contains argument, conclusions of law, characterizations of Florida's CHIP Plan, and characterizations of regulatory

2

provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan and the cited regulatory provisions, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

8.     Defendants admit that on September 29, 2023, CMS issued a SHO Letter, and on October 27, 2023, CMS issued FAQs.  Defendants deny any characterization of the SHO Letter and FAQs, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

9.     This paragraph contains characterizations of the SHO Letter and FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter and FAQs, which speak for themselves, and respectfully refer the Court to the those materials for a complete and accurate statement of their contents.

10.    This paragraph contains characterizations of the SHO Letter, FAQs, and a statutory provision, argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter, FAQs, or cited statutory provision, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

11.     Defendants deny the first sentence of this paragraph. This balance of this paragraph contains argument, conclusions of law, and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

12.     Defendants deny the first sentence of this paragraph. The second sentence of this paragraph contains argument, conclusions of law, and characterizations of a statutory provision, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provision, which speaks for itself, and respectfully refer the Court to the provision for a complete and accurate statement of its contents. The third sentence of this paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required.

13.     Denied.

14.     This paragraph contains argument, conclusions of law, and characterizations of a statutory provision, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provision, which speaks for itself, and respectfully refer the Court to the provision for a complete and accurate statement of its contents.

15.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

16.     Denied.

## PARTIES

17.     Defendants admit that Plaintiff Florida is a sovereign state.  The balance of this paragraph contains argument, not allegations of fact, and thus response is required.

18.     Admitted.  The footnote accompanying this paragraph contains characterizations of Plaintiffs' complaint, not allegations of fact, and thus no response is required.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

## LEGAL STANDARD

23.     This paragraph contains argument, conclusions of law, and characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited statutory provisions and judicial decisions contain the quoted text, but deny any characterization of those materials, which speak for themselves, and respectfully

refer the Court to those materials for a complete and accurate statement of their contents.

24.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited decisions contain the quoted text, but deny any characterization of those decisions, which speak for themselves, and respectfully refer the Court to those decisions for a complete and accurate statement of their contents.

25.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited decisions contain the quoted text, but deny any characterization of those decisions, which speak for themselves, and respectfully refer the Court to those decisions for a complete and accurate statement of their contents.

26.    This paragraph contains argument, conclusions of law, and characterizations of statutory provisions and judicial decisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited statutory provisions and judicial decisions contain the quoted text, but deny any characterization of those materials, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

## JURISDICTION AND VENUE

27.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required.

28.     This paragraph contains argument, conclusions of law, and characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

29.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited decisions contain the quoted text, but deny any characterization of those decisions, which speak for themselves, and respectfully refer the Court to those decisions for a complete and accurate statement of their contents.

30.     The first sentence of this paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied. The second, third, fourth, and fifth sentences of this paragraph contain argument, conclusions of law, and characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs,

which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

31.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

**FACTUAL BACKGROUND**

32.     Defendants admit that in 1997, Congress established the CHIP program, a cooperative program between the federal government and the states. The balance of this paragraph contains characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

33.     This paragraph contains characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

34.     This paragraph contains characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited statutory and regulatory provisions contain the quoted text, but deny any characterization of those

provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

35. This paragraph contains argument, conclusions of law, and characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

36. This paragraph contains characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

37. This paragraph contains characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

38. This paragraph contains conclusions of law and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is

9

required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

39.    This paragraph contains characterizations of regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

40.    This paragraph contains argument, conclusions of law, and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

41.    This paragraph contains characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

42.     This paragraph contains conclusions of law and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

43.     This paragraph contains characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited statutory and regulatory provisions contain the quoted text, but deny any characterization of those provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

44.     This paragraph contains characterizations of regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants admit that the cited statutory and regulatory provisions contain the quoted text, but deny any characterization of those provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

45.     Defendants admit that in 1990, before Congress established CHIP, the Florida Legislature created the Florida Healthy Kids Corporation as a public-private partnership. The balance of this paragraph contains argument, not allegations of fact, and thus no response is required.

46.     With respect to the first sentence, Defendants admit that the program begin in Volusia County as a demonstration project under the Omnibus Budget Reconciliation Act of 1989. The balance of the first sentence contains characterizations of statutory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.  With respect to the second sentence, Defendants admit that by 1995, the federal funding had ended. The balance of the second sentence contains characterizations of Demonstration Report, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the Demonstration Report, which speaks for itself, and respectfully refer the Court to that report for a complete and accurate statement of its contents.

47.     This paragraph contains conclusions of law and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

48.     Admitted.

49.     The first two sentences of this paragraph, including footnote 2, contain characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents. Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in the third sentence of this paragraph. Footnote 3 contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

50.     This paragraph contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

51.     This paragraph contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

52.    This paragraph contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

53.    Defendants lack sufficient knowledge or information to form a believe as to the truth of the allegations in this paragraph.

54.    The first sentence of this paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's constitution, which speaks for itself, and respectfully refer the Court to Florida's constitution for a complete and accurate statement of its contents. The second sentence of this paragraph contains argument, not allegations of fact, and thus no response is required.

55.    This paragraph contains argument, conclusions of law, and characterizations of a statutory provision and a government report, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provision and government report, which speak for themselves, and respectfully refer the Court to the cited statutory provision and government report for a complete and accurate statement of their contents.

14

56.     This paragraph contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents.

57.     The first sentence contains argument and conclusions of law, not allegations of fact, and thus no response is required. The second and third sentences contain characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents. The fourth sentence contains characterizations of Florida's demonstration project, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's demonstration project, which speaks for itself, and respectfully refer the Court to Florida's demonstration report for a complete and accurate statement of its contents. The fifth sentence contains characterizations of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida state law, which speaks for itself, and respectfully refer the Court to the cited provision for a complete and accurate statement of its contents.

58.     The first sentence contains characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents. Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in the balance of this paragraph.

59.     Defendants admit that on June 22, 2023, Governor DeSantis signed Florida H.B. 121. Defendants deny any characterization of H.B. 121, which speaks for itself, and respectfully refer the Court to the cited provision for a complete and accurate statement of its contents. Defendants lack sufficient knowledge of information to form a belief as to the truth of the allegations in the balance of this paragraph.

60.     This paragraph contains characterizations of Florida's "New 5-year Section 1115 Demonstration Request Full Public Notice," not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited public notice, which speaks for itself, and respectfully refer the Court to the public notice for a complete and accurate statement of its contents.

61.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

62.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required.

63.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required.

64.     This paragraph and accompanying footnote contain argument and conclusions of law, not allegations of fact, and thus no response is required.

65.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny.

66.     This paragraph contains argument, conclusions of law, and characterizations of statutory and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory and regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

67.     Defendants admit that the cited bills addressing CHIP were introduced in Congress but not enacted, and that they contain the quoted text, but deny any characterization of those bills, which speak for themselves, and respectfully refer the Court to those bills for a complete and accurate statement of their contents.

68.     Defendants admit the first sentence of this paragraph. The second sentence is denied.

69.     The first sentence is denied except to admit that the SHO Letter contains the quoted text. The second sentence contains argument, conclusions of law, and characterizations of the SHO Letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter, which speaks for itself, and respectfully refer the Court to the SHO Letter for a complete and accurate statement of its contents.

70.     This paragraph contains characterizations of the SHO Letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter, which speaks for itself, and respectfully refer the Court to the SHO Letter for a complete and accurate statement of its contents.

71.     This paragraph contains characterizations of the SHO Letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter, SHO Letter, which speaks for itself, and respectfully refer the Court to the SHO Letter for a complete and accurate statement of its contents.

72.     This paragraph contains characterizations of the SHO Letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the SHO Letter, which speaks for itself, and respectfully refer the Court to the SHO Letter for a complete and accurate statement of its contents.

73.     Defendants admit the first sentence of this paragraph. The second sentence is denied.

74.     The first sentence of this paragraph contains characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents. The second sentence is denied.

75.     This paragraph contains characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

76.     This paragraph contains characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

77.     This paragraph and accompanying footnote contain characterizations of the FAQs, statutory provisions, and regulatory provisions, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs and cited statutory and

regulatory provisions, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

78.     This paragraph contains characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

79.     As to the first sentence, Defendants admit that, on October 10, 2023, CMS informed Florida that its anticipated request to expand its CHIP could not be approved through a state plan amendment, and that the state would instead need to apply for a waiver under section 1115 of the Social Security Act. As to the second sentence, Defendants admit that, on October 30, 2023, CMS informed Florida that it would need to submit a state plan amendment modifying Florida CHIP to align with the understanding of the CAA 2023 reflected in the SHO Letter and FAQs. Defendants deny any remaining allegations.

80.     Defendants admit that CMS informed Florida that it would not anticipate approving a waiver under section 1115 that allowed the disenrollment of children in the proposed expansion population for failure to pay premiums during the continuous eligibility period. Defendants deny any remaining allegations.

81.     Admitted.

82.     Defendants admit that on December 18, 2023, Secretary Becerra sent a letter to Governor DeSantis. The balance of this paragraph contains

characterizations of the letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the letter, which speaks for itself, and respectfully refer the Court to the letter for a complete and accurate statement of its contents.

83.     This paragraph contains characterizations of the December 18, 2023, letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the letter, which speaks for itself, and respectfully refer the Court to the letter for a complete and accurate statement of its contents.

84.     This paragraph contains characterizations of the December 18, 2023, letter, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the letter, which speaks for itself, and respectfully refer the Court to the letter for a complete and accurate statement of its contents.

85.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs and the relevant provisions of the CAA 2023, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

86.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is

deemed necessary, Defendants deny any characterization of the FAQs and the relevant provisions of the CAA 2023, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

87.    The first and second sentences contain argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.  The third sentence consists of speculation, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied. The fourth sentence contains argument, conclusions of law, and characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

88.    This paragraph characterizes a declaration concerning Florida's "anticipate[d]" compliance costs. Defendants deny any characterization of that declaration, which speaks for itself, and respectfully refer the Court to that declaration for a complete and accurate statement of its contents.

89.    This paragraph contains speculation and argument, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

90.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

91.     This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

92.     The first three sentences of this paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents. The fourth sentence contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited regulation and the FAQs, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

93.     The first two sentences are denied. The balance of this paragraph contains argument, conclusions of law, and characterizations of statutory provisions and Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions and Florida's CHIP Plan, which speak for

themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

94. Denied.

## CLAIMS FOR RELIEF

## COUNT ONE

95. Defendants restate and incorporate by reference the responses contained in all preceding paragraphs.

96. This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provision, which speaks for itself, and respectfully refer the Court to the provision for a complete and accurate statement of its contents.

97. Denied.

98. This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied except to admit that 42 C.F.R. § 457.342(b) has not been rescinded via notice-and-comment rulemaking.

99. Denied.

100. The first sentence contains argument, conclusions of law, and characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan, which speaks for itself, and respectfully

24

refer the Court to Florida's CHIP Plan for a complete and accurate statement of its contents. The second sentence is denied.

## COUNT TWO

101.    Defendants restate and incorporate by reference the responses contained in all preceding paragraphs.

102.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provision, which speaks for itself, and respectfully refer the Court to the provision for a complete and accurate statement of its contents.

103.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

104.    This paragraph contains argument, conclusions of law, and characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of Florida's CHIP Plan and cited statutory provisions, which speak for themselves, and respectfully refer the Court to Florida's CHIP Plan and those provisions for a complete and accurate statement of their contents.

105.    This paragraph contains argument, conclusions of law, and characterizations of Florida's CHIP Plan, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny

any characterization of Florida's CHIP Plan and the cited regulatory provisions, which speak for themselves, and respectfully refer the Court to Florida's CHIP Plan and those provisions for a complete and accurate statement of their contents.

106.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

107.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

108.   Denied.

109.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

110.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited regulatory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

111.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

112.   Denied.

113.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

114.   Denied.

## COUNT THREE

115.   Defendants restate and incorporate by reference the responses contained in all preceding paragraphs.

116.   This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions and judicial decisions, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

117.   This paragraph contains characterizations of the FAQs, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the FAQs, which speak for themselves, and respectfully refer the Court to the FAQs for a complete and accurate statement of their contents.

118.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

119.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

120.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited case, which speaks for itself, and respectfully refer the Court to that case for a complete and accurate statement of its contents.

121.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

122.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

123.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, denied.

## COUNT FOUR

124.    Defendants restate and incorporate by reference the responses contained in all preceding paragraphs.

125.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

126.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory provisions and case law, which speak for themselves, and respectfully refer the Court to those materials for a complete and accurate statement of their contents.

127.    Denied.

128.    Denied.

129.    Denied.

## COUNT FIVE

130.    Defendants restate and incorporate by reference the responses contained in all preceding paragraphs.

131.    This paragraph contains argument and conclusions of law, not allegations of fact, and thus no response is required. To the extent a response is deemed necessary, Defendants deny any characterization of the cited statutory

provision, which speaks for itself, and respectfully refer the Court to the provision for a complete and accurate statement of its contents.

132.   Denied.

## PRAYER FOR RELIEF

The remaining paragraphs of the complaint contain a prayer for relief, to which no response is required. To the extent a response is deemed necessary, Defendants deny the allegations contained in the prayer for relief, and further aver that Plaintiffs are not entitled to the requested relief or any other relief from Defendants.

Defendants deny any and all allegations in the complaint not expressly admitted herein to which a response is deemed required.

## DEFENSES

1.   This Court lacks subject matter jurisdiction over this action.

2.   Venue is not proper in this district.

3.   The complaint fails to state a claim upon which relief can be granted.

4.   Defendants' actions did not violate the Administrative Procedure Act, the Social Security Act, or any other statutory or regulatory provision.

## CONCLUSION

WHEREFORE, having fully answered, Defendants respectfully request that the Court enter judgment dismissing this action with prejudice and awarding Defendants costs and such other relief as the Court may deem appropriate.

DATED: May 14, 2024    Respectfully submitted,

           BRIAN M. BOYNTON
           Acting Assistant Attorney General

           ERIC B. BECKENHAUER
           Assistant Director

           */s/ Madeline McMahon*
           MADELINE M. MCMAHON (DC Bar No.
           1720813)
           Trial Attorney
           U.S. Department of Justice
           Civil Division, Federal Programs Branch
           1100 L Street NW
           Washington, D.C. 20005
           (202) 451-7722
           Madeline.m.mcmahon@usdoj.gov

           *Counsel for Defendants*

# Doc. 32

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA, et al.,

     Plaintiffs,

v.                                 Case No. 8:24-cv-317-WFJ-AAS

CENTERS FOR MEDICARE AND
MEDICAID SERVICES, et al.,

     Defendants.

_____/

## <u>ORDER</u>

Before the Court is Plaintiffs State of Florida and Florida Agency for Health Care Administration's (collectively, "Florida") Motion for Preliminary Injunction (Dkt. 2). Defendants Centers for Medicare and Medicaid Services, Department of Health and Human Services, Administrator for the Centers for Medicare and Medicaid Services, and Secretary of the Department of Health and Human Services (collectively, "CMS") have responded (Dkt. 22), and Florida has replied (Dkt. 23). On April 18, 2024, the Court held a hearing on this matter (Dkt. S-30). Upon careful consideration, and with the benefit of able argument by both sides, the Court denies Florida's Motion. The Court lacks subject-matter jurisdiction over this dispute due to the statutory review scheme contained in 42 U.S.C. § 1316. The instant case is dismissed without prejudice.

## BACKGROUND

### I.    Medicaid and CHIP

Medicaid and CHIP are joint federal-state programs that enable states to extend medical coverage to low-income individuals under Title XIX (Medicaid) and Title XXI (CHIP) of the Social Security Act. 42 U.S.C § 1396, *et. seq.*; *id.* § 1397aa, *et. seq.* To participate in either, each state must create a specific plan that fulfills the conditions specified in 42 U.S.C. § 1396a(a) or 42 U.S.C. §§ 1397aa–1397bb and submit the plan for approval. *Id.* § 1396a(b); *id.* §1397ff(a)–(c); 42 C.F.R. § 457.150(a)–(c). Upon approval, states administer their plans, and the federal government provides funding to help defray costs. A state dissatisfied with a determination concerning whether "a State plan . . . submitted . . . for approval" conforms to federal requirements can request reconsideration and a hearing, and can ultimately petition a U.S. Court of Appeals for review. 42 U.S.C. § 1316(a)(1)–(3), (b); *see id.* § 1397gg(e)(2)(B) (incorporating 42 U.S.C. § 1316).

Despite this overlap, Medicaid and CHIP are distinct programs. CHIP specifically aims to provide subsidized health insurance to children in low-income families who do not qualify for free health coverage under Medicaid. 42 U.S.C. §§ 1397aa–1397bb; *see also id.* § 1396o(a)(1), (2)(A). Per the statute, "[n]othing" in CHIP is to "be construed as providing an individual with an entitlement to child health assistance under a State [CHIP] plan." *Id.* § 1397bb(b)(5). States may

2

require "premiums, deductibles, coinsurance, and other cost sharing" as a condition of enrollment in CHIP. *Id.* § 1397cc(e)(1)(A); 42 C.F.R. § 457.510. States can also disenroll CHIP participants for nonpayment of premiums if the state provides sufficient notice and a grace period for late payments. *See* 42 U.S.C. § 1397cc(e)(3)(C); 42 C.F.R. §§ 457.342(b), 457.570.

## II.  Continuous Eligibility under Medicaid and CHIP

Prior to January 1, 2024, Title XIX gave states the option to provide children with twelve months of "continuous eligibility" for Medicaid. 42 U.S.C. § 1396a(e)(12) (2022). A child "determined to be eligible for benefits" would thereby remain "eligible" for twelve months even if the child's circumstances changed in a way that would otherwise render the child ineligible. *Id.* Under CMS regulation, states also had the option to provide continuous eligibility to CHIP participants under Title XXI. 42 C.F.R. § 457.342(a); *see* 81 Fed. Reg. 86382, 86464 (Nov. 30, 2016) (adding 42 C.F.R. § 457.342).

CMS regulations previously provided five exceptions to continuous eligibility for Medicaid: (1) "[t]he child attains the maximum age specified"; (2) "[t]he child or child's representative requests a voluntary termination of eligibility"; (3) "[t]he child ceases to be a resident of the State"; (4) the state "determines that eligibility was erroneously granted"; or (5) "[t]he child dies." 42 C.F.R. § 435.926(d). CMS regulation incorporated these exceptions for the CHIP

continuous eligibility option as well, while also providing that CHIP participants may "be terminated during the continuous eligibility period for failure to pay required premiums or enrollment fees." *Id.* § 457.342(b).

This optional system was changed by the Consolidated Appropriations Act of 2023 ("2023 CAA"), which itself amended the Social Security Act. It is now required that "an individual who is under the age of 19 and who is determined to be eligible for benefits under a State [Medicaid] plan . . . remain eligible for such benefits" for twelve-months following the eligibility determination unless the individual "attains the age of 19" or "ceases to be a resident of such State." Pub. L. No. 117-328, § 5112(a), 136 Stat. 4459, 5940 (2022) (amending 42 U.S.C. § 1396a(e)(12)). Congress made the same requirement applicable to CHIP by reference in 42 U.S.C. § 1397gg(e)(1). *See* Pub. L. No. 117-328, § 5112(b), 136 Stat. at 5940 (amending 42 U.S.C. § 1397gg(e)(1)(K)). Still, the 2023 CAA amendments did not discuss CHIP *enrollment* for CHIP *eligible* children.

### III.   Florida CHIP

In 1990, approximately seven years prior to the enactment of CHIP, Florida began a demonstration project under the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6407, 103 Stat. 2106, 2266 (1989). This program offered subsidized health insurance to children in low-income families, and Congress later grandfathered it into CHIP. 42 U.S.C. § 1397cc(a)(3), (d)(1). At this

time, Florida required premium payments for CHIP enrollment. Dkt. 2-2 at 85. It also allowed for a period of continuous eligibility, meaning that eligible participants could be disenrolled from Florida CHIP for non-payment of premiums while retaining their eligible status.

Florida CHIP still requires monthly premiums. *Id.* at 24–25, 178–79. Florida claims that it collects approximately $30 million in annual premium payments and that cost-sharing is vital to the sustainability and expansion of its CHIP program. Florida also maintains that CHIP cost-sharing enables it to meet the balanced budget requirement of the Florida Constitution. *Id.* at 8 (citing Fla. Const. art. III, § 19(a); *id.* art. VII, § 1(d)); *see* Dkt. 2-1 (Noll Declaration) at 3, ¶ 4; Staff of Florida H.R. Health Care Servs. Comm., *Review of the Implementation of the Florida KidCare Act* 7–8 (Sept. 1999), http://www.leg.state.fl.us/data/Publications/2000/House/reports/interim_reports/pdf/kidcare.pdf. Finally, Florida interprets its law as requiring the disenrollment of CHIP participants for failure to pay premiums even where a CHIP participant is in a period of continuous eligibility. *See* Fla. Stat. §§ 409.8132(8), 624.91(5)(b)(9).

## IV.   The State Health Official ("SHO") Letter and FAQs

In light of the 2023 CAA amendments, on September 29, 2023, CMS issued a SHO Letter partially concerning continuous eligibility requirements for Medicaid and CHIP participants. Dkt. 2-3 at 4–6. While the 2023 CAA amendments

explicitly provide for only two exceptions to continuous eligibility—attaining the age of 19 or ceasing to be a resident of the subject state—the SHO Letter instructed states that they were "expected to" continue terminating Medicaid and CHIP eligibility during continuous eligibility periods for all five reasons previously specified in regulation. *Id.* at 5–6; 42 C.F.R. §§ 435.926(d), 457.342(b). CMS was, however, "still assessing how non-payment of premiums intersects with [continuous eligibility] under the CAA." Dkt. 2-3 at 5 n.14.

CMS issued the FAQs one month later. Dkt. 2-4. The first question asked was whether "[S]tates [may still] terminate CHIP coverage during a continuous eligibility (CE) period due to non-payment of premiums?" *Id.* at 2. CMS answered "No." *Id.* The FAQs noted that "[t]here is not an exception to [continuous eligibility] for non-payment of premiums" under the 2023 CAA amendments; accordingly, the "existing regulatory option at 42 CFR § 457.342(b) for states operating a separate CHIP to consider non-payment of premiums as an exception to [continuous eligibility] [was to] end on December 31, 2023." *Id.*

V.    **The Instant Lawsuit**

On February 1, 2024, Florida sued CMS. Florida argues that FAQs violate the Administrative Procedure Act ("APA") because they are: (1) contrary to law; (2) in excess of CMS's authority in implementing the 2023 CAA amendments; and (3) arbitrary and capricious. Dkt. 1 at 28–37. Florida also argues that the FAQs—a

legislative rule that allegedly confuses *eligibility* and *enrollment*—can only be issued through notice-and-comment rulemaking. Florida now moves for a preliminary injunction preventing CMS from enforcing the FAQs. Dkt. 2.

CMS responds that: (1) Florida's claims are not ripe for adjudication; (2) the Social Security Act impliedly precludes district court jurisdiction; (3) the FAQs are mandated by the 2023 CAA amendments; (4) the FAQs are an interpretive rule exempt from APA rulemaking requirements; (5) Florida does not face irreparable harm; and (6) the equities do not favor injunctive relief. *See generally* Dkt. 22.

## LEGAL STANDARD

To obtain a preliminary injunction concerning the enforcement of the FAQs, Florida must show that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "The first two factors are 'the most critical.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Further, "the third and fourth factors [tend to] merge when, as here, the government is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020) (cleaned up) (citations omitted).

## DISCUSSION

### I.      Jurisdiction

CMS argues that 42 U.S.C. § 1316 impliedly precludes district court jurisdiction over the instant dispute. The Court agrees and will therefore not address the merits or CMS's ripeness arguments.

### i.      Implied Preclusion

District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Sometimes, however, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). In these situations, "[t]he agency fills in for the district court, with the court of appeals providing judicial review." *Id.* at 185.

The first implied preclusion issue to consider is whether Congress has created a "comprehensive review process . . . that oust[s] district court jurisdiction" over challenges to CMS action. *Id.* at 186 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208 (1994)). Contrary to Florida's suggestions, this is a preliminary question focused on whether there is a valid statutory review scheme that provides for some level of exclusive agency review. It is not a means of avoiding or diminishing the central considerations posed by implied preclusion caselaw. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 9–18 (2012) (addressing the existence and

validity of an exclusive statutory review scheme before going on to consider whether the particular claims brought were of the type Congress intended to be reviewed within that scheme under the *Thunder Basin* factors); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489–92 (2010) (same); *Thunder Basin*, 510 U.S. at 207–16 (same); *Axon Enter.*, 598 U.S. at 185–96 (same).

A valid and comprehensive review process undoubtedly exists here. 42 U.S.C. § 1316(a)(1), made applicable to CHIP through 42 U.S.C. §1397gg(e)(2), provides for administrate review of state CHIP plans. "Any State dissatisfied with a determination [by CMS]" may "file a petition with [CMS] for reconsideration of the issue of whether such plan conforms to the requirements for approval under [CHIP]." 42 U.S.C. § 1316(a)(2). And, "[a]ny State which is dissatisfied with a final determination made by [CMS] on such a reconsideration or final determination" may petition for review in the appropriate circuit court. *Id.* § 1316(a)(3). Florida does not contest the constitutionality of this statutory scheme or the fact that it provides for some level of exclusive agency review of CMS action. Nor could it—the Supreme Court has routinely held similar statutory schemes valid. The Court sees no reason to treat 42 U.S.C. § 1316 differently.

The next issue, and the heart of the implied preclusion inquiry, is "whether the particular claims brought [are] 'of the type congress intended to be reviewed'" under 42 U.S.C. § 1316. *Axon Enter.*, 598 U.S. at 186 (quoting *Thunder Basin*, 510

U.S. at 208). The Supreme Court has identified three factors to consider in making this determination: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside of the agency's expertise[.]" *Axon Enter.*, 598 U.S. at 186. "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim[s] in question." *Id.*

Precluding district court jurisdiction would not rule out all meaningful judicial review of Florida's claims. Like the statutes in *Thunder Basin* and *Elgin*, 42 U.S.C. § 1316 "does not foreclose all judicial review . . . but merely directs that judicial review shall occur [at the appellate court level]." *Elgin*, 567 U.S. at 10. There is no indication that the Eleventh Circuit is incapable of meaningfully reviewing Florida's APA claims. At least one other federal circuit, moreover, has already reviewed APA claims under 42 U.S.C. § 1316 which came on appeal from a final CMS determination. *See W. Virginia v. Thompson*, 475 F.3d 204, 209–14 (4th Cir. 2007) (reviewing appeal of final CMS determination that was, among other things, allegedly violative of 5 U.S.C. § 706(2)(A)). The Court finds such review to be adequate, just as other courts have in the past. *See New York v. U.S. Dept. of Health & Human Services*, 07 CIV.8621 (PAC), 2008 WL 5211000, at *16 (S.D.N.Y. Dec. 15, 2008) (finding that 42 U.S.C. § 1316 did not foreclose

meaningful judicial review of the plaintiffs' APA claims); *see also Axon Enter.*, 598 U.S. at 190 (noting that "*Thunder Basin* and *Elgin* both make clear that adequate judicial review does not usually demand a district court's involvement").

Florida's cannot avoid this conclusion by reference to the injury it might suffer from "betting the farm" on a decision to ignore the FAQs. In *Axon*, the Supreme Court took care to emphasize the importance of limiting exceptions to statutory review schemes which are based on the "the interaction between the alleged injury and the timing of review." 598 U.S. at 191. The majority elaborated on this limit by juxtaposing two categories of injuries. On one hand, there are injuries like those alleged by the *Axon* plaintiffs. These "here-and-now" injuries include subjection to illegitimate proceedings led by an illegitimate decisionmaker and can be synonymized with a violation of established immunity rights. *Id.* at 192. They would exist even if the claimants "won before the agency" because they have nothing to do with a particular agency action. And they cannot be redressed on appeal or any time after the agency proceedings have begun. *Id.* at 191–92. On the other hand, there are the types of injuries that "could have" been argued by the *Thunder Basin* and *Elgin* plaintiffs. *Id.* at 192. These include "greater litigation costs" and the "expense and disruption of protracted adjudicatory proceedings." *Id.* (citations and internal quotations omitted). Unlike the former category of injuries which stem from structural constitutional challenges, this latter category does "not

11

justify immediate review." *Id.* Such injuries are dependent on the outcome of agency proceedings or "other decisions made within it," and do not interact with the timing of agency review so as to preclude later, meaningful judicial review. *Id.*

Florida's asserted potential "bet the farm" injury does not belong in the category of injuries that justify immediate district court intervention. It is important to recognize that "betting the farm" in this context equates to betting some amount of access to arguably unrecoverable federal funding for Florida's CHIP program. Such a loss is wholly dependent on the outcome of a lengthy administrative review process that culminates in review by the Eleventh Circuit. Florida's claims, furthermore, do not invoke the type of structural constructional concerns that might result in here-and-now injuries sufficient to synonymize Florida with the *Axon* plaintiffs. They instead focus on potential CMS action—something that Congress provided an alternative review scheme for by way of 42 U.S.C. § 1316.

*Free Enterprise Fund* does not change the Court's analysis. There, among other things, the plaintiffs argued that the Serbanes-Oxley Act (the basis of the defendant agency's authority) "contravened the separation of powers by conferring wide-ranging executive power on Board members without subjecting them to Presidential control." *Free Enter. Fund*, 561 U.S. at 487. This is precisely the type of constitutional claim that the *Axon* majority differentiated from the types of claims brought by Florida. These claims result in potential here-and-now injuries

independent of any outcome because they challenge structural legitimacy and imply a right not to be subjected to actions and proceedings at all. It follows that Florida is comparing apples and oranges. Its potential "bet the farm" injuries are financial in nature and founded on claims that do not focus on inherent constitutional deficiencies.

Florida also cites *Free Enterprise Fund* out of context. While courts "normally do not require plaintiffs to bet the farm . . . by taking violative action before testing the validity of the law," *id.* at 490 (citations and internal quotations omitted), this Order would merely require Florida to do what all states must do in order to receive or retain federal CHIP funding—submit their CHIP plan to CMS and allow CMS to review it before seeking judicial review. In *Free Enterprise Fund*, by contrast, the Supreme Court found unreasonable the idea that the plaintiffs should go out of their way to incur an unrelated sanction simply to supplement "an uncomplimentary inspection report" that was itself not reviewable. *Id.* Requiring individuals to purposefully break rules and subject themselves to costly fines cannot be fairly compared with requiring a state to follow established statutory and regulatory procedures. Florida can seek and obtain meaningful judicial review of its APA claims under 42 U.S.C. § 1316.

The next sub-issue is whether Florida's claims are wholly collateral to the statute's review provisions. They are not. Florida's only argument to the contrary

is that CMS has made no "determination;" and thus, there is nothing to review under 42 U.S.C. § 1316. The problem with this argument is obvious. Florida "cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion." *Doe v. F.A.A.*, 432 F.3d 1259, 1263 (11th Cir. 2005). This is, however, precisely what Florida seeks to do by having the Court enter an injunction to bar CMS from enforcing the FAQs' interpretation of the 2023 CAA amendments against it.

If there is any doubt as to this point, one need only take a closer look at *Doe*. There, the Eleventh Circuit explained the pertinent facts as follows:

> After an investigation revealed (and a subsequent criminal trial confirmed beyond a reasonable doubt) that the school from which the Plaintiffs received their airmen certificates fraudulently examined and certified some applicants for those certificates, the FAA concluded that the existence of aircraft mechanics unqualified to hold certificates and perform aircraft maintenance posed a serious threat to air safety. The FAA was unable to determine which of the mechanics who received their certificates from the implicated school had been fraudulently certified. Therefore, the FAA wrote letters to the Plaintiffs (and approximately 2,000 other mechanics who had been certified at the school during the relevant time period) stating that reexamination of their airmen competency was necessary under 49 U.S.C. § 44709. The FAA took no action to suspend or revoke the mechanics' certificates. Rather than submitting to reexamination or refusing reexamination, thereby risking an FAA order suspending or revoking their certificates, the Plaintiffs filed this action in federal district court and sought a preliminary injunction instructing the FAA how to proceed in its process of reexamination.

14

*Id.* at 1260. The facts in this case are remarkably similar. CMS released the FAQs and requested amended CHIP plans from states that treated nonpayment of premiums as an exception to continuous eligibility. Dkt. 2-4 at 2. Rather than submitting an amended plan or risking an adverse determination, Florida filed this action in federal court seeking a preliminary injunction. This Florida cannot do. Further, no reasonable statutory interpretation could result in a finding that CHIP plan compliance is wholly collateral to the review provisions of 42 U.S.C. § 1316.[1]

Florida's claims are also not outside CMS's expertise. It is undisputed that any analysis of Florida's APA claims will largely turn on properly interpreting the Medicaid and CHIP statutes. Interpretation of these statutes falls squarely within CMS's realm of expertise, especially considering Medicaid and CHIP's recognized complexities. *See Thompson*, 475 F.3d at 212 (explaining that "[t]he Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration, which makes deference particularly warranted") (citation omitted). Indeed, Florida does not claim "that tenure protections violate Article II," *Axon Enter.*, 598 U.S. at 194, or "object[] to "[CMS's] existence," *Free Enter. Fund*, 561 U.S. at 490. The Court has little doubt

---

[1] The Court also notes that the Supreme Court has found some APA challenges to be "inextricably intertwined" with challenges to specific agency determinations. *Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (finding the plaintiff's APA challenge to be inextricably intertwined with her claim concerning the invalidity of an agency determination about whether a certain surgery is reimbursable under Medicare). This is all the more reason to find that Florida's claims are not "wholly collateral," if collateral at all, to the review provisions in 42 U.S.C. § 1316.

that "exclusive review before [CMS] is appropriate" and that "agency expertise could be brought to bear on" Florida's claims. *Thunder Basin*, 510 U.S. at 215 (internal quotations and citations omitted) (cleaned up).

In sum, Congress's intent to allocate initial review of Florida's claims to CMS is "fairly discernable in [42 U.S.C. § 1316]." *Id.* at 207. The Court consequently lacks subject-matter jurisdiction over Florida's claims and dismisses this case without prejudice. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("A dismissal for lack of subject-matter jurisdiction . . . is entered without prejudice.") (cleaned up).

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

(1) Florida's Motion for Preliminary Injunction (Dkt. 2) is **DENIED**.

(2) This case is **DISMISSED WITHOUT PREJUDICE**.

**DONE AND ORDERED** at Tampa, Florida, on May 31, 2024.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO**</u>:
Counsel of Record

# COS

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2024, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.


Dated: September 23, 2024                    /s/ Jared M. Kelson
                                             Jared M. Kelson

                                             *Counsel for Florida Agency for Health Care Administration*